UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ROBERT DORAN, MARIA BAEZ,                    **Docket No.:**
ALEXANDER SHAPOROV, and
BERNARD LINN,

                         Plaintiffs,

-against-


THE STATE OF NEW YORK, JAMES C. COX,
DAN COYNE, ANNA COSCHIGNANO,
SHERRI TOMPKINS,  ROBERT BYRNES,          **COMPLAINT**
RUSSELL S. RIZZO, MATHEW CHIESA,
CHRISTOPHER BEDELL and JOHN and
JANE DOES 1-5 (said names being fictitious,   **JURY TRIAL REQUESTED**
the persons intended being those who aided and
abetted the unlawful conduct of the named
Defendants),

                         Defendants.

--------------------------------------------------------X


       Plaintiffs, by their attorneys, **MADUEGBUNA COOPER LLP**, complaining

of the defendants, allege, upon information and belief, as follows:

# I. NATURE OF THIS ACTION

       1.    Plaintiffs bring this action to secure protection of and to redress

deprivation of rights, privileges and immunities secured by the Title VII of the

Civil Rights Act of 1964 as amended 42 U.S.C. § 2000 et seq. ("Title VII"), Civil

Rights Act of 1871, 42 U.S.C. § 1983, 42 U.S.C. § 1981, as amended by the Civil

Rights Act of 1991, 42 U.S.C. § 1981(a) ("Section 1981"); the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); the New York Human Rights Law as contained in New York State Executive Law, § 296 *et seq.* ("Executive Law") and New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107 *et seq.* ("City Law"), providing for injunctive relief and other relief against discrimination on the basis of race, color, sex, ethnicity, ancestry, national origin, and age.

## II. JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 2617(a)(2).

3.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all State and City law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

4.     Venue is proper in the United States District Court for the Southern District of New York because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

### III. <u>PROCEDURAL REQUIREMENTS</u>

5.     Prior to the commencement of this action, where applicable, any Plaintiff pursuing claims under the ADEA and Title VII have satisfied all conditions precedent, including filing Charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") pursuant to the provisions of the ADEA, and receipt of a Right to Sue Notice.

6.     This lawsuit was commenced within 90 days of receipt of the Right to Sue Notice.

7.     Plaintiffs will serve a copy of the complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New York in accordance with New York City Administrative Code Section 8-502 (c).

### IV. <u>PARTIES</u>

#### A. <u>Plaintiffs' General Duties and Work</u>

8.     Plaintiffs are a group of white-Caucasians of non-Italian ancestry, Hispanic, and non-U.S. born individuals, most of whom are over the age of forty (40) years, currently employed by Defendant State of New York ("State") in the Office of the Medicaid Inspector General ("OMIG").

9.     Plaintiffs are four current employees of the State and OMIG serving in various capacities within OMIG, including Medicaid Investigators and Management Specialists.

10.     Plaintiffs are stationed in OMIG's New York City Office located at 217 Broadway, New York, New York ("New York City Office").

11.     Plaintiffs perform and supervise Medicaid fraud investigations, as well as manage Medicaid and Medicaid fraud cases.

12.     The OMIG Division of Medicaid Investigations ensures the integrity of the Medicaid program by conducting investigations, recovering overpayments and implementing administrative sanctions against providers.

13.     Medicaid Investigators use their expertise in data analysis, interviewing, billing and medical chart review, financial audits, and undercover surveillance to investigate providers for fraud.

14.     Medicaid Investigators use various methods to identify cases of Medicaid fraud and abuse and to analyze, review, and refer such cases for administrative and legal action.

15.     There are several levels of Medicaid Investigators within the structure of OMIG, ranging from Medicaid Investigator Level 1 to Level 5.

16.     The levels of Medical Investigator are distinguished by the scope and methods of investigation, supervisory responsibility, and authority for pursuing and referring cases for administrative and legal action.

17.     Medicaid Investigators, Level 1 ("MI-1") conduct routine and standard undercover investigations where the elements of the case are straightforward and/or the law and facts are not in dispute.

18.     Incumbents of the MI-1 position and title also analyze and review cases of potential Medicaid fraud, waste, and/or abuse, and/or serve on teams investigating Medicaid providers, and as directed testify in legal proceedings relating to assigned investigations.

19.     Medicaid Investigators, Level 2 ("MI-2") perform the same functions and duties as MI-1s for investigations that are more difficult or where the Medicaid law requires interpretation, or where the facts of the investigation under review are not firmly established.

20.     Additionally, MI-2s function as team leaders for MI-1s and assist Senior Investigators with on the job training of subordinate staff, general case management, and other administrative duties.

21.     Medicaid Investigators, Level 3 ("MI-3") is a supervisory level position and performs the same functions and duties as MI-1s and MI-2s but have additional supervisory and administrative duties over MI-2s and MI-1s.

22.     MI-3s supervise a team or teams of investigative staff usually headed by an MI-2; coordinate investigator workload for an assigned unit; evaluate

investigative data, and compile and review data for investigative report recommendations.

23.     Medicaid Investigators, Level 4 ("MI-4") is a managerial level position.

24.     MI-4s provide administrative oversight of a unit or group consisting of multiple teams of investigators.

25.     Additionally, MI-4s perform the same duties as MI-3s with additional supervisory and administrative duties over MI-1s, MI-2s, MI-3s, and supervise multiple investigative squads, headed by MI-3s, and provide overall program guidance to investigative program staff.

26.     Medicaid Investigators, Level 5 ("MI-5") is a director level position.

27.     Incumbents of the MI-5 position or title oversee and coordinate the overall Medicaid anti-fraud investigations function.

28.     Additionally, MI-5s recommend policy changes to ensure the Medicaid program is complaint with existing state and federal law and is operating efficiently.

29.     Management Specialists ("MS") within the structure of OMIG are in several levels, including levels 1 and 2.

30.     Management Specialists, Level 1 ("MS-1") and Management Specialists, Level 2 ("MS-2") work with the Enrollment and Reinstatement

("EAR") Unit reviewing Medicaid participant applications from pharmacies, durable medical equipment companies, laboratories, transportation companies, portable X-ray providers, physical therapists, dentists, dental groups, and home care providers.

31.    MS-1s and MS-2s review Medicaid reinstatement applications to ensure that excluded providers are not reinstated if they continue to present a danger to the Medicaid population or its fiscal integrity. This involves managing a large caseload to ensure cases are decided in a consistent and fair manner that protects Medicaid, its recipients, and due process for the provider community.

32.    Plaintiffs' work is generally overseen by supervisors who are mostly white-Caucasian, and, in some cases, less experienced and younger than the Plaintiffs they supervise.

## B. Individual Plaintiffs

33.    Plaintiff ROBERT G. DORAN ("DORAN") is a white-Caucasian male of non-Italian ancestry, aged 59 years, and a resident of Rockville Centre, New York.

34.    DORAN holds an undergraduate degree in Accounting and Management from Adelphi University and is a graduate of the Criminal Investigator School and IRS Special Agent School from the Federal Law Enforcement Training Center in Glynco, Georgia.

35.    DORAN has over thirty (30) years of experience working for Federal and State agencies, including the New York State OMIG, the Internal Revenue Service of the United States Department of Treasury ("IRS"), and the New York State Department of Labor.

36.    Prior to OMIG, DORAN was a Senior Special Agent with the IRS' Criminal Investigation Division.

37.    DORAN achieved a long and distinguished career at the IRS, earning good and outstanding performance reviews, several promotions as well as increased responsibilities at each level.

38.    At the IRS, DORAN gained more than twenty (20) years' experience in fraud investigation, rising to the positions of Acting Supervisory Special Agent, Lead Special Agent, and On-the-Job Instructor.

39.    Since February 5, 2009, DORAN has been continuously employed by the State and OMIG in various capacities, including as an MI-1 and MI-2 in the Fraud Investigations Unit.

40.    DORAN currently holds the civil service title of MI-2 at OMIG, which he has held for over six (6) years.

41.    At all times relevant to this lawsuit, DORAN performed the duties of a Medicaid Investigator, with responsibility for investigating incidences and allegations of Medicaid fraud within the parameters of OMIG guidelines, and was

instrumental in OMIG's successful execution of the well-publicized Oceana Project and Roslyn Heights Project.

42.    Plaintiff MARIA BAEZ ("BAEZ") is a Hispanic woman aged 42 years, and a resident of East Stroudsberg, Pennsylvania.

43.    BAEZ was born in Puerto Rico and immigrated to the United States when she was two (2) years old.

44.    BAEZ is of Hispanic ancestry, with marked Hispanic ethnic and linguistic characteristics, behavior and mannerism.

45.    BAEZ holds an undergraduate degree in Criminal Justice from Mercy College in New York.

46.    For over for over sixteen (16) years, BAEZ has been a public servant working for State and public agencies, such as the Bureau of Fraud Investigation ("BFI") of the City of New York's Human Resources Administration ("HRA").

47.    Prior to OMIG, BAEZ worked as a Welfare Fraud Investigator-2 with BFI, gaining more than ten (10) years of experience with fraud investigation, and rising to the position of Associate Fraud Investigator before leaving BFI.

48.    Since August 18, 2008, BAEZ has been continuously employed by OMIG as an MI-2 in the Fraud Investigations Unit.

49.    BAEZ currently holds the civil service title of MI-2 at OMIG, a title in which she has remained for nearly seven (7) years since 2008.

50.     At all times relevant to this lawsuit, BAEZ performed the duties of a Medicaid Investigator, with responsibility for investigating allegations of Medicaid fraud.

51.     Plaintiff ALEXANDER SHAPOROV ("SHAPOROV") is a white-Caucasian male of non-Italian ancestry, and a resident of the City of New York, Borough of Brooklyn.

52.     SHAPOROV was born in Russia and immigrated to United States when he was thirteen (13) years old.

53.     SHAPOROV is of Russian national origin and Russian ancestry, with marked Russian ethnic and linguistic characteristics, behavior and mannerism.

54.     SHAPOROV holds an undergraduate degree in Criminal Justice from John Jay University and a Certificate in Pharmaceutical and Medical Device Law Compliance from Seton Hall University. He is certified as a Fraud Examiner by the Association of Certified Fraud Examiners.

55.     Since February 5, 2009, SHAPOROV has been continuously employed by OMIG in various capacities, including MI-1 and MI-2 in the Division of Medicaid Investigations Fraud Investigations Unit.

56.     SHAPOROV currently holds the civil service title of MI-2 at OMIG, a title in which he has remained for nearly one and half (1.5) years since 2014.

57.     At all times relevant to this lawsuit, SHAPOROV performed the duties of a Medicaid Investigator, with responsibility for investigating Medicaid fraud under OMIG guidelines.

58.     Plaintiff BERNARD LINN ("LINN") is a sixty-three (63) year old white-Caucasian man of Jewish heritage and ancestry, and a resident of Cedarhurst, New York.

59.     LINN holds an undergraduate degree in Political Science from Long Island University and a Masters' degree in Accounting from Long Island University.

60.     LINN has over thirty-five (35) years of experience as a public servant working for OMIG.

61.     Since March 30, 1978, LINN has been continuously employed by OMIG as an MS-1 and then as an MS-2 in the Fraud Investigations Unit.

62.     LINN currently holds the civil service title of MS-2, which he has held since 2006.

63.     At all times relevant to this lawsuit, LINN performed the duties of a MS-2, with responsibilities that include conducting and supervising investigations of Medicaid fraud and managing a caseload to ensure cases are decided in a consistent and fair manner that protects Medicaid, its recipients, and due process for the provider community.

C. **Defendants**

64.     Defendant STATE is the State of New York.

65.     OMIG is an agency of Defendant STATE.

66.     OMIG is an independent entity created within the New York State Department of Health ("DOH") to improve and preserve the integrity of the Medicaid program by conducting and coordinating fraud, waste, and abuse control activities for all State agencies responsible for services that Medicaid funds.

67.     Defendant ANNA COSCHIGNANO ("COSCHIGNANO") is a white-Caucasian female, of Italian ancestry.

68.     Defendant COSCHIGNANO was, at all times relevant, the former Deputy Medicaid Inspector General ("DMIG") of OMIG.

69.     Defendant COSCHIGNANO is sued in her personal and official capacities.

70.     Upon information and belief, at all relevant times, COSCHIGNANO was responsible for developing, implementing, and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

71.     In April 2012, COSCHIGNANO began working at OMIG.

72.     In November 2014, COSCHIGNANO resigned from OMIG.

73.    Defendant ROBERT BYRNES ("BYRNES") is a white-Caucasian male.

74.    Defendant BYRNES was, at all times relevant, a MI-4 and then a MI-5 with OMIG, and served as the Assistant Medicaid Investigator in Charge for the New York Office.

75.    Defendant BYRNES is sued in his official and individual capacities.

76.    Upon information and belief, at all relevant times, BYRNES is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

77.    Defendant DANIEL COYNE ("COYNE") is a white-Caucasian male.

78.    Defendant COYNE was, at all times relevant, the Assistant Medicaid Inspector General for investigations, and the Acting DMIG stationed in the New York City Office.

79.    Defendant COYNE is sued in his official and individual capacities.

80.    In November 2014, Defendant COYNE became the Acting DMIG at OMIG following the resignation of Defendant COSCHIGNANO.

81.    Upon information and belief, at all relevant times, COYNE is responsible for developing, implementing, and enforcing personnel policies and

procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

82.     Defendant JAMES COX ("COX") is a white-Caucasian male.

83.     Defendant COX was, at all times relevant, the former Acting Medicaid Inspector General of OMIG.

84.     Governor Andrew Cuomo appointed COX as director in 2011.

85.     Defendant COX is sued in his official and individual capacities.

86.     In November 2014, Defendant COX resigned as Acting Medicaid Inspector General of OMIG.

87.     Upon information and belief, at all relevant times, COX is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

88.     Defendant SHERRI TOMPKINS ("TOMPKINS") is a white-Caucasian female.

89.     Defendant TOMKINS is and was, at all times relevant, the Associate Personnel Administrator of OMIG.

90.     Defendant TOMPKINS is sued in her official and individual capacities.

91.    Upon information and belief, at all relevant times, TOMPKINS is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

92.    Defendant MATHEW CHIESA ("CHIESA") is a white-Caucasian male.

93.    Defendant CHIESA is and was, at all times relevant, the Associate Personnel Administrator of OMIG.

94.    Defendant CHIESA is sued in his official and individual capacities.

95.    Upon information and belief, at all relevant times, CHIESA is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

96.    Defendant RUSSELL S. RIZZO ("RIZZO") is a white-Caucasian male of Italian ancestry.

97.    Defendant RIZOO is and was, at all times relevant, an MI-4 at the New York City Office of OIMG.

98.    In April 2014, RIZZO began working at OMIG, having been hired from outside of OMIG by Defendant COSCHIGNANO.

99.     Beginning April 2014, RIZZO was involved in the overall and direct supervision of Plaintiffs.

100.    Defendant RIZZO is sued in his official and individual capacities.

101.    Upon information and belief, at all relevant times, RIZZO is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

102.    Defendant CHRISTOPHER BEDELL ("BEDELL") is a white male.

103.    Defendant BEDELL, while under forty years of age, was, at all times relvant, an MI-2 and then promoted to the position of MI-3 in or around June 2013.

104.    On or around June 2013, BEDELL was promoted to the position of MI-3.

105.    BEDELL is sued in his official and individual capacities.

106.    Upon information and belief, at all relevant times, BEDELL is responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs.

## V. FACTS COMMON TO ALL CLAIMS

### A. Overview: Defendants' Discriminatory Employment Practices

107. Between April 2012 and December 2014, OMIG, through COSCHIGNANO, instituted policies and practices designed to hire and promote unlawfully favored employees, mostly younger and white-Caucasian employees and individuals, and specifically those with Italian ancestry.

108. COSCHIGNANO initiated many of these unlawful hiring practices in order to hire and promote her preferred employees: unqualified younger men of Italian descent and ancestry with limited relevant work experience.

109. Pursuant to OMIG's preferential policies and practices, these unlawfully favored employees were provided special treatment and diverse opportunities to advance rapidly into senior positions or were simply appointed to senior positions through irregular selection or interview processes that departed from normal hiring procedures.

110. Frequently, these unlawfully favored employees received senior positions and promotions within OMIG without any interview or job posting at all.

111. As detailed below, COSCHIGNANO used many different tactics to ensure that her preferred candidates received promotions and positions, at times flagrantly lowering qualification requirements and using different interview scoring methods.

112.   Since 2012 and continuing, many of these unlawfully favored employees have been rapidly promoted or appointed to senior positions with supervisory responsibilities and higher salaries such as Principal Medical Facilities Auditor, MI-2, MI-3, and MI-4.

113.   Conversely, Plaintiffs have been consistently passed-over for promotions, and have simply not been considered for any new career growth opportunities, in favor of younger, less experienced, and overwhelmingly white-Caucasian and U.S. born employees, some of whom are of Italian ancestry.

114.   Defendants frequently create new job titles and positions with specific, preferred candidates in mind who were typically white-Caucasian of Italian ancestry and younger than Plaintiffs.

115.   Defendants often interview and/or select their preferred candidates even before a Vacancy Notice for an open position was posted, or before agency-wide interviews schedules were announced.

116.   Defendants would "stonewall" applications from Plaintiffs and similar minority, older, non-U.S. born, or non-Italian individuals by refusing to respond to their applications for open positions or announce whether a decision had been reached or a candidate selected for such open positions. As a result, Plaintiffs and others similarly situated are discouraged from applying for or seeking promotional opportunities.

117.   Plaintiffs and their union, the Public Employees Federation ("PEF"), have repeatedly protested the foregoing discriminatory practices and policies to the OMIG Human Resources Department and to OMIG's senior management staff, including the individual defendants, to no avail.

118.   Despite these complaints, OMIG has given and continues to give promotions and salary increases almost exclusively to younger and predominantly white-Caucasian, U.S. born staff, including those with Italian ancestry.

119.   For several years, prior to and following the institution of these discriminatory hiring policies, the Plaintiffs and other well-qualified staff have performed the same work as the unlawfully favored employees, with limited or no career advancement.

120.   Furthermore, some of the Plaintiffs not only perform the same work as the unlawfully favored employees, they are frequently paid less and given more work, including the job duties of positions to which Plaintiffs' had been denied promotion and attendant pay increases.

**B. Challenged OMIG Promotional Positions**

(i.) Challenged Position: 2012 MI-3 Position

121.   On or about September 11, 2012, EUNICE GREEN ("GREEN"), an African-American female over forty years of age, was promoted to MI-3 (the "2012 MI-3 Position").

- 19 -

122.   GREEN was promoted to the 2012 MI-3 Position without the posting of a Vacancy Notice or conducting any interviews for the position.

123.   Although they were more qualified, Plaintiffs DORAN, BAEZ, and LINN were passed over in favor of GREEN for the 2012 MI-3 Position.

124.   The promotion of GREEN to the 2012 MI-3 Position was made and announced by Defendant COSCHIGNANO, via email with the active participation of all other defendants except Defendant RIZZO, who at that time had not been hired at OMIG.

125.   The promotion of GREEN to the 2012 MI-3 Position and denial of the promotion to Plaintiffs DORAN, BAEZ, and LINN was based on considerations of race and ancestry.

(ii.) Challenged Position: 2012 MI-2 Position

126.   On or about September 11, 2012, CHRISTOPHER BEDELL ("BEDELL"), a white male under forty years of age, was promoted to MI-2 (the "2012 MI-2 Position").

127.   BEDELL was promoted to the 2012 MI-2 Position without the posting of a Vacancy Notice or conducting any interviews for the position.

128.   The promotion of BEDELL to the 2012 MI-2 Position was made and announced by Defendant COSCHIGNANO, via email.

129.   BEDELL was promoted to the 2012 MI-2 Position despite lacking the required qualifications for the position and despite the existence of OMIG employees with superior qualifications, such as Plaintiff SHAPOROV, GLENDON GRIFFITH, a black male OMIG employee from the Republic of Trinidad and Tobago, and NIGIL JOHNSON ("JOHNSON"), a black female of non-United States national origin.

130.   The promotion of BEDELL to the 2012 MI-2 Position and denial of the promotion to better qualified OMIG employees, such as SHAPOROV, GRIFFITH, and JOHNSON, was based on considerations of race, ancestry, national origin, and as it relates to GRIFFITH, and JOHNSON, also as to age.

(iii.) Challenged Position: February 2013 MI-3 Position

131.   On or about January 9, 2013, ANTHONY CANADÉ ("CANADÉ"), a white male of Italian ancestry not previously employed at OMIG was appointed an MI-3 at OMIG (the "February 2013 MI-3 Position").

132.   The hiring of CANADÉ to the February 2013 MI-3 Position was announced by Defendant, former DMIG COSCHIGNANO on February 13, 2013 via e-mail.

133.   The selection of CANADÉ to the February 2013 MI-3 Position was made without the posting of a Vacancy Notice or the conduct of any interviews for the position.

134.   CANADÉ was selected for the February 2013 MI-3 Position, despite lacking the required qualifications for the position.

135.   CANADÉ was less qualified than OMIG employees such as Plaintiffs DORAN, BAEZ, SHAPOROV, and LINN, for the February 2013 MI-3 Position.

136.   The selection of CANADÉ for the February 2013 MI-3 Position was made by Defendant COSCHIGNANO, with the active participation of all defendants except Defendant RIZZO, who at that time had not been hired at OMIG.

137.   The selection of CANADÉ for the February 2013 MI-3 Position and denial of the promotion to better qualified OMIG employees such as Plaintiffs DORAN, BAEZ, SHAPOROV, and LINN, was based on considerations of age, race, ancestry, national origin, and was in retaliation for complaints of discrimination.

(iv.) Challenged Position: June 2013 MI-3 Position

138.   On or about June 24, 2013, it was announced that a position for an MI-3 was open at OMIG (the "June 2013 MI-3 Position").

139.   Subsequent to that announcement, on or about February 6, 2014, BEDELL, a white male under 40 years of age was promoted to the position.

140.   The selection of BEDELL for the June 2013 MI-3 Position would be BEDELL's second promotion in less than two years.

141.   BEDELL's selection for the June 2013 MI-3 Position passed over more qualified OMIG employees, such as Plaintiffs DORAN and LINN, who are both older than BEDELL, and applied for the position.

142.   At the time of his interview and selection for the June 2013 MI-3 Position, BEDELL had never supervised any employee at OMIG, never signed time cards, never approved leave, never assigned work assignments, never signed/wrote evaluations, had only five (5) years' experience as an investigator with no experience as a criminal investigator, and only three (3) years' experience in health care fraud.

143.   As detailed below, BEDELL's discriminatory promotion to the June 2013 MI-3 Position was based on a rigged interview scoring scheme.

144.   The selection of BEDELL for the June 2013 MI-3 Position and denial of the promotion to better qualified OMIG employees such as Plaintiffs DORAN and LINN, was based on considerations of age, and was in retaliation for Plaintiffs' and others' prior complaints of discrimination.

(v.) Challenged Position:  April 2014 MI-3 Position

145.   On or about April 10, 2014, LISA GERARDI ("GERARDI"), a white female of Italian Ancestry, an outside candidate not previously employed at OMIG, was hired as an MI-3 (the "April 2014 MI-3 Position").

146.   GERARDI was selected for the April 2014 MI-3 Position, despite lacking the required qualifications for the position.

147.   GERARDI was less qualified than several OMIG employees such as Plaintiffs DORAN and LINN, for the April 2014 MI-3 Position.

148.   The selection of GERARDI for the April 2014 MI-3 Position was made and announced by Defendant TOMPKINS, with the active participation of all other defendants except Defendant RIZZO.

149.   The selection of GERARDI for the April 2014 MI-3 Position and denial of the promotion to better qualified OMIG employees such as Plaintiffs DORAN and LINN, were based on considerations of age, race, ancestry, national origin, and was in retaliation for Plaintiffs' and others' prior complaints of discrimination.

(vi.) Challenged Position: 2014 MI-4 Position

150.   On or about April 28, 2014, Defendant RIZZO, then an outside candidate, was hired and appointed to the position of MI-4 (the "2014 MI-4 Position").

151.   The selection and appointment of Defendant RIZZO to the 2014 MI-4 Position was made by Defendant COSCHIGNANO, with the active participation of others, including Defendant TOMPKINS.

152.    RIZZO was selected for the 2014 MI-4 Position despite the fact that he was less qualified than several OMIG employees such as Plaintiffs DORAN and LINN.

153.    The selection of RIZZO for the 2014 MI-4 Position and denial of the promotion to better qualified OMIG employees, such as Plaintiffs DORAN and LINN, was based on considerations of race and ancestry, and was in retaliation for Plaintiffs' and others' prior complaints of discrimination.

154.    In fact, Defendant RIZZO tacitly admitted that he was specifically hired from outside and into OMIG by Defendant COSCHIGNANO to target OMIG employees such as Plaintiffs who had complained that the failure to promote them to a number of positions was for unlawful and discriminatory reasons.

(vii.) Challenged Position: September 2014 MI-3 Position

155.    On September 25, 2014, THOMAS CHERIYAN ("CHERIYAN"), an Indian-American male, employed at the New York City Office was promoted to the position of MI-3 (the "September 2014 MI-3 Position").

156.    The promotion of CHERIYAN to the September 2014 MI-3 Position was made, and announced, by Defendant COSCHIGNANO, with the active participation of all other defendants.

157.   The promotion of CHERIYAN to the September 2014 MI-3 Position was announced by Defendant COSCHIGNANO as temporary.

158.   However, CHERIYAN's promotion to the September 2014 MI-3 Position was secretly made permanent and Plaintiffs only discovered this months after it had occurred.

159.   The promotion of CHERIYAN to the September 2014 MI-3 Position was made despite the fact that no job announcement was posted prior to his selection.

160.   CHERIYAN was promoted to the September 2014 MI-3 Position despite the fact that he was less qualified than several OMIG employees such as Plaintiffs DORAN, BAEZ, SHAPOROV, and LINN.

161.   The promotion of CHERIYAN to the September 2014 MI-3 Position was in response to previous discrimination complaints by Plaintiffs and other OMIG employees.

162.   The promotion of CHERIYAN was a band-aid effort to end complaints about OMIG's discriminatory employment practices.

(viii.) Challenged Position: Principal Medical Facilities Auditor

163.   On or about February 27, 2014, EUGENE GRECO ("GRECO"), a white male of non-Jewish heritage or ancestry, was promoted to the position of

Principal Medical Facilities Auditor within OMIG (the "Principal Medical Facilities Auditor Position").

164.  Plaintiff LINN applied for the Principal Medical Facilities Auditor Position, and was interviewed, but despite his qualifications and experience was not selected.

165.  At the time Plaintiff LINN applied and was interviewed for the Principal Medical Facilities Auditor Position, to the knowledge of Defendants COSCHIGNANO, COX, TOMPKINS, and CHIESA, LINN had filed grievances alleging that he had been passed over for promotions for discriminatory reasons.

166.  GRECO was selected for the Principal Medical Facilities Auditor Position even though Defendants, such as COSCHIGNANO and COX, knew he was less qualified than Plaintiff LINN.

167.  Upon information and belief, the selection of GRECO for the Principal Medical Facilities Auditor Position was made by Defendants COSCHIGNANO and COX, with the active participation of some or all of the defendants.

168.  At the time of his selection for the Principal Medical Facilities Auditor Position, GRECO had only been in OMIG for six (6) years, compared to Plaintiff LINN who then had been at OMIG for 36 years handling functions relevant to the position.

169.   In addition, GRECO does not have a graduate degree in accounting and had not completed an MBA/CPA Program like Plaintiff LINN.

170.   Moreover, at the time of his selection for the Principal Medical Facilities Auditor Position, GRECO was much younger than Plaintiff LINN, who at the time was 61 years old.

171.   The selection of GRECO for the Principal Medical Facilities Auditor Position and denial of the promotion to the better qualified Plaintiff LINN was therefore based on considerations of age, race and ancestry, and was in retaliation for Plaintiff LINN's prior complaints of discrimination.

(ix.) Challenged Position: 2014 DMIG Position

172.   In November 2014, following the resignation of Defendant COSCHIGNANO, COYNE was given the DMIG position.

173.   The selection of COYNE was made despite the existence of other better qualified and more experienced employees, such as Plaintiff LINN.

**C. Examples of Discriminatory Hiring Tactics**

174.   In order to advance their discriminatory objectives, Defendants devised various tactics to circumvent the established promotion and advancement process within OMIG:

(i.) <u>Altering Position Qualifications</u>

175.   Defendants frequently modify the employment requirements of new job titles and positions, with preferred candidates in mind who are typically white, of Italian ancestry, and/or younger than the Plaintiffs. As the following three examples show these modified job requirements are then used to justify hiring those less qualified and younger and predominantly white-Caucasian candidates of Italian ancestry.

176.   First, the job requirements for the 2012 MI-2 Position that went to BEDELL on September 11, 2012, were modified by former DMIG COSCHIGNANO, with the involvement of and knowledge of other Defendants, such as Defendants TOMKINS, CHIESA, and COX, in order to allow BEDELL to qualify for a promotion to that position.

177.   The modifications to the job requirements for the 2012 MI-2 Position involved the removal of the requirement of two (2) years of supervisory experience.

178.   As of September 11, 2012, when BEDELL applied for the 2012 MI-2 Position, he was not even qualified for either the MI-1 or MI-2 positions, as he did not have the requisite criminal or welfare fraud investigatory experience.

179.   Upon information and belief, to the knowledge of Defendant COSCHIGNANO and some of the other defendants, BEDELL misrepresented his

criminal and welfare fraud investigative experience on the resume he submitted when he applied for the 2012 MI-2 Position. Yet he was selected for the position.

180.  Similarly, BEDELL's experience as an MI-1 was counted, when it should not have been, towards his level of experience when considering him for the 2012 MI-2 Position, because he misrepresented his criminal and welfare fraud investigation experience on his resume.

181.  As a second example, Defendant RIZZO and GERARDI were favored in their selection for the 2014 MI-4 Position and 2014 MI-3 Position.

182.  As part of the interviews for the selection of Defendant RIZZO and GERARDI to the 2014 MI-3 Position and the 2014 MI-4 Position respectively, the interview panel scored each candidate on their answers to twenty-four (24) questions on an interview questionnaire designed to examine the candidate's competency, motivation, and compatibility.

183.  Defendant RIZZO, an outside candidate of Italian ancestry, was interviewed for the 2014 MI-4 Position on December 3, 2013, and eventually received the position.

184.  Two weeks later, on December 17, 2013, GERARDI, also an outside candidate of Italian ancestry was interviewed for the April 2014 MI-3 Position, which she ultimately received.

185.   Also, in connection with the April 2014 MI-3 Position that went to GERARDI and the 2014 MI-4 Position that went to Defendant RIZZO, the interview questionnaires, the answers to which were used to determine who to select for the positions, were modified by OMIG, therefore producing two different sets of questions for outside candidates and for internal candidates such as Plaintiffs DORAN and LINN.

186.   By producing two different sets of questions, the interview process was altered to favor outside candidates, such as RIZZO and GERARDI who eventually were selected for the position.

187.   On GERARDI's and RIZZO's questionnaire, question number two (2) was modified to remove the portion referencing employment with OMIG and questions three (3) through eight (8) were modified to change the portions of the questions referencing employment with OMIG.

188.   As a third example, Defendant COSCHIGNANO, with the participation of TOMPKINS and CHIESA, deliberately removed the Certified Fraud Examiner (CFE) Certification requirement from the 2012 MI-2 Position and 2012 MI-3 Position that respectively went to BEDELL and GREEN.

189.   Defendant COSCHIGNANO, with the participation of TOMPKINS and CHIESA, removed the CFE requirement so that BEDELL and GREEN could qualify for promotions given their lack of Medicaid investigation experience.

(ii.) <u>Pre-Filling of Open Positions</u>

190.   Furthermore, Defendants often interview and/or select their preferred candidates – predominantly white-Caucasian, and younger employees of Italian descent – *even before* a Vacancy Notice for an open position was posted, before agency-wide interview schedules were announced, or interviewing outside candidates contrary to the restrictions in the job vacancy notices, thereby denying Plaintiffs the opportunity to apply for higher salaried positions and/or equal access to promotional opportunities.

191.   Advertisements were either not placed on the internal OMIG employee portal accessed by the Plaintiffs or restrictions in the job vacancy notices were disregarded for the following positions:

a.   The 2012 MI-3 Position that went to GREEN on September 11, 2012 was not posted;

b.   The February 2013 MI-3 Position that went to CANADÉ on January 9, 2013, was similarly not posted;

c.   The September 2014 MI-3 Position that CHERIYAN was promoted into on September 25, 2014 was not advertised or placed on the employee portal;

d.   The 2014 MI-4 Position went to Defendant RIZZO on April 21, 2014, despite that he was an outside applicant and the notice for that

opening was available via an internal employee portal accessible only to OMIG employees.

(iii.) Failing to Scrutinize Preferred Candidates' Credentials

192.   Defendants maintain a pattern and practice of disfavoring Plaintiffs and similarly situated employees in protected categories, who are older and of certain racial minorities, and favoring and fast tracking the career of predominately white, younger, and newer employees by reducing the requirements for open positions, accepting the stated qualifications of outside candidates which are of dubious validity, and refusing to verify the accuracy of the stated qualifications of outside candidates in order to promote favored candidates more quickly.

193.   For example, in December 2010, BEDELL, a white male, thirty four (34) years of age joined OMIG as an MI-1, with no prior Medicaid fraud or criminal investigatory experience. In less than two (2) years he was promoted to the 2012 MI-2 Position, on September 11, 2012. Less than one (1) year following his promotion to the 2012 MI-2 Position, BEDELL was allowed to complete his probationary period as MI-2 early in order to apply for the 2013 MI-3 Position, which he received on January 21, 2014.

(iv.) Using Different Interview Scoring Methods to Favor Preferred
        Candidates

194.   Preferred candidate BEDELL was interviewed and scored for the
2013 MI-3 Position using a different standard than for non-preferred candidates
like Plaintiff DORAN.

195.   BEDELL benefitted from receiving partial points even when he
answered "no" to questions on the interview questionnaire for the 2013 MI-3
Position.

196.   BEDELL was also given scores for interview questions with points
awarded as 1-4 and given partial points for the 2013 MI-3 Position.

197.   In contrast, DORAN was given either no points or four points
depending on his answer during the interview for the 2013 MI-3 Position.

198.   DORAN, unlike BEDELL, did not receive partial credit for his
answers for the 2013 MI-3 Position.

199.   As a result, BEDDELL received an inflated interview score that was
then used to justify his selection over Plaintiff DORAN for the 2013 MI-3
Position.

(v.) Lowering Scores of Non-Preferred Candidates After
        Completing the Interviews

200.   In or about 2010, GRIFFITH, a black male OMIG employee from the
Republic of Trinidad and Tobago, interviewed for an MI-2 position.

201.   Based on his panel interview scores, GRIFFITH had the highest score and should have been promoted.

202.   Instead, MAUREEN HOWLEY, the Medicaid Investigator-in-Charge, asked the interview panel to retroactively lower GRIFFITH's score so he would no longer be the top candidate because "Albany was questioning the selection."

203.   When GRIFFITH asked about the status of his promotion in or around 2011, he was told that his promotion "was waiting on budgetary approval" and that his promotion "would be delayed because of budget issues."

204.   GRIFFITH ultimately never received the promotion.

205.   Instead, the MI-2 position (2012 MI-2 Position) was awarded to BEDELL, who is a white MI-1 candidate 20 years younger than GRIFFITH.

206.   The discriminatory denial of the 2012 MI-2 Position to GRIFFITH is presently the subject of a lawsuit alleging race and national origin discrimination against Defendants COSCHIGNANO, COX and others in the United States District Court for the Northern District of New York entitled <u>Glendon Griffith v. The New York State Department of Health et al.</u>, Docket No. 1:14-cv-1128 (TJM/RFT).

(vi.) <u>Falsely Advising Minority Candidates that they are Unqualified</u>

207.   On July 22, 2013, Defendant TOMPKINS informed BAEZ that she lacked the requisite qualifications to apply and be considered for the 2014 MI-3

Position, even though she was permitted to interview for the same position before she joined OMIG five years earlier. Yet BAEZ was allowed to interview for the MI-3 vacancy less than a month later on August 13, 2013 after complaining about the e-mail to BYRNES, indicating that BAEZ was in fact qualified.

208.  Similarly, on December 5, 2013, Defendant TOMPKINS advised CLAIRE SEXTON ("SEXTON"), an African-American female, and a long time employee of OMIG, that she lacked the requisite qualifications for an MI-2 opening. Yet on January 5, 2014, following SEXTON's complaint, Wendy Siek, an OMIG employee, sent an e-mail scheduling SEXTON for an interview for that same MI-2 position, indicating that SEXTON was in fact qualified.

### D. **Defendants' Attempts to Stop Discrimination Complaints**

(i.) Defendants' Practices

209.  Defendants maintain a policy and practice of excluding older and minority employees from applying to job openings, relenting only when pressured by employee complaints or grievances alleging discrimination.

210.  Defendants knew, and ought reasonably to have known, that the consequence of these policies and practices was an adverse impact on the prospects, as well as terms and conditions of employment, of its tenured, predominately older employees many of whom are non-white, minorities, and of non-Italian ancestry.

211.   Nevertheless, Defendant STATE, as well as the named Defendants have maintained, and continue to engage in, discriminatory policies and practices that deprive the Plaintiffs of the fair promotion, salary and career advancement opportunities guaranteed to them under the law.

212.   Within the past three (3) years immediately preceding the commencement of this action OMIG – under the leadership of COX and COYNE – has given promotions, almost exclusively, to many of the younger and predominantly white staff (i.e., staff with four (4) years or less in the agency) most of whom are of Italian ancestry. This has perpetuated and exacerbated the vast disparities in both career and income advancement between the older, non-white, tenured employees (i.e., staff with six (6) or more years in OMIG), and the younger, predominantly white, newer employees.

(ii.) Discrimination Complaints and Defendants' Responses

213.   At different times since prior to September 2012 and continuing, Plaintiffs and other similarly situated OMIG employees such as GRIFFITH and NIGIL JOHNSON ("JOHNSON"), a black female of non-United States national origin, have protested and complained about defendants unlawful and discriminatory practices in the hiring and selection of candidates for promotion or higher positions within OMIG.

214. In response to complaints about Defendants unlawful and discriminatory practices, on or about September 11, 2012, GREEN, an African-American Female over 40 years old was promoted to the 2012 MI-3 Position.

215. In or about March 1, 2013, the PEF, the Union representing the Plaintiffs, complained to OMIG regarding the foregoing preferential and discriminatory employment practices in regards to the promotion of BEDELL to the 2012 MI-2 Position and of GREEN to the 2012 MI-3 Position.

216. On April 9, 2013, Plaintiffs DORAN and SHAPOROV filed a complaint with the New York State Inspector General's Office about Defendants' unlawful and discriminatory practices, the promotion of GREEN to the 2012 MI-3 Position, the promotion of BEDELL to the 2012 MI-2 Position, and the promotion of CANADÉ to the February 2013 MI-3 Position.

(iii.) Class Action Grievance

217. In February 2014, JOHNSON, an African-American female born in the West Indies, an OMIG employee in the New York City Office, and her co-workers filed a class action grievance over OMIG's discriminatory employment and promotions practices.

218. At the same time, Usher Piller, a PEF leader, sent a letter to Defendant COX and OMIG stating that "recent promotions in OMIG have unleashed a torrent of pent up resentment among employees, especially Medicaid Investigators, who

allege the existence of a culture of racism and ageism that has been festering a long time."

219.   On May 1, 2014, PEF Union held a rally outside the OMIG New York Office at 217 Broadway, New York, New York, to protest the unfair and discriminatory labor practices and seek Defendant COX's resignation.

220.   Plaintiff SHAPOROV was warned not to attend the rally because he was being considered for a promotion and was told participating could jeopardize his career.

221.   Following the class grievance and PEF rally, Defendant COSCHIGNANO and OMIG made a series of quick minority promotions after receiving, upon information and belief, pressure from Governor Andrew Cuomo's office during an election year to quell the complaints about OMIG's employment practices.

222.   Some of the employees promoted under these circumstances had been previously told they were not qualified for the promotions they wanted and were discouraged from applying for specific promotions. These promotions include that of JOSEPH HENRY, a white male age 67, to MI-2; GREG WARING, a black male over the age of 40 to MI-3; CHERIYAN, an Indian-American male over the age of 40, to MI-3; and, JOHNSON, a black female over the age of 40 to MI-2.

223.   With specific reference to JOHNSON, on April 24, 2014, she was promoted to an MI-2, with a Grade 21 salary level, three days before the Step 1 Class Grievance was to be heard.

224.   JOHNSON was promoted with a one (1) year probation period where OMIG could demote her without cause.

225.   While still on probation, on September 8, 2014, JOHNSON was notified that her promotion had been revoked and she was demoted back to MI-1, with a Grade 17 salary.

226.   OMIG had used JOHNSON's short-lived promotion to publically push back against and apply a band-aid over the claims that OMIG engaged in discrimination.

227.   In an article featured in *The Chief Leader* and *Times Union Capital Confidential*, OMIG spokesperson Wanda A. Fischer, referencing JOHNSON, stated that "two of the employees referenced in this protest were among the qualified individuals promoted under Medicaid Inspector General Cox's leadership."

228.   In or around 2014 or 2015, JOHNSON complained again about the actions taken against her in OMIG, including her recent demotion.

229.   In the Summer of 2015, a member of OMIG's Inspector General office told JOHNSON that she would be promoted if she withdrew her pending grievance and complaint.

230.   Similar to JOHNSON's strategic band-aid promotion, on September 25, 2014, Defendant COSCHIGNANO gave CHERIYAN, an Indian-American male, a temporary promotion from an MI-2 to the September 2014 MI-3 Position, only to later make the promotion permanent without allowing any other employees to apply or interview for the MI-3 position.

231.   CHERIYAN was unqualified for the (September 2014 MI-3 Position), and was personally surprised about the promotion, as he did not have the required investigation experience to be an MI-3.

(iv.) Plaintiff's Union Letter of Interrogation sent to Defendant COX

232.   On September 24, 2014 in a letter of interrogation sent to Defendant COX regarding, among other improprieties, Plaintiff's union, PEF, "alleged aggravated malfeasance, official misconduct, and the overt practice of cronyism."

233.   The letter of interrogation was a union mechanism to set forth a formal hearing to interrogate Defendant COX

234.   Plaintiffs also protested these practices in their respective written complaints and grievances to their union, PEF, the EEOC, OMIG, the New York

State Department of the Civil Service, the New York State Division of Human Rights, and the New York State Office of the Inspector General ("NYSIG").

### (v.) OMIG Leadership Resignations

235.   Upon information and belief, under pressure from Plaintiffs' complaints of discrimination, in November 2014, Defendant COX resigned from OMIG.

236.   Similarly, in December 2014, COSCHIGNANO also resigned from OMIG.

## VI. INDIVIDUAL PLAINTIFFS

### A. Plaintiff DORAN

237.   Plaintiff DORAN, 59 years old, has approximately six (6) years of continuous employment with OMIG, in various positions and titles.

238.   In the course of his employment with OMIG, DORAN has accumulated extensive experience, having held various positions, including those of MI-1 and MI-2, supervising a team of investigators.

239.   DORAN was well qualified for those positions given his excellent and long record of performance and accomplishments in State and criminal investigations.

240.   Since joining OMIG as a MI-2, DORAN has received numerous acknowledgments and positive feedback from third-parties and private individuals

with regard to his dedication, professionalism, work ethic, and ability to achieve exceptional results in pursuing Medicaid fraud investigations, including a commendation from OMIG Director of Public Affairs Bill Swartz in an April 22, 2015 e-mail for his "impressive work" on the Roslyn Heights Project which resulted in uncovering significant amounts of welfare fraud in Brighton Beach, Brooklyn, and was the supervisor in the much publicized Oceana project.

241.   DORAN, who began his employment with OMIG as an MI-1 in the New York City Office on February 5, 2009, was in May 2010, before Defendant COSCHIGNANO took over as DMIG, promoted to an MI-2 position.

242.   In October 2010 following the departure from OMIG of KEITH PALADINO ("PALADINO"), an MI-3 supervisor with the New York City Office, DORAN assumed the duties of a group supervisor previously handled by PALADINO.

243.   Despite handling and performing the duties of an MI-3 by acting and working as a group supervisor since October 2010, Defendants have refused to grant DORAN a salary increase commensurate with the increased duties of an MI-3 he performs, in comparison to other younger and less experienced female MI-3s, such as GREEN and FERN DEPAULO ("DEPAULO"), and his career advancement has been stagnated and stymied.

244.  Since 2013, each time DORAN applied for a position with a higher salary, he was denied a position, or was otherwise prevented from interviewing for them by the various subterfuges employed by Defendants to circumvent established hiring, promotion, and salary increase procedures resulting in higher paying positions being subsequently awarded to mostly younger employees, typically with experience of four (4) years or less in the agency, and some of whom were of Italian ancestry.

### (i.) Failure to Promote:  2012 MI-3 Position

245.  In September 2012, DORAN was passed over for promotion to the 2012 MI-3 Position in favor of GREEN, a lesser qualified African-American female.

246.  DORAN complained about his being denied promotion to the 2012 MI-3 Position to OMIG and the NYSIG on April 9, 2013, which forwarded it to the New York Civil Service Commission on or around April 25, 2013.

247.  GREEN's promotion to MI-3 constitutes reverse race discrimination against DORAN on account of his Caucasian ethnicity.

### (ii.) Protest of BEDELL's Promotion to the 2012 MI-2 Position

248.  DORAN also protested the promotion of BEDELL to the 2012 MI-2 Position, by filing complaints with OMIG and the NYSIG on April 9, 2013, and

his complaint was in turn forwarded to the New York State Civil Service Commission on April 25, 2013.

(iii.) Failure to Promote: February 2013 MI-3 Position

249.   In or about January 9, 2013, DORAN was passed over for promotion to the February 2013 MI-3 Position in favor of CANADÉ, a lesser qualified white male of Italian ancestry.

250.   CANADÉ received the appointment despite lacking the required qualifications for the position.

251.   The hiring of CANADÉ to the February 2013 MI-3 Position was announced by Defendant, former DMIG COSCHIGNANO on February 13, 2013 via e-mail, without any Vacancy Notice for an open position or interview process.

252.   DORAN only became aware of the selection of CANADÉ to the February 2013 MI-3 Position on March 10, 2015 and immediately complained about the hiring to OMIG, the New York Civil Service Commission, and through his union, the PEF, filed a Step 1 grievance in March 2015.

253.   The hiring of CANADÉ and the failure to consider DORAN for the February 2013 MI-3 Position was discriminatory on the basis of his non-Italian ancestry.

### (iv.) Failure to Promote:  June 2013 MI-3 Position

254.   In or about June 2013, DORAN applied for the June 2013 MI-3 Position.

255.   Although DORAN was well qualified for the position, he was denied the position, and BEDELL, a much less qualified applicant under forty years of age was hired.

256.   BEDELL, unlike DORAN, had never supervised any employees at OMIG, never signed time cards, never approved leave, never assigned work assignments, never signed/wrote evaluations, had only five (5) years' experience as an investigator with no experience as a criminal investigator, and only three (3) years' experience in health care fraud.

257.   BEDDELL's selection for the June 2013 MI-3 Position, was based on a rigged interview scoring scheme.

258.   During the interviews for the June 2013 MI-3 Position, DORAN AND BEDELL were evaluated with different forms and different numerical values were assigned to both candidates on the same questions despite the fact that they provided the same answers.

259.   BEDELL received an interview score of 100 from the panel of three interviews based on his answers to twenty-one numerically scored questions.

260.   DORAN scored 64.

261.   BEDELL's interview evaluation form allowed the interviewers on certain questions to provide a score of one *through* four while DORAN's sheet required he be scored one *or* four.

262.   As a result, BEDELL received the full 4 points on his answers compared to the partial credit DORAN received.

263.   Furthermore, BEDELL was given points even when he answered "no" to a question.

264.   During DORAN's interview, the panel of Christopher Mulhalll, William Gilbert and Matthew Babock wrote down few of his answers. In comparison, the panel took detailed notes of BEDELL's answers.

265.   DORAN complained about the promotion of BEDELL to the June 2013 MI-3 Position to OMIG, the Department of Health, the New York State Division of Human Rights, and with his union, PEF, filed a Step 1 grievance.

266.   In his Step 1 Grievance which was filed on February 11, 2014, DORAN alleged that the failure to promote him to the June 2013 MI-3 Position, was due to age discrimination.

267.   On April 10, 2014, DORAN also filed a complaint with the Bureau of Human Resources Management of OMIG, alleging age discrimination with respect to the selection of BEDELL for the June 2013 MI-3 Position.

268.    Subsequently, on May 15, 2014, DORAN filed a complaint with the New York State Division of Human Rights alleging unlawful discriminatory practices because of age in connection with the promotion of BEDELL to the June 2013 MI-3 Position.

269.    On November 3, 2014, the New York State Division of Human Rights made a finding of probable cause that the promotion of BEDELL over DORAN showed that DORAN "was disadvantaged by the promotion process, and that a younger job applicant [BEDELL] was treated differently and more favorably than Complainant [DORAN] during the interview process."

270.    The promotion of the much younger and much less qualified BEDELL to the June 2013 MI-3 Position constitutes discrimination against DORAN on account of his age.

271.    The selection of BEDELL over DOARN for the June 2013 MI-3 Position was also in retaliation for DORAN's previous complaints of discrimination.

(v.) Failure to Promote:  2014 MI-3 Position

272.    On or about April 3, 2014, GERARDI, a younger, white female of Italian ancestry, and an outside candidate, was hired for the 2014 MI-3 Position without DORAN being considered.

273.   In selecting GERARDI over DORAN for the position, two different sets of questions, one for outside candidates and one for OMIG employees, were used on the interview questionnaire which favored outside candidates.

274.   DORAN learned of GERARDI's promotion to MI-3 on March 10, 2015 and complained about the promotion to OMIG and the PEF in a Step 1 grievance filed on March 17, 2015.

275.   The selection of GERARDI over DORAN was based on considerations of age and ancestry and was in retaliation for DORAN's complaints of discrimination.

(vi.) Failure to Promote: 2014 MI-4 Position

276.   In or about December 2013, DORAN applied for the 2014 MI-4 Position.

277.   Despite the fact that DORAN was well qualified for the position, he was not selected for the position.

278.   Instead, Defendant RIZZO, a white male, of Italian ancestry, not previously employed at OMIG, was selected.

279.   At the time of his selection over DORAN, RIZZO had no experience as an auditor, accountant, financial investigator, no experience with New York State Medicaid laws and regulations, and no accounting degree.

280.   In connection with the selection of RIZZO over DORAN for the 2014 MI-4 Position, no outside job announcement had been made.

281.   DORAN has over twenty five (25) years as an investigator, twenty (20) years supervisory experience, over twenty (20) years' experience as a federal agent, over twenty (20) years' experience as a criminal investigator, is a licensed tax accountant, and has over twenty-five (25) years' experience as a forensic accountant.

282.   The selection of RIZZO over DORAN was based on considerations of ancestry and was in retaliation for DORAN's complaints of discrimination.

283.   Consequently, on March 17, 2015, DORAN complained about RIZZO's promotion to OMIG, the Department of Health, and through his union, PEF, filed a Step 1 grievance.

284.   On or about December 17, 2014, RIZZO spoke derisively of DORAN in relation to DORAN's age. RIZZO said "he's [DORAN] not a ball of fire let's face it."

285.   RIZZO further questioned the prestige of DORAN's past occupations asking "why is he only a 21 [MI-2]," and when told that DORAN was fifty-nine (59), RIZZO said "he's [DORAN] fifty-nine [59]? I thought he was about sixty-four [64]?"

286.   On December 4, 2014 RIZZO also asked why DORAN was going on a work assignment which involved carrying heavy boxes, implying DORAN was old.

(vii.) Equal Pay Claim

287.   DORAN performs a heavier workload than his MI-2 job description indicates which additionally consists of MI-3 duties DORAN has performed since October 2010.

288.   DORAN continues to perform these MI-3 duties for less pay than similarly situated female MI-3s GREEN ($90,020 per annum), DEPAULO ($90,020 per annum), and GERARDI ($80,477 per annum). This demonstrates a gender bias in pay and equal pay discrimination against DORAN.

289.   After six (6) years of distinguished service, DORAN's base salary remains that of an MI-2 even following his assumption of MI-3 duties in October 2010, at just $69,157 per annum.

290.   In 2014, when DORAN complained to Defendant BYRNES about violation of his civil rights, BYRNES replied "you don't have any civil rights and I don't care."

291.   Consequently, DORAN has complained to the New York State Division of Human Rights that he is a victim of equal pay discrimination.

### B. **Plaintiff BAEZ**

292.   Plaintiff BAEZ is 42 years old and has nearly seven (7) years of continuous employment with OMIG in various positions and titles, including MI-2, Supervising Investigator and Senior Investigator.

293.   After nearly seven (7) years of distinguished service without any promotion, BAEZ's base salary has remained stagnant at just $71,192.

294.   BAEZ has accumulated extensive experience at OMIG and has an excellent record of performance and accomplishments with complex, Medicaid fraud investigation projects.

295.   Performance evaluations, authored by BAEZ's supervisors and reviewed by MI-5 Defendant BYRNES, include many high ratings and positive statements.

296.   Despite her extensive experience, outstanding job performance evaluations, and accomplishments, Defendants have refused to promote BAEZ for the past six (6) years, and her career advancement has been stagnated and stymied.

297.   Since 2008, Defendants have not considered BAEZ for promotion.

298.   Instead, younger, less experienced, white employees were repeatedly promoted over BAEZ.

299.   BAEZ is the only Hispanic female at OMIG who holds the position of MI-2 and has suffered from racial discrimination in the form of several adverse employment actions.

### (i.) Failure to Promote:  2012 MI-3 Promotion

300.   Although BAEZ was well qualified for the 2012 MI-3 Position, she was denied the position, and GREEN, a much less qualified, non-Hispanic female was hired.

301.   Consequently, BAEZ complained about her being denied the 2012 MI-3 Position to OMIG, the NYSIG, and the New York State Civil Service Commission, alleging discrimination.

### (ii.) Failure to Promote:  February 2013 MI-3 Position

302.   On January 9, 2013, BAEZ was passed over for promotion to the February 2013 MI-3 Position in favor of CANADÉ, a white male of Italian ancestry.

303.   Since the hiring was made without any Vacancy Notice for an open position or interview process, it was impossible for BAEZ to apply for the position.

304.   Although BAEZ was well qualified for the position, she was denied the position, and CANADÉ, a much less qualified, white male was hired.

305.   As a result, on March 18, 2015, BAEZ complained about the promotion through a Step 1 grievance, and by complaints to the NYSIG, and the New York State Civil Service Commission, alleging discrimination.

(iii.) Failure to Promote: 2013 MI-3 Position

306.   In July 2013, OMIG posted vacancy notices for two (2) MI-3 (Grade 24) positions in the New York City Office ("2013 MI-3 Position").

307.   BAEZ applied for one of the MI-3 position for which she was qualified.

308.   By an email dated July 22, 2013, Defendant TOMPKINS advised BAEZ that she lacked the requisite qualifications for the position, and therefore would not be interviewed.

309.   However, when BAEZ complained about being denied an interview by Defendant TOMPKINS, she was allowed to interview for the position, showing that BAEZ was in fact qualified.

310.   In August 2013, BAEZ was interviewed for the 2013 MI-3 Position.

311.   During the interview, two different sets of questions, one for outside candidates and one for OMIG employees, were used on the interview questionnaire which favored outside candidates.

312.   Although BAEZ was well qualified for the position, she was denied the position, and GERARDI, a less qualified, non-Hispanic female was hired.

313.   Baez complained about the promotion to OMIG and filed through her union, PEF, a Step 1 grievance on March 18, 2015, alleging discrimination.

(iv.) Failure to Promote: 2014 MI-3 Position

314.   On September 25, 2014, THOMAS CHERIYAN, an Indian-American male, was promoted to MI-3.

315.   The temporary promotion was announced by Defendant DMIG COSCHIGNANO in an October 6, 2013 e-mail that CHERIYAN would be appointed temporarily to the position.

316.   However, CHERIYAN's promotion was secretly made permanent and this was only discovered by Plaintiffs months after it had occurred.

317.   The open position was never posted or advertised.

318.   BAEZ had no opportunity to apply for the position.

319.   Although BAEZ was well qualified for the position, she was denied the position, and CHERIYAN, a less qualified, non-Hispanic male was hired.

320.   BAEZ became aware of the permanent nature of the promotion on February 2, 2015, and complained in a Step 1 grievance on March 5, 2015.

321.   CHERIYAN was promoted as a band-aid to end the persistent out cry about OMIG's unlawful and discriminatory employment practices.

322.   The promotions of GREEN, CANADÉ, and GERARDI constitute race discrimination against BAEZ on account of her Hispanic ethnic background.

- 55 -

323.   The promotions of CANADÉ, GERARDI, and CHERIYAN, were also in retaliation against BAEZ for filing grievances, alleging discrimination.

(v.) Retaliation against BAEZ

324.   On or about May 2014, BAEZ was transferred to work under newly hired MI-4 RIZZO in retaliation for filing grievances for promotion denials.

325.   RIZZO, a favorite of COSHIGNANO, was brought in as a hatchet man to harass and retaliate against employees who protested or complained about OMIG's employment practices or COSHIGNANO's leadership.

326.   Since July 2014, when RIZZO assumed supervision of BAEZ, Defendant RIZZO has verbally harassed BAEZ and others OMIG employees throughout his time as a supervisor.

327.   In or about July 2014, RIZZO also unlawfully accessed BAEZ personnel folder in a furtive move to learn more about her.

328.   As a result of RIZZO's conduct, on August 20, 2014, BAEZ filed a Step 1 grievance over RIZZO's harassment.

329.   Since July 2014, RIZZO has evinced an intention to terminate BAEZ's employment with OMIG and the State.

330.   At different times between July 2014 and the present, RIZZO has singled BAEZ out for unwarranted scrutiny and harassment.

331.   As an example, on April 30, 2015, BAEZ received an e-mail from her supervisor COLLEEN DRISCOLL ("DRISCOLL") asking her to comply with "random" spot-checks of her completed work.

332.   In fact this adverse employment action was retaliation against BAEZ, singling her out for closer scrutiny for filing grievances, alleging discrimination.

333.   In a May 13, 2015, RIZZO gloated about the spot checks DRISCOLL performed on BAEZ and said: "I hope she [BAEZ] grieves it, cause you know what'll happen? I don't even wanna tell you what'll happen. The worst thing that could happen to her [BAEZ]. She doesn't want to grieve that . . . because if it wasn't for Dan [COYNE] and I she'd be out of the program, how's that?"

334.   RIZZO's verbal harassment and DRISCOLL's punitive spot-checking of BAEZ's work were also in retaliation against BAEZ for filing grievances, alleging discrimination.

335.   On May 15, 2015, COYNE threatened BAEZ with disciplinary action over her use of telecommuting in retaliation for her past complaints of discrimination.

## C. **Plaintiff LINN**

336.   Plaintiff LINN, a Jewish male of non-Italian ancestry, has thirty-seven (37) years of continuous employment with OMIG in various positions and titles.

337.   LINN has an excellent record of performance and accomplishments with conducting Medicaid fraud investigations, supervising investigations, developing staff protocols, and auditing.

338.  Performance evaluations, authored by MI-3 BEDELL, LINN's supervisor, and reviewed by MI-4 RIZZO, who previously wrote a retaliatory "unsatisfactory" performance evaluation on July 29, 2014 with a litany of dubious assertions, changed their opinion of LINN's performance on their following evaluation.

339.   LINN has, with the exception of that one retaliatory evaluation dated July 29, 2014, had an exceptional performance record at OMIG.

340.  Despite his extensive experience, outstanding performance evaluations, and accomplishments, Defendants have refused to promote LINN to a higher salaried position for the past nine (9) years, and his career advancement has been stymied.

341.   At different times between 2012 and 2015, each time LINN applied for a position with a higher salary, he was denied such positions, or was otherwise prevented from either applying or interviewing for them by Defendants' discriminatory practices.

(i.) <u>Failure to Promote: February 2013 MI-3</u>

342.   Although LINN was well qualified for the February 2013 MI-3 Position, he was denied the position, and CANADÉ, a much less qualified, younger non-Jewish male was hired.

343.   LINN became aware of the promotion on or about March 10, 2015 and filed a Step 1 grievance, alleging discrimination, with the PEF on March 17, 2015.

(ii.) <u>Failure to Promote: June 2013 MI-3 Position</u>

344.   LINN applied for the June 2013 MI-3 Position, for which he was qualified.

345.   Although LINN was well qualified for the position, he was denied the position, and BEDELL, a much younger and much less qualified non-Jewish candidate under forty years of age was hired.

346.   LINN filed a Step 1 grievance with the PEF alleging discrimination with respect to his non-promotion on February 19, 2014.

(iii.) <u>Failure to Promote: 2014 MI-3 Position</u>

347.   LINN applied for the June 2013 MI-3 Position, for which he was qualified.

348.   Two different sets of questions, one for outside candidates and one for OMIG employees, were used on the interview questionnaire which favored outside candidates.

349.   Although LINN was well qualified for the position, he was denied the position, and GERARDI, a much less qualified, younger, non-Jewish outside candidate was hired.

350.   On or about March 10, 2015, LINN learned that DMIG COSHIGNANO used two sets of interview questions during GERARDI's interview for the position on December 17, 2013. OMIG employees applying for the position were restricted to answering job interview questions which concerned their OMIG experience only while separate questions were given to GERARDI.

351.   LINN filed a Step 1 discrimination grievance with the PEF on March 17, 2015.

(iv.) Failure to Promote: Principal Medical Facilities Auditor

352.   In 2013 LINN applied for the position of Principal Medical Facilities Auditor within OMIG, for which he was qualified.

353.   Although LINN was well qualified for the position, he was denied the position, and EUGENE GRECO ("GRECO"), a much less qualified, younger non-Jewish male was hired.

354.   LINN challenged as discriminatory the promotion in a Step 1 grievance on March 11, 2014.

(v.) Failure to Promote: 2014 MI-4 Position

355.   On October 4, 2013, LINN applied for the 2014 MI-4 Position, for which he was qualified based on his investigation and supervisory experience at OMIG.

356.   Although LINN was well qualified for the position, he was denied the position, and RIZZO, a much less qualified, non-Jewish male of Italian descent was hired.

357.   On or about March 10, 2015, LINN became aware that two sets of interview questions were used by DMIG COSHIGNANO during RIZZO's interview for the position on December 3, 2013.

358.   OMIG employees applying for the position were restricted to answering job interview questions which concerned their OMIG experience only while separate questions were given to RIZZO.

359.   LINN filed a Step 1 grievance with the PEF regarding the discriminatory interview questions at RIZZO's interview on March 17, 2015 and another Step 1 grievance with the PEF regarding being passed over for the 2014 MI-4 Position on May 21, 2014.

### (vi.) Failure to Promote: 2014 DMIG Position

360.   In 2014, LINN applied for the position of Deputy Medicaid Inspector General ("DMIG").

361.   Given his investigation and supervisory experience at OMIG, LINN was qualified for the position but was not selected.

362.   Instead, COYNE, a less-qualified, younger, non-Jewish white Caucasian male, was selected for the position in an unlawful discriminatory preference for non-Jewish employees.

### (vii.) Discriminatory and Retaliatory Denial of Promotions

363.   BEDELL's promotion to the June 2013 MI-3 Position, GRECO's promotion to Principal Medical Facilities Auditor, and the promotions of CANADÉ and GERARDI respectively to the February 2013 MI-3 Position and 2014 MI-3 Position, RIZZO to the 2014 MI-4 and COYNE to DMIG constitute discrimination on the basis of Jewish heritage and ancestry and age against LINN.

364.   The promotions and/or hiring of CANADÉ and GERARDI to the February 2013 MI-3 Position and 2014 MI-3 Position, RIZZO to the 2014 MI-4 Position and COYNE to DMIG constitute retaliation against LINN for filing grievances alleging discrimination.

(viii.) Further Retaliation for Filing Discrimination Grievances

365. In or about February 2014, after filing his promotional grievances, LINN was transferred to work under the newly promoted MI-3, BEDELL.

366. The transfer of LINN to work under BEDELL was in retaliation for filing grievances complaining of discrimination.

367. Defendants' placement of LINN under the supervision of the younger and much less experienced BEDELL caused LINN embarrassment and humiliation.

368. On July 29, 2014, LINN conducted a performance evaluation of LINN.

369. In the evaluation of July 29, 2014, BEDELL who then had only been LINN's supervisor for three months out of the twelve month evaluation period gave LINN an "unsatisfactory" rating.

370. To justify the unfavorable evaluation, BEDELL listed personal reasons as well as a litany of dubious reasons such as minor instances of late reports during a period where LINN was working without any assistance and facing an increased workload from his superiors, who were retaliating against LINN and other plaintiffs for filing grievances.

371. The "unsatisfactory" performance evaluation of LINN by BEDELL was reviewed and signed off on by Defendant RIZZO.

372.   This "unsatisfactory" performance evaluation of LINN by BEDELL was the first such evaluation of LINN's long and productive career.

373.   On March 31, 2014, SERENA FALLON ("FALLON"), a representative of LINN's union, PEF, complained in writing and directly to Defendant CHIESA that the placement of LINN under the supervision of BEDELL as well singling him out for case review by four (4) supervisors including BYRNES, BEDELL and COSCHIGNANO, which lasted four hours and caused LINN to miss lunch shortly after he filed a discrimination grievance, seemed "retaliatory," "excessive," and "punitive"s.

374.   In the same complaint, FALLON, LINN's union representative, pointed out the retaliatory practices by OMIG management against those employees who have filed grievances, such as LINN, as well JOHNSON and GRIFFITH, who were receiving double workloads from their supervisor, GREEN.

375.   LINN has also complained to no avail about the actions of Defendants and BEDELL towards him.

376.   Despite the complaints of LINN and his union, except for changing their opinion of LINN's performance on his next evaluation, in retaliation for his complaints, Defendants have subjected LINN to adverse treatment, including but not limited to refusal to provide LINN with staff to assist him unlike other Grade 23s, including Vivian Campbell, who are given staff, included in managerial

meetings and allowed to interview investigator candidates, and blocking LINN blocked from taking part in these activities or receiving support staff.

377.   After thirty-seven (37) years of distinguished service, LINN's base salary has remained stagnant at just $85,365 per annum with no promotion since 2006.

### D. **Plaintiff SHAPOROV:**

378.   At all times relevant, Plaintiff SHAPOROV was employed with OMIG in various positions and titles for approximately six (6) years.

379.   Throughout his six (6) years of employment, SHAPOROV accumulated extensive experience at OMIG, having held various positions, including MI-1 and MI-2.

380.   SHAPOROV was well qualified for those positions and maintained an excellent record of performance and accomplishments with Medicaid fraud investigations.

381.   At all times relevant, SHAPOROV held the title of MI-1 and then MI-2 within OMIG and performed the duties of a Medicaid Investigator, with responsibility for investigating incidences and allegations of Medicaid fraud within the parameters of OMIG guidelines.

382.   On February 5, 2009, SHAPOROV started his employment at OMIG as an MI-1 (salary grade level 17) assigned to the Forensic Fraud Investigation Unit of the New York Office.

383.   In May 2009, in consideration of his investigatory skills, SHAPOROV was reassigned to the Health Care Fraud Prevention and Enforcement Action Team ("HEAT") also known as the Medicaid Fraud Strike Force.

384.   In June 2009, in recognition of his fine performance, SHAPOROV was again reassigned to the General Fraud Investigations Unit.

(i.) Initial Failure to Promote SHAPOROV:

385.   Despite his extensive experience, outstanding performance evaluations, and accomplishments, Defendants refused to promote SHAPOROV to a higher salaried position during his initial five (5) years of employment.

386.   SHAPOROV was promoted to MI-2 in January 2014.

387.   The promotion of SHAPOROV to MI-2 was only after multiple promotional and discrimination grievances and complaints were made and filed by OMIG employees, including those filed by SHAPOROV and DORAN, with NYSIG on April 25, 2013 regarding the 2012 MI-2 Position that went to BEDELL and the 2012 MI-3 Position that went to GREEN.

388.   Otherwise, between February 2009 and December 2013, each time SHAPOROV applied for a position with a higher salary he was denied such positions, or was otherwise prevented from either applying or interviewing for them by the various subterfuges Defendants employed to circumvent established hiring, promotion and salary increase procedures.

(ii.) SHAPOROV is Targeted

389.   SHAPOROV was subject to adverse employment actions in retaliation for filing grievances and as a result of discrimination against SHAPOROV based on his Russian national origin, ethnicity and ancestry.

(a.) Kept on Probation and Denied Promotional Opportunities

390.   The promotion of SHAPOROV to MI-2 in January 2014 came with a probationary period of one year.

391.   Unlike BEDELL, SHAPOROV was not allowed to complete his one (1) year probationary period early, which would have allowed SHAPOROV to apply for a MI-3 vacancy.

392.   Instead, SHAPOROV was made to remain on probation from January 2014 to January 2015.

393.   As a result, between January 2014 and  January 2015, SHAPOROV was unable to apply, or be considered, for promotions to positions, such as  the April 2014 MI-3 Position that went to GERARDI, the April 2014 MI-4 Position

that went to RIZZO, and the September 2014 MI-3 Position that CHERIYAN received.

(b.) <u>Falsely Accused of Conspiring to Solicit Bribes</u>

394.   In 2010, a now former MI-2 and SHAPOROV's former work partner, Anastascio Garcia Jr. ("GARCIA"), was arrested and subsequently convicted for soliciting a $9,000 bribe from a pharmacy during an OMIG audit.

395.   SHAPOROV was interrogated by NYSIG investigators over the incident and was accused of being a potential accomplice of GARCIA.

396.   During this investigation, due to his Russian ancestry, the NYSIG investigators looked at him like he was a "criminal," and threatened to review every other case that he worked on at OMIG.

397.   Most notably, when the NYSIG investigators learned that SHAPOROV lived in the Brighton Beach community they cited examples of Russians being arrested for extortion. The investigators used those examples so SHAPOROV would feel bad for being of Russian descent.

398.   Despite SHAPOROV protesting that being Russian does not mean that he was involved in any criminal activity, that he emigrated to the United States when  was 13 years old and that he was Americanized long ago, the NYSIG investigators told him that all that meant nothing to them.

399.   Based on the conduct of the NYSIG investigators which was made known to OMIG Management, SHAPOROV's career advancement at OMIG was jeopardized.

(iii.) <u>Failure to Promote and SHAPOROV's  Complaints</u>

400.   SHAPOROV has complained a number of times about the unlawful and discriminatory promotional and hiring practices at OMIG, and the failure to select or consider him for a number of positions.

401.   On April 9, 2013, SHAPOROV complained about his non-consideration and the promotion of GREEN to the 2012 MI-3 Position as well as the selection of BEDELL to the 2012 MI-2 Position, to the NYSIG, which was forwarded to the New York Civil Service Commission on April 25, 2013.

402.   Similarly, when, on March 10, 2015, SHAPOROV became aware of the promotion of CANADÉ to the February 2013 MI-3 Position and that of GERARDI to the 2014 MI-3 Position, he complained about the promotions to OMIG, the New York Civil Service Commission, and filed a Step 1 grievance on March 18, 2015.

403.   In the same vein, SHAPOROV also complained about the selection of BEDELL to the June 2013 MI-3 Position to the NYSIG.

404.   SHAPOROV complained to the PEF regarding the promotion of RIZZO to the 2014 MI-4 Position.

405.   In the same respect, when SHAPOROV became aware of CHERIYAN's permanent promotion to the September 2014 MI-3 Position on February 12, 2015, he complained about the promotion to OMIG and to the PEF in a Step 1 grievance on February 24, 2015.

406.   Although SHAPOROV was well qualified for these positions, he was denied the positions or prevented by Defendants from applying for them; and GREEN, BEDELL, CANADÉ, GERARDI, and CHERIYAN received the promotion despite lacking the required qualifications.

407.   The promotions/hiring of BEDELL to MI-2, GREEN, CANADÉ, BEDELL, GERARDI, and CHERIYAN to MI-3, and RIZZO to MI-4 constitute retaliation against SHAPOROV for filing grievances and discrimination against SHAPOROV on account of his Russian national origin, ethnicity and ancestry.

408.   After six (6) years of distinguished service with OMIG, SHAPOROV's base salary remained stagnant the first five (5) years before promotional and discrimination grievances forced Defendant COSCHIGNANO to promote him to MI-2, his salary in this new position is just $63,052 per annum.

(iv.) COSCHIGNANO uses RIZZO to retaliate against SHAPOROV

409.   In May 2014, following his hire in April 21, 2014, Defendant COSCHIGNANO assigned SHAPOROV to report to RIZZO as his new supervisor for his federal cases.

410.   Since assuming office in 2012, due to SHAPOROV's Russian ancestry, ethnicity and national origin, Defendant COSCHIGNANO had grown suspicious of SHAPOROV since he had accumulated about $30,000 in overtime benefits during his time with OMIG even though SHAPOROV's former supervisors, including BYRNES, vouched for SHAPOROV.

411.   Due to the intensive nature of his assignments, SHAPOROV had honestly earned those benefits.

412.   Still, on account of SHAPOROV's Russian ancestry and despite the fact that COSCHIGNANO was even employed at OMIG when SHAPOROV performed the overtime work, COSCHIGNANO did not believe SHAPOROV had honestly earned the overtime.

413.   COSCHIGNANO transferred SHAPOROV to work under RIZZO in retaliation for SHAPOROV's filing of grievances, as would be evidenced by RIZZO's repeated verbal harassment of SHAPOROV which included discriminatory remarks about SHAPOROV's Russian national origin.

414.   Under COSCHIGNANO's direction, RIZZO was tasked with retaliating against SHAPOROV.

415.   In carrying out COSCHINGANO's request and based on his own animus towards persons of Russian national origin, ancestry, or descent, RIZZO (a) scrutinized SHAPOROV's use of overtime, (b) forced him to use unpaid time

to attend federal task force meetings, (c) denied him use of a state car to conduct his field work and wanted him to take public transportation the Federal Strike Force even when the State Cars were available at the office, (d) started rumors that he was lying about his work hours, (e) attempted to remove him from the federal task force, (f) accused him of pretending to be a law enforcement agent and using his personal gun during raids, and (g) constantly monitored his office door to determine if it was locked and why the door was closed.

416.   The above acts were in retaliation for SHAPOROV's complaints and grievances.

417.   The above acts were also made on account of his Russian national origin, ancestry, and descent.

418.   These acts also subjected SHAPOROV to a hostile work environment.

419.   RIZZO told SHAPOROV that Russians could not be trusted.

420.   For example, on or about Oct 10, 2014, RIZZO accused SHAPOROV of attempting to create unnecessary over time by scheduling different inventories and meetings with a Department of Justice attorney inventorying evidence.

421.   RIZZO additionally accused SHAPOROV of lying about the evidence inventory assignment in front of several of SHAPOROV's supervisors in a conference call including BYRNES and COYNE in order to harm his reputation among federal agents involved with the Federal Strike Force cases.

422.   Also, on or about October 14, 2014, RIZZO made derisive remarks about SHAPOROV "speaking English," in reference to his Russian accent and had been making such remarks for some time before then. RIZZO told SHAPOROV that he was not irreplaceable just because he spoke Russian and that there were other Russian investigators in the office that could assist Special Agents and that being Russian didn't give SHAPOROV a right to make overtime or be on the Task Force Team.

423.   Again on October 14, 2014, RIZZO questioned SHAPOROV's use of a state car, made up rules designed to inconvenience him and interfere with his duties, such as preventing SHAPOROV from taking the state car home and then using it for early morning raids and meetings.

424.   Additionally, on or about October 14, 2014, RIZZO contacted Scott Lampert ("Lampert"), a Supervising Special Agent with the U.S. Department Health and Human Services, Office of Inspector General, and told him that OMIG wanted to remove SHAPOROV from the task force. However, Lampert pushed back and said SHAPOROV needed to stay on the task force because they did not have time to train a new investigator.

425.   On or about October 18, 2014, SHAPOROV and Special Agent Daniel Connor interviewed an important witness for a Federal investigation in

Brooklyn, New York. The witness was a Russian speaker and the Agent needed SHAPOROV's assistance.

426.   RIZZO refused to approve the over time for SHAPOROV, claiming that Agent Connor should have worked around SHAPOROV's schedule. Left without a choice, SHAPOROV conducted the interview with Special Agent Connor on his personal time.

427.   On or about October 21, 2014, RIZZO and COYNE confronted SHAPOROV, claiming that he complained to COSCHIGNANO about restrictions on his use of the state car. SHAPOROV was warned not to break the chain of command or contact COSCHINGNANO again.

428.   Also on October 21, 2014, RIZZO contacted federal agent Lampert to ask if SHAPOROV was carrying his personal gun during field work and misleading people into believing he was a law enforcement agent instead of a Medicaid investigator.

429.   The federal agents advised SHAPOROV to be careful and alerted him that RIZZO was targeting him.

430.   On or about November 12, 2014, SHAPOROV was accused by RIZZO in front of COYNE of misrepresenting himself as a law enforcement officer during investigations. SHAPOROV denied the accusation and said that

during the investigation in question, the Special Agents took the lead and identified themselves as Special Agents and SHAPOROV as an Investigator with OMIG.

431.   Also, on or about November 10, 2014, SHAPOROV spoke with COYNE and inquired about an interview with a Department of Justice ("DOJ") Trial Attorney for which he needed to use a State car.

432.   COYNE denied the request. SHAPOROV was forced to take a taxi to and from the interview.

433.   On or about December 2, 2014, RIZZO told SHAPOROV that he cannot use the state car for the federal cases and would be required to take public transportation even for search warrants executed at 4 A.M.

434.   COYNE over-rode RIZZO's decision. RIZZO said that a contract employee could use the car but not SHAPOROV, despite it being against the rules to have contract employees keep a state car overnight.

435.   On December 12, 2014, RIZZO denied SHAPOROV the use of a State Issued vehicle to conduct an interview and SHAPOROV was forced to take public transportation.

436.   In December 2014, SHAPOROV learned that RIZZO and COYNE are conducting a further retaliatory inquiry into his participation with federal investigations.

437.   In April 2015, RIZZO was found inspecting SHAPOROV's office and attempting to find out why his door was locked at certain times.

438.   Despite the above unlawful and discriminatory actions, RIZZO was on interview panels in May 2015 to evaluate candidates for promotions, including interviewing Plaintiffs DORAN and LINN, and possibly Plaintiffs BAEZ and SHAPOROV who applied but are yet to be interviewed for open promotions at OMIG.

(v.) Falsely Altering his Performance Evaluations

439.   On SHAPOROV's last performance evaluation dated January 8, 2015, Defendant COYNE changed one of the evaluation categories (Interpersonal Relations) from "5" to "3" without explanation.

440.   SHAPOROV's direct supervisor DEPAULO refused to sign the modified evaluation. Yet COYNE still insisted on changing the score from "5" to at least "4." DEPAULO asked SHAPOROV if he was fine with such an evaluation and SHAPOROV gave his approval and both of them then signed the form.

**Defendants' Actions Continue and Warrant Injunctive and other Relief:**

441.   Defendants' actions were unlawful and in violation of Plaintiffs' rights under several amendments to the United States Constitution as well as Federal laws such as the ADEA, Section 1981, Section 1983, Title VII, and State

and local laws, such as the New York City Human Rights Law, and New York State Human Rights Law.

442.   As a proximate result of Defendants' conduct towards Plaintiffs, Plaintiffs have suffered and continue to suffer monetary loss, and damages, including the loss of past and future earnings, and other employment benefits.

443.   As a further proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer from severe emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

444.   The conduct of the individual Defendants is outrageous and malicious; were intended to injure Plaintiffs, and was carried out with reckless indifference to Plaintiffs' protected civil rights, thereby entitling them to punitive damages.

445.   Plaintiffs have no complete, plain, clear or adequate remedy at law.

446.   Defendants must be restrained from further retaliation and discrimination against Plaintiffs and directed to cease and desist from their unlawful acts against Plaintiffs who currently have applications for promotions pending and are thus being subject to on-going and imminent injury.

447.   The acts of the defendants against Plaintiffs continue.

448.   Plaintiffs believe that the Defendants' unlawful acts against them will continue until this Court, by injunction and/or its judgment, compels otherwise.

**FIRST COUNT AGAINST DEFENDANTS
STATE OF NEW YORK, COSCHIGNANO, COX,
COYNE, CHIESA, TOMPKINS & BYRNES
(Age Discrimination against Plaintiff
DORAN under the ADEA, 29 U.S.C.A. § 621, *et seq*.)**

449.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

450.   As a proximate result of the foregoing, Plaintiff lost wages, benefits, promotional opportunities and bonuses, and has incurred damages.

451.   Plaintiff is a current employee of the State and intends to apply for future positions and promotions, and currently has applications for promotion pending.

452.   Defendants have not ceased their on-going unlawful and discriminatory promotion practices of not promoting qualified employees over the age of 40.

453.   By reason of the foregoing, Defendants should be restrained from future violations through the award of injunctive relief and through promoting DORAN for the pending positions that he has applied for.

## SECOND COUNT AGAINST DEFENDANT
## STATE OF NEW YORK
### (Equal Pay Discrimination against Plaintiff
### DORAN in Violation of Title VII)

454.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

455.   DORAN has been employed by OMIG since February 5, 2009.

456.   Plaintiff DORAN's prior work experience relative to his new position of MI-2 at OMIG was greater than the experience of the three (3) females, GREEN, DEPAULO, and GERARDI, relative to their positions.

457.   Plaintiff DORAN has continued to perform the duties of an MI-3 since October 2010 while receiving lesser pay commensurate to a position of an MI-2.

458.   Plaintiff was hired as a MI-2 at Salary Grade 17, and promoted to Salary Grade 21 in May 2010.

459.   The three females, GREEN, DEPAULO, and GERARDI, were hired or promoted to the position of MI-3 at Salary Grade 24.

460.   In September 2012, one (1) African-American female, GREEN, received a promotion to Salary Grade 24 while performing the same job duties.

461.   In April 2014, one (1) white-Caucasian female, GERARDI, was hired to Salary Grade 24 as an outside candidate. One (1) white-Caucasian female,

DEPAULO, has held the position of Salary Grade 24 while performing the same job duties.

462.   In 2015, plaintiff DORAN remained at Salary Grade 21, receiving a lower pay rate than the three (3) females.

463.   On information and belief, Plaintiff was performing his job duties in equal or more competent fashion than any of the three (3) females.

464.   As a proximate result of the foregoing, Plaintiffs have lost wages, benefits, bonuses, and have incurred damages thereby.

465.   By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than one-hundred thousand ($100,000.00) Dollars.

### THIRD COUNT AGAINST DEFENDANTS COSCHIGNANO, COYNE, COX, CHIESA, RIZZO, TOMPKINS & BYRNES (Discrimination against Plaintiff DORAN under 42 U.S.C. §§ 1981 and 1983)

466.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

467.   Defendants subjected Plaintiff DORAN to differential terms and conditions of employment because of his race, color and ancestry. These differential terms and conditions of employment include, but are not limited to:

a.  Failure to promote Plaintiff to higher paying titles and positions within OMIG including:

    i.  the 2012 MI-3 Position given to GREEN and

    ii.  the 2014 MI-4 position given to RIZZO.

b.  Retaliating against Plaintiffs for protesting racial discrimination, by continuing to deny Plaintiffs promotion and opportunities for career advancement.

468.  All the foregoing actions were taken by the Defendants in order to deprive Plaintiff of employment and other contractual opportunities on account of his race.

469.  Because of the willful and deliberate actions of the Defendants, and as a proximate cause thereof, Plaintiff has been and continues to be denied his right to equal employment opportunity in violation of Section 1981.

470.  By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than one-hundred thousand ($100,000.00) Dollars.

**FOURTH COUNT AGAINST DEFENDANTS**
**COSCHIGNANO, COYNE, COX, CHIESA, TOMPKINS & BYRNES**
**(Discrimination against Plaintiff**
**BAEZ under 42 U.S.C. §§ 1981 and 1983)**

471.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

472.   Defendants subjected Plaintiff BAEZ to differential terms and conditions of employment because of her race, color, ethnicity, and ancestry, including not promoting her to:

a.  the 2012 MI-3 Position given to GREEN,

b.  the 2013 MI-3 position given to GERARDI, and,

c.  the  2014 MI-3 position given to CHERIYAN

**FIFTH COUNT AGAINST DEFENDANTS**
**COSCHIGNANO, COYNE, CHIESA, TOMPKINS, BYRNES & COX**
**(Discrimination against Plaintiff**
**LINN under 42 U.S.C. §§ 1981 and 1983)**

473.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

474.   Defendants subjected Plaintiff LINN to differential terms and conditions of employment because of his race, ethnicity, and ancestry, including not promoting him to:

a.  The 2013 MI-3 position given to non-Jewish CANADE,

b.  The 2013 MI-3 position given to non-Jewish GERARDI

c.  The 2013 MI-3 position given to non-Jewish BEDELL

d.  The 2013 Principal Medical Facilities Auditor given to non-Jewish GRECO.

e.  The 2014 MI-4 position given to non-Jewish RIZZO

f.  The 2014 DMIG position given to non-Jewish COYNE.

**SIXTH COUNT AGAINST DEFENDANTS
COSCHIGNANO, COYNE, CHIESA, TOMPKINS, BYRNES & COX
(Discrimination against Plaintiff
SHAPOROV under 42 U.S.C. §§ 1981 and 1983)**

475.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

476.   Defendants subjected Plaintiff SHAPOROV to differential terms and conditions of employment because of his race, ethnicity, and ancestry, including not promoting him to positions for which he was qualified.

**SEVENTH COUNT AGAINST DEFENDANTS
COSCHIGNANO, COYNE, BRYNES, CHIESA, TOMPKINS & COX
(Retaliation against Plaintiff DORAN
under 42 U.S.C. §§ 1981 and 1983)**

477.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

478.   Defendants' aforesaid conduct were in retaliation for Plaintiff's complaints of discrimination on the basis of race, color, and ancestry and violated Plaintiff's rights under 42 U.S.C. § 1981.

479.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial but estimated to be no less than one-hundred thousand ($100,000.00) Dollars.

## EIGHTH COUNT AGAINST DEFENDANTS
## RIZZO, COSCHIGNANO, COX,
## <u>CHIESA, TOMPKINS, BYRNES & COYNE</u>
### (Retaliation against Plaintiff
### BAEZ under 42 U.S.C. §§ 1981 and 1983)

480.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

481.   Defendants' aforesaid conduct was retaliation for Plaintiff's complaints of discrimination on the basis of race, color, ethnicity, and ancestry and violated Plaintiff's rights under 42 U.S.C. § 1981.

## NINTH COUNT AGAINST DEFENDANTS
## RIZZO, COSCHIGNANO, COX, BYRNES,
## <u>CHIESA, BEDELL, TOMPKINS & COYNE</u>
### (Retaliation against Plaintiff LINN
### under 42 U.S.C. §§ 1981 and 1983)

482.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

483. Defendants' aforesaid conduct was retaliation for Plaintiff's complaints of discrimination on the basis of race, ethnicity, and ancestry and violated Plaintiff's rights under 42 U.S.C. § 1981.

## TENTH COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE & RIZZO
### (Retaliation against Plaintiff SHAPOROV
### under 42 U.S.C. §§ 1981 and 1983)

484. Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

485. Defendants' aforesaid conduct was retaliation for Plaintiff's complaints of discrimination on the basis of race, ancestry, and ethnicity and violated Plaintiff's rights under 42 U.S.C. § 1981.

## ELEVENTH COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE, COX, CHIESA, TOMPKINS & BYRNES
### (Race, Color, Age, and Sex Discrimination against
### DORAN in Violation of NYSHRL)

486. Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

487. By adversely affecting the terms, conditions and privileges of Plaintiff DORAN's employment because of his race, color, gender, and age, Defendants violated the New York State Human Rights Law.

488. Such terms and conditions include, but are not limited to:

a. Segregating and classifying OMIG employees in a manner which tends to deprive, and, in fact, deprived named Plaintiffs of employment opportunities because of their age;

b.  Initiating, implementing and enforcing a blanket policy of nurturing, promoting, compensating and advancing the careers of younger employees under the age of 40 who have been with OMIG for four (4) years or less, to the detriment of the Plaintiffs;

c. Failing to promote and/or grant other compensation to the named Plaintiffs because of their age; and,

d. Adversely affecting the employee status of Plaintiffs by denying them career advancement opportunities, because of their age.

489.   By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than one-hundred thousand ($100,000.00) Dollars.

## TWELFTH COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE, COX, CHIESA, TOMPKINS & BYRNES
### (Race, Color, Age, Sex and National Origin Discrimination against BAEZ in Violation of NYSHRL)

490.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

491.   By adversely affecting the terms, conditions and privileges of Plaintiff BAEZ employment because of her race, color, age, sex, and national origin, Defendants violated the New York State Human Rights Law.

### THIRTEENTH COUNT AGAINST DEFENDANTS
### COSCHIGNANO, COYNE, COX, CHIESA, TOMPKINS & BYRNES
**(Age, Race and Religious Discrimination against**
**LINN in Violation of NYSHRL)**

492.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

493.   By adversely affecting the terms, conditions and privileges of Plaintiff LINN's employment because of his age, race and religion, Defendants violated the New York State Human Rights Law.

### FOURTEENTH COUNT AGAINST DEFENDANTS
### COSCHIGNANO, COYNE, COX, CHIESA, TOMPKINS & BYRNES
**(National Origin, Ethnicity, and Ancestry Discrimination against**
**SHAPOROV in Violation of NYSHRL)**

494.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

495.   By adversely affecting the terms, conditions and privileges of Plaintiff SHAPOROV's employment because of his national origin, ethnicity, and ancestry, Defendants violated the New York State Human Rights Law.

## FIFTEENTH COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE CHIESA, TOMPKINS, BYRNES & COX
### (Race, Color, Age, and Sex Discrimination against
### DORAN in Violation of NYCHRL)

496.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

497.   By adversely affecting the terms, conditions and privileges of Plaintiff DORAN's employment because of his race, color, gender, and age, Defendants violated the New York City Human Rights Law.

498.   By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than one-hundred thousand ($100,000.00) Dollars.

## SIXTEENTH COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE, COX, TOMPKINS, CHIESA, & BYRNES
### (Race, Color, Age, Sex, and National Origin Discrimination against
### BAEZ in Violation of NYCHRL)

499.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

500.   By adversely affecting the terms, conditions and privileges of Plaintiff BAEZ's employment because of her race, color, age, sex, and national origin, Defendants violated the New York City Human Rights Law.

## SEVENTEENTH COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE, COX, CHIESA, TOMPKINS & BYRNES
### (Age, Race and Religion Discrimination against
### LINN in Violation of NYCHRL)

501.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

502.   By adversely affecting the terms, conditions and privileges of Plaintiff LINN's employment because of his age, race, and religion, Defendants violated the New York City Human Rights Law.

## EIGHTEENTH COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE, COX, CHIESA, TOMPKINS & BYRNES
### (National Origin, Ethnicity, and Ancestry Discrimination against
### SHAPOROV in Violation of NYSHRL)

503.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

504.   By adversely affecting the terms, conditions and privileges of Plaintiff SHAPOROVO's employment because of his national origin, ethnicity, and ancestry, Defendants violated the New York City Human Rights Law.

## NINETEENTH COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE, BRYNES,
## <u>CHIESA, TOMPKINS, BYRNES & COX</u>
### (Retaliation against DORAN in Violation of NYSHRL)

505.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

506.   All the various actions taken by the Defendants against Plaintiff DORAN subsequent to when he complained of discrimination, constitute unlawful retaliation in violation of New York State Human Rights Laws.

507.   By reason of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than one-hundred thousand ($100,000.00) Dollars.

## TWENTIETH COUNT AGAINST DEFENDANTS
## <u>RIZZO, COSCHIGNANO, COX & COYNE</u>
### (Retaliation against BAEZ in Violation of NYSHRL)

508.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

509.   All the various actions taken by the Defendants against Plaintiff BAEZ subsequent to when she complained of discrimination constitute unlawful retaliation in violation of New York State Human Rights Laws.

## TWENTY-FIRST COUNT AGAINST DEFENDANTS
## RIZZO, COSCHIGNANO, COX, BYRNES,
## <u>CHIESA, BEDELL, TOMPKINS, BYRNES & COYNE</u>
### (Retaliation against LINN in Violation of NYSHRL)

510.  Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

511.  All the various actions taken by the Defendants against Plaintiff LINN subsequent to when he complained of discrimination constitute unlawful retaliation in violation of New York State Human Rights Laws.

## TWENTY-SECOND COUNT AGAINST DEFENDANTS
## <u>COSCHIGNANO, COYNE & RIZZO</u>
### (Retaliation against SHAPOROV in Violation of NYSHRL)

512.  Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

513.  All the various actions taken by the Defendants against Plaintiff SHAPOROV subsequent to when he complained of discrimination constitute unlawful retaliation in violation of New York State Human Rights Laws.

## TWENTY-THIRD COUNT AGAINST DEFENDANTS
## COSCHIGNANO, COYNE,
## <u>BRYNES, CHIESA, TOMPKINS & COX</u>
### (Retaliation against DORAN in Violation of NYCHRL)

514.  Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

515.   All the various actions taken by the Defendants against Plaintiff DORAN subsequent to when he complained of discrimination, constitute unlawful retaliation in violation of New York City Human Rights Laws including when Plaintiff filed grievances with the PEF or complained to other organizations over the above-mentioned promotions.

516.   By reason of the foregoing, Plaintiffs have suffered loss and damage in an amount to be determined at trial but estimated to be no less than one-hundred thousand ($100,000.00) Dollars.

### TWENTY-FOURTH COUNT AGAINST DEFENDANTS RIZZO, COSCHIGNANO, COX, CHIESA, TOMPKINS, BYRNES & COYNE
#### (Retaliation against BAEZ in Violation of NYCHRL)

517.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

518.   All the various actions taken by the Defendants against Plaintiff BAEZ subsequent to when she complained of discrimination constitute unlawful retaliation in violation of New York City Human Rights Laws.

## TWENTY-FIFTH COUNT AGAINST DEFENDANTS
## RIZZO, COSCHIGNANO, COX, BYRNES,
## <u>CHIESA, TOMPKINS, BEDELL & COYNE</u>
### (Retaliation against LINN in Violation of NYCHRL)

519.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

520.   All the various actions taken by the Defendants against Plaintiff LINN subsequent to when he complained of discrimination constitute unlawful retaliation in violation of New York City Human Rights Laws.

## TWENTY-SIXTH COUNT AGAINST DEFENDANTS
## <u>COSCHIGNANO, COYNE & RIZZO</u>
### (Retaliation against SHAPOROV in Violation of NYCHRL)

521.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

522.   All the various actions taken by the Defendants against Plaintiff SHAPOROV subsequent to when he complained of discrimination constitute unlawful retaliation in violation of New York City Human Rights Laws.

## TWENTY-SEVENTH COUNT AGAINST DEFENDANTS
## <u>RIZZO & COSCHIGNANO</u>
### (Hostile Work Environment against
### BAEZ under NYSHRL, NYCHRL and 42 U.S.C. §§ 1981 & 1983)

523.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

524.   By adversely affecting the terms, conditions and privileges of Plaintiff BAEZ's employment, Defendants subjected Plaintiff to a hostile work environment in violation of City, State and Federal law.

525.   On account of Plaintiff's race, color, age, sex, and national origin, the individual Defendants and others acting on their behalf, have continuously and to date subjected Plaintiff to a pattern of harassment which had the effect of unreasonably interfering with Plaintiff's work performance and creating an intimidating, hostile or offensive work environment that seriously affected the psychological well-being of Plaintiff.

## TWENTY-EIGHTH COUNT AGAINST DEFENDANTS
## RIZZO, COSCHIGNANO & COYNE
### (Hostile Work Environment against
### SHAPOROV under NYSHRL, NYCHRL and 42 U.S.C. § 1981)

526.   Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

527.   By adversely affecting the terms, conditions and privileges of Plaintiff SHAPOROV's employment, Defendants subjected Plaintiff to a hostile work environment in violation of City, State and Federal law.

528.   On account of Plaintiff's national origin, ancestry and ethnicity, the individual Defendants and others acting on their behalf, have continuously and to date subjected Plaintiff to a pattern of harassment which had the effect of

unreasonably interfering with Plaintiff's work performance and creating an intimidating, hostile or offensive work environment that seriously affected the psychological well-being of Plaintiff.

## PUNITIVE DAMAGES

529.   By reason of the wanton, unrepentant, reckless and egregious conduct of the individual Defendants alleged, Plaintiffs claim punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs request that the Court:

a)  Issue an order for the following preliminary injunctive relief:

    i.   Enjoining Defendants from continuing with its policy and practice of classifying employees on the basis of age for purposes of promotion, salary increases and career advancement opportunities;

    ii.   Enjoining OMIG from the further withholding merit-based salary increases, promotion and career advancement opportunities to Plaintiffs are Hispanic, African American or non-white; or not born in the United States; or are over the age of 40 years.

b)  Impanel a jury to hear Plaintiffs' claims;

c)  Issue a judgment declaring that Defendants' policy and practice of disparate treatment of its employees who are Hispanic, African American or non-white and non-Italian ancestry; or are over the age of 40 years, is unlawful in that it violates § 1981, Title VII, the laws of New York State and New York City, and the ADEA;

d)  Award compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

e) Award all named Plaintiffs attorneys' fees pursuant to 42 U.S.C. § 1988;

f) Award all Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and,

g) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated:    New York, New York
          September 11, 2015

                                        Respectfully Submitted,

                                        SAMUEL O.  MADUEGBUNA (6084)
                                        MADUEGBUNA COOPER LLP
                                        Attorneys for Plaintiffs
                                        30 Wall Street, 8th Floor
                                        New York, New York 10005
                                        (212) 232-0155

TO:  **DEFENDANTS**

          THE STATE OF NEW YORK
          OMIG New York City Regional Office
          217 Broadway, 9th Floor
          New York, New York 10007

          JAMES C. COX
          OMIG New York City Regional Office
          217 Broadway, 9th Floor
          New York, New York 10007

DAN COYNE
OMIG New York City Regional Office
217 Broadway, 9th Floor
New York, New York 10007

ANNA COSCHIGNANO
1046 Victory Blvd.
Staten Island, NY 10301

SHERRI TOMPKINS
OMIG New York City Regional Office
217 Broadway, 9th Floor
New York, New York 10007

ROBERT BYRNES
OMIG New York City Regional Office
217 Broadway, 9th Floor
New York, New York 10007

RUSSELL S. RIZZO
OMIG New York City Regional Office
217 Broadway, 9th Floor
New York, New York 10007

MATHEW CHIESA
OMIG New York City Regional Office
217 Broadway, 9th Floor
New York, New York 10007

CHRISTOPHER BEDELL
OMIG New York City Regional Office
217 Broadway, 9th Floor
New York, New York 10007