UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROBERT DORAN, MARIA BAEZ,
ALEXANDER SHAPOROV, and
BERNARD LINN,

                          Plaintiffs,                          15-cv-7217 (PKC) (SN)

          -against-                              MEMORANDUM
                                                      AND ORDER

NEW YORK STATE DEPARTMENT OF
HEALTH OFFICE OF THE MEDICAID
INSPECTOR GENERAL, DENNIS ROSEN,
JAMES C. COX, DAN COYNE, ANNA
COSCHIGNANO, SHERRI TOMPKINS,
ROBERT BYRNES, RUSSELL S. RIZZO,
MATHEW CHIESA, CHRISTOPHER BEDELL,
and JOHN and JANE DOES 1-5
(said names being fictitious, the persons intended
being those who aided and abetted the unlawful
conduct of the named Defendants),

                          Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

                Plaintiffs Robert Doran, Maria Baez, Alexander Shaporov, and Bernard Linn bring

this action for employment discrimination under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e et seq. ("Title VII"), the Age Discrimination in Employment Act of 1967, 29

U.S.C. § 621 et seq. ("ADEA"), the Civil Rights Act of 1871, 42 U.S.C. § 1983, N.Y. Exec. L. §

290 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §

8-101 et seq. ("NYCHRL").  Plaintiffs allege that defendants the Office of the Medicaid

Inspector General ("OMIG"), Dennis Rosen, Anna Coschignano, Robert Byrnes, Daniel Coyne,

James Cox, Sherri Tompkins, Mathew Chiesa, Russell Rizzo, and Christopher Bedell

discriminated against plaintiffs based on their race, sex, national origin, and age, retaliated

against plaintiffs for complaining about this discrimination, and created a hostile work environment.  Defendants have moved to dismiss the Second Amended Complaint ("SAC") pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6), Fed. R. Civ. P., for lack of subject matter jurisdiction, lack of personal jurisdiction, insufficient service of process, and failure to state a claim upon which relief can be granted.

BACKGROUND

Plaintiffs are individuals of various ages, races, sexes, and national origins who are currently employed at OMIG, located within the New York State Department of Health. Plaintiffs are stationed in OMIG's New York City office and work as Medicaid Investigators and Management Specialists, who perform and supervise Medicaid fraud investigations as well as manage Medicaid and Medicaid fraud cases.  (SAC ¶ 9-10.)  Medicaid Investigators range from Levels 1-5, with Level 1 being the lowest position, Level 5 being a director level position, and the levels in between progressively increasing in the amount of supervisory responsibility they entail and the complexity of the cases to which they are assigned.  (SAC ¶ 14-18.)  Management Specialists review Medicaid participant applications.  (SAC ¶ 19.)

I.    Plaintiffs.

Plaintiff Robert Doran is a 59 year old white-Caucasian man of non-Italian ancestry.  (SAC ¶ 21.)  He has an undergraduate degree in accounting and management and is a graduate of the Criminal Investigator School and Internal Revenue Service ("IRS") Special Agent School at the Federal Law Enforcement Training Center in Glynco, Georgia.  (SAC ¶ 22.) Doran has over thirty years of experience working for federal and state agencies, including OMIG, the IRS, and the New York State Department of Labor.  (SAC ¶ 23.)  Before joining OMIG, Doran was a Senior Special Agent with the IRS Criminal Investigation Division.  (SAC ¶

24.)  Doran has been continuously employed in the Fraud Investigations Unit of OMIG since February 5, 2009.  (SAC ¶ 26.)  He is currently a Level 2 Medicaid Investigator (MI-2), and has been for over 6 years.  (SAC ¶ 28.)

Plaintiff Maria Baez is a 42 year old Hispanic woman.  (SAC ¶ 30.)  She holds an undergraduate degree in Criminal Justice.  (SAC ¶ 33.)  Baez has worked for state and other public agencies, such as the Bureau of Fraud Investigation of the City of New York's Human Resources Administration, where she worked as a Welfare Fraud Investigator.  (SAC ¶ 34-35.)  Since August 18, 2008, Baez has been continuously employed by OMIG as an MI-2 in the Fraud Investigations Unit.  (SAC ¶ 36.)

Plaintiff Alexander Shaporov is a white-Caucasian man of Russian ancestry who was born in Russia and immigrated to the U.S. when he was 13 years old.  (SAC ¶ 38-39.)  He has an undergraduate degree in Criminal Justice and a Masters of Public Administration in Forensic Investigations and Auditing and a Certificate in Pharmaceutical and Medical Device Law Compliance.  (SAC ¶ 41.)  He is certified as a Fraud Examiner by the Association of Certified Fraud Examiners.  (SAC ¶ 41.)  Since February 5, 2009 Shaporov has been continuously employed by OMIG.  (SAC ¶ 42.)  Shaporov is currently an MI-2, and has been since 2014.  (SAC ¶ 43.)

Plaintiff Bernard Linn is a 63 year old white-Caucasian man of Jewish heritage and ancestry.  (SAC ¶ 45.)  Linn has an undergraduate degree in Political Science and a Master's Degree in Accounting.  (SAC ¶ 46.)  Linn has been continuously employed in the Fraud Investigation Unit in OMIG since March 30, 1978.  (SAC ¶ 48.)  Linn has been an MI-2 since 2006.  (SAC ¶ 49.)

II.   <u>Defendants.</u>

Defendant OMIG is an agency of the State of New York and an independent entity created within the New York State Department of Health to protect the Medicaid program by conducting fraud, waste, and abuse of control activities for all state agencies responsible for services that Medicaid funds.  (SAC ¶ 51.)

Defendant Dennis Rosen is the current Inspector General of OMIG, and has been since around January 2015.  (SAC ¶ 52.)  Plaintiff alleges that Rosen has appointing authority and final authority for policy-making and personnel decisions at OMIG.  (SAC ¶ 53.)

Defendant Coschignano is a white-Caucasian woman.  (SAC ¶ 55.)  Coschignano worked at OMIG from April 2012 until November 2014.  (SAC ¶ 59.)  She was at all relevant times the Deputy Medicaid Inspector General ("DMIG") of OMIG.  (SAC ¶ 56.)  Plaintiff alleges that Coschignano had final authority for personnel decisions.  (SAC ¶ 58.)

Defendant Robert Byrnes is a white-Caucasian man.  (SAC ¶ 60.)  During the relevant time period Byrnes was a MI-4, then a MI-5, and served as the Assistant Medicaid Investigator in Charge for the New York office.  (SAC ¶ 61.)

Defendant Daniel Coyne is a white-Caucasian man.  (SAC ¶ 63.)  During the relevant time period Coyne was the Assistant Medicaid Inspector General for Investigations and the acting DMIG stationed in the New York City office.  (SAC ¶ 64.)  In November 2014 Coyne became acting DMIG after Coschingano resigned.  (SAC ¶ 66.)  Plaintiff alleges that Coyne had final authority for personnel decisions.  (SAC ¶ 67.)

Defendant James Cox is a white-Caucasian man.  (SAC ¶ 68.)  Cox was the acting Medicaid Inspector General of OMIG from 2011 until his resignation in November 2014.  (SAC

¶¶ 70, 72.)  Plaintiff alleges that Cox had final authority for personnel decisions at OMIG.  (SAC ¶ 73.)

Defendant Sherri Tompkins is a white-Caucasian woman.  (SAC ¶ 74.)  Tompkins was an Associate Personnel Administrator of OMIG during the relevant time period.  (SAC ¶ 75.)

Defendant Mathew Chiesa is a white-Caucasian man who during the relevant time period was an Associate Personnel Administrator of OMIG.  (SAC ¶¶ 77-78.)

Defendant Russell Rizzo is a white-Caucasian man of Italian ancestry and has been a MI-4 at the New York City office of OMIG since April 2014.  (SAC ¶¶ 80-82.) Beginning in April 2014, Rizzo supervised plaintiffs.  (SAC ¶ 83.)

Defendant Christopher Bedell is a 34 year old white non-Jewish man.  (SAC ¶ 85, 114, 267.)  Bedell was an MI-2 who was promoted to MI-3 in June 2013.  (SAC ¶ 86.)

Defendant Rosen is sued in his official capacity for injunctive relief.  (SAC ¶ 54.) All other individual defendants are sued in both their official and individual capacities.  (SAC ¶¶ 57, 62, 65, 71, 76, 79, 84, 87.)

Plaintiffs allege that during the relevant time period all of the individual defendants were "responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including Plaintiffs."  (SAC ¶ 88.)

III.   Challenged Promotions.

On September 11, 2012, Bedell was promoted to MI-2 ("September 2012 MI-2 Position").  (SAC ¶ 103.)  The SAC alleges that when Bedell applied he was not qualified due to his lack of the requisite criminal or welfare fraud investigatory experience.  (SAC ¶ 104.)  The job requirements for this position were modified by Coschignano in order to allow Bedell to

qualify for the position by removing the requirement of two years of supervisory experience with the involvement and knowledge of Tompkins, Chiesa, and Cox.  (SAC ¶ 103.)  Further, Coschignano, with the participation of Tompkins and Chiesa, removed the Certified Fraud Examiner Certification requirement for the position.  (SAC ¶ 111.)  Bedell, with Coschignano's knowledge, misrepresented his criminal and welfare fraud investigative experience on his resume.  (SAC ¶ 105.)  No vacancy notice was posted for the position and no interviews were conducted.  (SAC ¶ 313.)  Bedell was promoted after less than 2 years as an MI-1, a position he obtained with no prior Medicaid fraud or criminal investigatory experience.  (SAC ¶ 114.) Shaporov was more qualified for the position than Bedell.  (SAC ¶ 314.)

On September 11, 2012, Eunice Green, an African-American woman over forty years of age was promoted to MI-3 ("September 2012 MI-3 Position").  (SAC ¶ 100.) Coschignano, with the participation of Tompkins and Chiesa, removed the Certified Fraud Examiner Certification requirement for the position.  (SAC ¶ 111.)  Green was promoted without the posting of a vacancy notice or the conducting of any interviews.  (SAC ¶ 163.)  The promotion of Green was made and announced by Coschignano, with the active participation of all other defendants besides Rizzo.  (SAC ¶ 164.)  Baez, Doran, and Shaporov were all more qualified for the position.  (SAC ¶¶ 161, 224, 336.)

On January 9, 2013, Anthony Canade, a white man of Italian ancestry, was promoted to MI-3 ("January 2013 MI-3 Position").  (SAC ¶ 100.)  Canade lacked the required qualifications for the position.  (SAC ¶ 168.)  Canade was promoted without the posting of a vacancy notice or the conducting of any interviews.  (SAC ¶¶ 169, 227.)  Canade is younger than Linn and not Jewish.  (SAC ¶ 264.)  Plaintiffs were all more qualified for the position.  (SAC ¶¶ 167, 228, 264, 336.)

On June 24, 2013, Bedell was promoted to MI-3 ("June 2013 MI-3 Position"). (SAC ¶ 100.)  Bedell, who was previously promoted to MI-2 in September 2012, was allowed to complete his probationary period as an MI-2 early in order to apply for the MI-3 position.  (SAC ¶ 114.)  Bedell's interview questionnaire was scored differently than the plaintiffs who applied, for example, by receiving partial points on certain questions where plaintiffs were unable to obtain partial points.  (SAC ¶¶ 115-118, 178.)  Doran and Linn applied for the position, and Shaporov either applied or was prevented from applying.  (SAC ¶¶ 172, 266, 336.)  All three were denied the promotion despite being more qualified than Bedell.  (SAC ¶¶ 173-74, 267, 336.)

On April 10, 2014, Lisa Gerardi, a white woman of Italian ancestry, was hired as an MI-3 ("April 2014 MI-3 Position").  (SAC ¶ 100.)  Gerardi's selection was made and announced by Tompkins with the participation of all other defendants except Rizzo.  (SAC ¶ 190.)  The interview questionnaires that were used to score candidates were modified, such that a different set of questions was used for plaintiffs as was used for candidates not previously employed at OMIG, such as Gerardi.   (SAC ¶¶ 108-10, 189.)  OMIG employees were restricted to answering questions about their experience at OMIG, while Gerardi had separate questions. (SAC ¶ 272.)  Gerardi is younger than Doran, (SAC ¶ 188,) and Linn, and not Jewish, (SAC ¶ 271.)   Plaintiffs were all qualified for the position, and either applied for the position or were prevented from applying.  (SAC ¶¶ 188, 236, 269, 336.)

On April 28, 2014, Rizzo, a non-Jewish man of Italian ancestry (SAC ¶¶ 195, 285) was hired as an MI-4 ("April 2014 MI-4 Position").  (SAC ¶ 100.)  Coschignano selected Rizzo with the help of Tompkins.  (SAC ¶ 196.)  No outside job announcement for the position was made.  (SAC ¶ 198.)  The interview questionnaires that were used to score candidates were

modified, such that a different set of questions was used for defendants as was used for candidates not previously employed at OMIG, such as Rizzo. (SAC ¶¶ 108-10.) Rizzo had no experience as an auditor, accountant, or financial investigator, no experience with New York State Medicaid laws and regulations, and no accounting degree. (SAC ¶ 197.) Doran and Linn were more qualified for the position and applied but were rejected. (SAC ¶¶ 193-94, 284-85.) Shaporov was well qualified for the position and was either denied the position or prevented from applying. (SAC ¶ 336.)

On September 25, 2014, Thomas Cheriyan, an Indian-American man, was promoted to acting MI-3 ("September 2014 MI-3 Position"). (SAC ¶¶ 100, 210.) Coschignano made and announced the temporary promotion of Cheriyan with the active participation of all other defendants. (SAC ¶ 211.) The promotion was made without a job vacancy posting (SAC ¶ 212.) Lacking the required investigatory experience, Cheriyan was unqualified for this promotion. (SAC ¶ 150.) Plaintiffs were all more qualified for the position. (SAC ¶¶ 212, 241, 336.)

In January 2016, Cheriyan was selected for a permanent MI-3 position ("January 2016 MI-3 Position"). (SAC ¶ 216.) Baez, Doran, and Shaporov had previously applied for this position and were interviewed on October 1, 2015. (SAC ¶¶ 214-15.)

On February 27, 2014, Eugene Greco, a white man of non-Jewish heritage or ancestry, was promoted to the position of Principal Medical Facilities Auditor. (SAC ¶ 100.) Coschignano and Cox selected Greco, with the active participation of some or all of the defendants. (SAC ¶ 278.) Greco had been at OMIG for six years and lacked a graduate degree in accounting. (SAC ¶¶ 279-80.) He was much younger than 61. (SAC ¶ 281.) Linn applied and was interviewed for the position, and was more qualified than Greco. (SAC ¶¶ 275, 277.)

8

In 2015, Mark Kelly, a non-Jewish white-Caucasian man was promoted to DMIG.  (SAC ¶ 100.)  Linn was qualified for the position, applied, and was rejected.  (SAC ¶ 291.)  Kelly is younger than Linn and less qualified.  (Id.)

IV.   Other Discriminatory and Retaliatory Behavior.

Doran had his primary supervisory functions transferred to other OMIG employees.  (SAC ¶ 218.)

The SAC alleges that Rizzo "tacitly admitted" that he was specifically hired by Coschignano to target OMIG employees, like plaintiffs, who had complained that the failure to promote them was for discriminatory reasons.  (SAC ¶ 200.)  On December 4, 2014, Rizzo asked an unidentified person why Doran was working on an assignment that involved carrying heavy boxes, implying that Doran was old.  (SAC ¶ 204.)  On or about December 17, 2014, Rizzo spoke of Doran's age, saying "he's not a ball of fire let's face it."  (SAC ¶ 202.)  Doran further stated, "he's fifty-nine?  I thought he was about sixty-four?"  (SAC ¶ 203.)

On or about May 2014 Baez was transferred to work under Rizzo in retaliation for filing grievances alleging that the failure to promote her was discriminatory.  (SAC ¶ 247.)  Since July 2014 Rizzo has verbally harassed Baez.  (SAC ¶ 248.)  Also in July 2014, Rizzo accessed Baez's personnel folder to learn more about her medical history.  (SAC ¶ 249.)  Since July 2014 Rizzo has singled Baez out for unwarranted scrutiny and harassment, including limiting Baez's access to case files she has uploaded, accusing her of time theft, and tracking her movements around the office.  (SAC ¶ 252.)  Starting April 30, 2015, Baez has been subject to random spot-checks of her completed work.  (SAC ¶ 253.)  On May 13, 2015 Rizzo made veiled references to possible undesirable consequences for Baez if she filed a grievance regarding the

spot-checks.  (SAC ¶ 256.)  In May 2015 Coyne threatened Baez with disciplinary action in response to her telecommuting.  (SAC ¶ 258.)

        Shaporov, unlike Bedell, was not allowed to complete his one year probationary period early, and was thus unable to apply for promotions between January 2014 and January 2015.  (SAC ¶¶ 319-21.)  Instead, Rizzo and Coyne extended Shaporov's probationary period by 32 days.  (SAC ¶ 322.)

        Coschignano allegedly transferred Shaporov to work under Rizzo in retaliation for filing grievances that complained of discrimination.  (SAC ¶ 343.)  Coschignano directed Rizzo to retaliate against Shaporov for his prior complaints.  (SAC ¶ 344.)  Rizzo repeatedly verbally harassed Shaporov, including with discriminatory remarks about Shaporov's Russian national origin.  (SAC ¶ 343.)  Rizzo told Shaporov that Russians could not be trusted.  (SAC ¶ 349.)  Rizzo made derisive remarks about Shaporov's Russian accent.  (SAC ¶ 352.)  Rizzo scrutinized Shaporov's use of overtime, forced him to use unpaid time to attend federal task force meetings, denied him the use of a state car to conduct field work, started rumors that Shaporov was lying about his work hours, attempted to remove him from the federal task force, accused him of pretending to be a law enforcement agent and using his personal gun during raids, and constantly monitored his office door.  (SAC ¶ 345.)  Rizzo questioned Shaporov's use of a state car and made up rules regarding the use of cars to inconvenience him.  (SAC ¶ 353.)  Coyne and Rizzo would not approve Shaporov's request to use a state car on assignments, so he was forced to take taxis or public transportation.  (SAC ¶ 362-65.)  Rizzo accused Shaporov of creating unnecessary overtime.  (SAC ¶ 350.)  During a conference call Rizzo accused Shaporov of lying about an assignment in order to harm Shaporov's reputation.  (SAC ¶ 351.)  Rizzo accused Shaporov, in front of Coyne, of misrepresenting himself as a law enforcement officer during investigations.

(SAC ¶ 360.)  Rizzo refused to approve overtime for Shaporov, which required Shaporov to perform official duties on his own time.  (SAC ¶ 356.)  In April 2015, Rizzo inspected Shaporov's office.  (SAC ¶ 367.)  Coyne altered one of Shaporov's performance evaluations that had been filled out by Shaporov's direct supervisor.  (SAC ¶¶ 368-69.)

Rizzo wrote a retaliatory "unsatisfactory" performance evaluation of Linn on July 29, 2014, that included a "litany of dubious assertions. . . ."  (SAC ¶ 260.)  Linn was transferred to work under MI-3 Bedell in February 2014 in retaliation for filing grievances complaining of discrimination.  (SAC ¶ 295.)  This humiliated Linn because Bedell was younger and less experienced.  (SAC ¶ 296.)  Bedell gave Linn an "unsatisfactory" rating on his performance evaluation, which was reviewed and signed by Rizzo.  (SAC ¶¶ 298-300.)  At some point on or before March 31, 2014, Linn was singled out for a case review lasting four hours by four supervisors, including Byrnes, Bedell, and Coschignano, shortly after he filed a discrimination grievance.  (SAC ¶ 302.)  Defendants have further retaliated against Linn by not providing Linn with assistant staff like others of similar rank, not including him in managerial meetings, and not allowing him to interview investigator candidates.  (SAC ¶ 305.)

V.     Plaintiffs' Complaints of Discrimination.

The SAC sets forth instances in which one or more plaintiffs made formal, internal complaints of discrimination.  It further alleges that defendants were aware of these complaints.  (SAC ¶ 346.)  On April 9, 2013, Doran and Shaporov filed a complaint with the Office of the New York State Inspector General ("NYSIG") alleging unlawful discrimination relating to the September 2012 MI-2 and MI-3 Positions and the January 2013 MI-3 Position.  (SAC ¶¶ 135, 162.)  Doran also filed a complaint with OMIG.  (SAC ¶ 166.)  Doran's complaint was forwarded to the New York State Civil Service Commission on April 25, 2013.  (Id.)  On

February 11, 2014, Doran filed a step 1 union grievance alleging that the failure to promote him to the June 2013 MI-3 Position was age discrimination.  (SAC ¶ 182.)  On April 10, 2014, Doran filed a complaint with the Bureau of Human Resources Management of OMIG, alleging the same, (SAC ¶ 183), and on May 15, 2014, with the New York State Division of Human Rights, (SAC ¶ 184.  In 2014, with respect to his being paid less than female MI-3s, Doran complained to Byrnes about violations of his civil rights, and Byrnes replied "you don't have any civil rights and I don't care."  (SAC ¶ 208.)  Doran subsequently complained to the New York State Division of Human Rights regarding equal pay discrimination.  (SAC ¶ 209.)  In March 2015 Doran complained to OMIG and the New York Civil Service Commission about the promotion of Canade to the January 2013 MI-3 Position, alleging discrimination, and filed a step 1 union grievance.  (SAC ¶ 170.)  Doran complained about the promotion of Gerardi and Rizzo to the April 2014 MI-3 and MI-4 Positions to OMIG, alleging discrimination, and filed a step 1 union grievance on March 17, 2015.  (SAC ¶¶ 191, 201.)

On February 19, 2014, Linn filed a step 1 union grievance alleging discrimination with respect to the failure to promote him to the June 2013 MI-3 Position.  (SAC ¶ 268.)  On March 11, 2014, Linn filed a step 1 union grievance alleging discrimination in the failure to promote him to the Principal Medical Facilities Auditor Position.  (SAC ¶ 283.)  On May 21, 2014, Linn filed a step 1 union grievance alleging discrimination in the failure to promote him to the April 2014 MI-4 Position.  (SAC ¶ 288.)  On March 17, 2015, Linn filed a step 1 union grievance regarding discriminatory interview questions at Rizzo's interview for the April 2014 MI-4 Position, (SAC ¶ 288), and a step 1 grievance alleging discrimination with regards the promotion of Canade to the January 2013 MI-3 Position.  (SAC ¶ 265.)

On April 9, 2013, Shaporov complained to the NYSIG about the failure to promote him to the September 2012 MI-2 and MI-3 Positions.  (SAC ¶ 330.)  These complaints were forwarded to the New York Civil Service Commission on April 25, 2013.  (Id.)  On May 1, 2014, plaintiffs' union held a rally outside the New York City office to protest OMIG's discriminatory practices and seek Cox's resignation.  (SAC ¶ 138.)  Coschignano told Shaporov not to attend the rally and warned him that attending could jeopardize his career and that there would be consequences if employees went to the rally.  (SAC ¶¶ 138-39.)  On February 24, 2015, Shaporov complained to OMIG and filed a step 1 union grievance regarding the promotion of Cheriyan to the September 2014 MI-3 Position, alleging discrimination.  (SAC ¶ 334.)  On March 10, 2015, Shaporov complained to OMIG and the New York Civil Service Commission regarding the failure to promote him to the January 2013 and April 2014 MI-3 Positions, alleging discrimination, and on March 18 he filed a step 1 grievance.  (SAC ¶ 331.)  On an unspecified date Shaporov complained to the NYSIG about discrimination in the failure to promote him to the June 2013 MI-3 Position.  (SAC ¶ 332.)  On an unspecified date Shaporov complained to his union regarding the failure to promote him to the April 2014 MI-4 Position, alleging discrimination.  (SAC ¶ 333.)

On August 20, 2014, Baez filed a step 1 grievance regarding Rizzo's verbal harassment and his inappropriately accessing her personnel file and medical history.  (SAC ¶ 250.)  On March 18, 2015, Baez complained to the NYSIG and the New York State Civil Service Commission regarding the failure to promote her to the January 2013 MI-3 Position, alleging discrimination, and by filing a step 1 union grievance.  (SAC ¶ 229.)  Also on March 18, 2015, Baez complained about the failure to promote her to the April 2014 MI-3 Position to OMIG and filed a step 1 union grievance, alleging discrimination.  (SAC ¶ 237.)  Baez complained, on an

13

unspecified date, about being denied the promotion to the September 2012 MI-3 Position to

OMIG, the NYSIG, and the New York State Civil Service Commission, alleging discrimination.

(SAC ¶ 225.)  On an unspecified date Baez complained about discrimination during a meeting

with Coyne, Rizzo, and her direct supervisor.  (SAC ¶ 258.)

VI.    Service of Process.

Defendants Chiesa, Cox, and Tompkins move to dismiss the claims against them

for insufficient service of process.  On September 30, 2015, plaintiffs' process server attempted

to serve Chiesa, Cox, and Tompkins at 217 Broadway, 9th Floor, New York, NY 10007.  (Pl.'s

Mem. in Opp., 5.)  The process server apparently spoke to Coyne, who instructed the process

server to serve Chiesa, Cox, and Tompkins at "Albany 900 North Pearl St. NY."  (Id.)  This was

the incorrect address of OMIG's Albany office, which is actually located at 800 North Pearl

Street.  (Id. at 5-6.)  On Sunday, October 11, 2015, service was attempted on Chiesa, Cox, and

Tompkins at 800 North Pearl Street.  (Id. at 6.)  The process server was told that service was not

permitted there, and was directed to serve an authorized attorney at 2438 Corning Tower, Empire

State Plaza, Albany, NY 12237.  (Id.)  On October 13, 2015, the process server served

Department of Health attorney Michael G. Bass, Esq. at Corning Tower, who identified himself

as authorized to accept process for Chiesa, Cox, and Tompkins.  (Id.)  The next day Chiesa, Cox,

and Tompkins requested representation from the Attorney General's office.  (Id.)  Defendants

first raised the issue of the sufficiency of service of process in a pre-motion letter dated February

1, 2016 (Dkt. No. 57).

DISCUSSION

Defendants Chiesa, Cox, and Tompkins move to dismiss the SAC for insufficient

service of process under Rule 12(b)(5), Fed. R. Civ. P., and lack of personal jurisdiction under

Rule 12(b)(2).  (Defs.' Mem. in Supp., 9-10.)  Plaintiffs argue that all defendants were properly

served, and, in the alternative if not properly served, that plaintiffs have shown good cause for an

extension of time to serve Tompkins, Chiesa, and Cox.  (Pl.s' Mem. in Opp., 6-9.)  Under Rule

4(m), Fed. R. Civ. P., a defendant must be served within 90 days of a complaint being filed.  A

district court may extend this period for an appropriate time on a showing of good cause by the

plaintiff.  Id.  Based on information given to plaintiffs by Coyne and directions received at

OMIG's Albany office, plaintiffs reasonably believed that they had effected proper service upon

a state attorney who said he was authorized to accept process for defendants.  Tompkins, Chiesa,

and Cox, who appear to have received actual notice of the proceedings and requested

representation by the Attorney General the next day, waited to raise the issue until well after the

time to serve under Rule 4(m) had expired.  As defendants have appeared in this matter, they will

not be prejudiced by the plaintiffs' failure to properly serve them within the original 120 day

period.  Plaintiffs have 30 days to effectuate service on Tompkins, Chiesa, and Cox.  If plaintiffs

fail to do so, all claims against Tompkins, Chiesa, and Cox will be dismissed without prejudice

for insufficient service of process and lack of personal jurisdiction.

I.      Motion to Dismiss Standard.

       To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  "'Labels and conclusions' or 'a formulaic recitation of the

elements of a cause of action will not do,'" rather, a plaintiff must plead "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Id. (quoting Twombly, 550 U.S. at 555).  In considering a Rule 12(b)(6) motion to

dismiss, all non-conclusory factual allegations are accepted as true, see id. at 1949-50, and all reasonable inferences are drawn in favor of the plaintiffs.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (per curiam).

In employment discrimination cases, the Iqbal plausibility standard applies in conjunction with the pleading standards set forth in Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002).  See Gillman v. Inner City Broad. Corp., 08 cv 8909 (LAP), 2009 WL 3003244, at *3 (S.D.N.Y. Sept. 18, 2009) ("The Iqbal plausibility standard applies in conjunction with employment discrimination pleading standards . . . .  Iqbal was not meant to displace Swierkiewicz's teachings about pleading standards for employment discrimination claims because in Twombly, which heavily informed Iqbal, the Supreme Court explicitly affirmed the vitality of Swierkiewicz."); Iqbal, 129 S.Ct. at 1953 ("Our decision in Twombly expounded the pleading standard for all civil actions, and it applies to antitrust and discrimination suits alike." (internal quotation marks and citations omitted)).

At the pleading stage, Swierkiewicz teaches that a plaintiff is not required to come forth with allegations sufficient to make a *prima facie* case of employment discrimination or to satisfy the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See 534 U.S. at 510; see also Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (per curiam).  Rather, "a complaint must include . . . a short and plain statement of the claim . . . [that] give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Swierkiewicz, 534 U.S. at 512 (internal quotation marks omitted).  "The facts required by Iqbal to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination.  They need only give plausible support to a minimal inference of discriminatory motivation."  Littlejohn v. City of

New York, 795 F.3d 297, 311 (2d Cir. 2015).  Accordingly, to overcome a Rule 12(b)(6) motion to dismiss in an employment discrimination case, a complaint must give fair notice of the basis of plaintiff's claims and the claims must be facially plausible.

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), consideration is generally limited to the factual allegations in the complaint.  Rule 12(d), Fed. R. Civ. P.  A court, however, may also consider certain documents such as those incorporated by reference or attached to the complaint as exhibits and items of which judicial notice may be taken.  See Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).  Additionally, a court may consider a document "where the complaint relies heavily upon its terms and effect, [thus] render[ing] the document integral to the complaint."  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

Defendants move to dismiss the SAC for violating the requirement of Rule 8(a)(2), Fed. R. Civ. P., that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  They argue that it suffers from unnecessary prolixity.  See, e.g., Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988).  The SAC is 412 paragraphs in length and spans 68 pages.  It leaves much to be desired in terms of brevity, consistency, clarity, and specificity.  However, given the number of plaintiffs and defendants and the span of events, the Court cannot conclude the SAC is unnecessarily prolix in violation of Rule 8(a)(2).

II.   Equal Pay Claim against OMIG.

While Doran refers to a claim under the Equal Pay Act in his opposition to the motion to dismiss, the Court does not address these arguments because no such claim was included in the SAC.  See Steinberg v. Zebrasky, No. 10 cv 4372 (RJS), 2011 WL 2565498, at

*5 n.8 (S.D.N.Y. June 14, 2011) (declining to address a new claim not included in the compliant and raised for the first time in opposition papers).

In the SAC, Doran brings an action for equal pay discrimination in violation of Title VII. (SAC at 60.) A claim of unequal pay for equal work under Title VII is generally analyzed under the same standards used in a claim brought under the Equal Pay Act, 29 U.S.C. § 206(d). See Tomka v. Seiler Corp., 66 F.3d 1295, 1312 (2d Cir. 1995) abrogated on other grounds by Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). However, a Title VII plaintiff "must also produce evidence of discriminatory animus in order to make out a *prima facie* case of intentional sex-based salary discrimination." Id. at 113 (citing Aldrich v. Randolph Cent. School Dist., 963 F.2d 520, 528 (2d Cir. 1992)). Doran alleges that younger, less experienced women who are MI-3s are paid more than him. (SAC ¶¶ 159, 206.) However, the fact that three female MI-3s are paid more than one male MI-2 does not show discriminatory animus. Doran's equal pay claims appear to be nothing more than his failure to promote claims, which are addressed below, repackaged under a different theory of liability. The SAC fails to set forth any non-conclusory allegations to support the proposition that that the pay discrepancy between Doran and the three women he lists is motivated by discriminatory animus based on sex, and Doran's equal pay claim against OMIG is thus dismissed.

III.   Official Capacity Claims against Individual Defendants.

A.   Claims for Damages against Defendants in their Official Capacities.

Under the Eleventh Amendment to the United States Constitution, non-consenting states and their agencies are immune from suit in federal court. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 97-100 (1984). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the

official is entitled to invoke the Eleventh Amendment immunity belonging to the state." <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 529-30 (2d Cir. 1993) (state officials immune from suit for money damages against them in their official capacities under section 1983). "New York has not consented to suit in federal court through the [NYSHRL]." <u>Cajuste v. Lechworth Dev. Disabilities Serv.</u>, 03 cv 0161 (RCC), 2005 WL 22863, at *3 (S.D.N.Y. Jan. 5, 2005); <u>Lambert v. New York State Office of Mental Health</u>, 97 cv 1347 (JG), 2000 WL 574193, at *7 (E.D.N.Y. Apr. 24, 2000) ("As district courts in this circuit have uniformly found, the New York [State] Human Rights Law includes no waiver of the state's immunity to suit in federal court."), <u>aff'd</u>, 22 Fed. App'x 71 (2d Cir. 2001). Moreover, "[t]he City of New York does not have the power to abrogate the immunity of the [s]tate," and there is "no evidence that the [s]tate has consented to suit in federal court under the NYCHRL." <u>Feingold v. New York</u>, 366 F.3d 138, 149 (2d Cir. 2004). To the extent plaintiffs' claims under section 1983, the NYSHRL, and the NYCHRL seek money damages against the individual defendants in their official capacities, they are dismissed.

> B.   <u>Claims for Injunctive Relief against Defendants in their Official Capacities.</u>

Doran brings a claim for injunctive relief under the ADEA against Rosen in his official capacity. Eleventh Amendment sovereign immunity has not been abrogated by the ADEA. <u>See</u> <u>McGinty v. New York</u>, 251 F.3d 84, 92 (2d Cir 2001). However, in <u>Ex parte Young</u>, 28 S.Ct. 441 (1908), the Supreme Court held that the Eleventh Amendment does not bar a suit for prospective injunctive relief against a state official alleged to have violated federal law. While the ADEA does not allow for the imposition of personal liability on the part of an individual employee or supervisor, <u>Parker v. Metro. Transp. Auth.</u>, 97 F. Supp. 2d 437, 452 (S.D.N.Y. 2000), district courts within this Circuit have recognized claims under the ADEA for

prospective injunctive relief against individuals in their official capacities.  See Siani v. State Univ. of N.Y., 7 F. Supp. 3d 304, 331 (E.D.N.Y. 2014); see also Griffith v. N.Y. State Dep't of Health, No. 14 cv 1128, 2015 WL 4545991, at *7 (N.D.N.Y. July 28, 2015) (collecting cases).  Doran seeks injunctive relief against Rosen in the form of a promotion, and alleges that Rosen has the authority to promote him.  (SAC ¶¶ 53, 382.)  Doran has thus properly pled a claim for injunctive relief against Rosen under the ADEA.

All plaintiffs seek further injunctive relief against all defendants, including Rosen, on their other claims.  (See SAC ¶ 375 ("Defendants must be restrained from further retaliation and discrimination against Plaintiffs. . . ."); Pl.'s Mem. in Opp., 4.)  All claims for equitable relief against individual defendants in their official capacities who are no longer employed at OMIG, Coschignano and Cox, are dismissed for failure to state a claim upon which relief could be granted due to the inability of any equitable relief the court could grant to remedy the plaintiffs' alleged injuries.

IV.     Damages Claims against Defendants in their Individual Capacities.

Plaintiffs bring claims for damages against defendants in their individual capacities for discrimination on the basis of race and national origin under section 1983, alleging violation of rights granted under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. (SAC ¶ 391.)  Plaintiffs bring further claims for discrimination on the basis of race, sex, and age under the NYSHRL and the NYCHRL.  (SAC ¶¶ 398, 401.)

"The Fourteenth Amendment provides public employees the right to be free from discrimination," and thus public employees who suffer employment discrimination may bring suit under section 1983 "against any responsible persons acting under color of state law."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015) (internal quotation marks

omitted).  To state a claim under section 1983, a plaintiff must allege "(1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law."  Id. at 87-88 (internal quotation marks omitted).  "A state employee acting in his official capacity is acting 'under color of state law.'"  Id. at 88 (quoting Feingold, 366 F.3d at 159).  An individual may only be held liable under section 1983 "if that individual is personally involved in the alleged deprivation."  Littlejohn, 795 F.3d at 314 (internal quotation marks omitted).

The NYSHRL makes it unlawful for an employer to discriminate on the basis of, among other things, age, race, color, sex, national origin, or creed.  See N.Y. Exec. Law § 296(1)(a).  "A supervisor is an 'employer' for purposes of establishing liability under the NYSHRL if that supervisor 'actually participates in the conduct giving rise to [the] discrimination.'"  Feingold, 366 F.3d at 157 (2d Cir. 2004) (alteration in original) (quoting Tomka, 66 F.3d at 1317).  The NYSHLR further states that it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6).  This language allows "a co-worker who actually participates in the conduct giving rise to a discrimination claim to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff."  Feingold, 366 F.3d 138 at 158 (internal quotation marks omitted).  These same standards of analysis apply the NYCHRL, as "the language of the two laws is virtually identical."  Id. (internal quotation marks omitted).

A. Personal Involvement of Defendants.

Plaintiffs allege disparate treatment based on race, age, sex, and national origin by defendants Coschignano, Coyne, Cox, Chiesa, Rizzo, Tompkins, and Byrnes, claiming they were

discriminated against numerous times by defendants' failure to promote then to several different positions.[1]

Plaintiffs allege that during the relevant time period all of the individual defendants were "responsible for developing, implementing and enforcing personnel policies and procedures affecting the terms and conditions of employment of employees within OMIG, including the Plaintiffs."  (SAC ¶ 88.)  Plaintiffs allege that Rosen, Coschignano, Coyne, and Cox had hiring authority during their time at OMIG.  (SAC ¶¶ 53, 58, 67, 73.)  It is reasonable to infer that Tompkins and Chiesa, who hold or held the title of Associate Personnel Administrator, were involved in hiring decisions.  (SAC ¶¶ 75, 78.)  Plaintiffs also make multiple specific allegations regarding the involvement of Chiesa and Tompkins in the hiring process with respect to the challenged promotions.  (See SAC ¶¶ 103, 111.)  Plaintiffs make multiple allegations that all of the defendants were involved in the hiring process with respect to some, but not all, of the specifically challenged promotions.  (See SAC ¶ 164 (promotion of Green to the September 2012 MI-3 Position made and announced by Coschignano with the active participation of all other defendants except Rizzo);  SAC ¶ 190 (selection of Gerardi for the April 2014 MI-3 Position made and announced by Tompkins with the participation of all other defendants except Rizzo);  SAC ¶ 196 (Rizzo selected for the April 2014 MI-4 Position by Coschignano with the help of other defendants, including Tompkins); SAC ¶ 211 (promotion of Cheriyan to the September 2014 MI-3 Position made and announced by Coschignano, with the active participation of all other defendants); SAC ¶ 278 (promotion of Greco to Principal Medical Facilities Auditor made by Coschignano and Cox, "with the active participation of some or all of the defendants").)  The SAC sufficiently alleges the personal involvement of Coschignano, Coyne, Cox, Chiesa, Rizzo,

---

[1] Plaintiffs bring no claim against Rizzo for disparate treatment under the NYCHRL.  (SAC at 64.)

Tompkins, and Byrnes, to the extent they were employed at OMIG when the promotional

decisions were made, to satisfy the personal involvement requirements of section 1983, the

NYSHRL, and the NYCHRL.  While plaintiffs list Bedell as a defendant in the caption, the SAC

fails to list any claim brought against him.  All claims against Bedell are thus dismissed.

      B.  Disparate Treatment Claims.

          i.     Failure to Promote.

Plaintiffs bring claims of disparate treatment based on race, age, sex, and national

origin against various defendants under section 1983, the NYSHRL, and the NYCHRL.  To

survive a motion to dismiss a plaintiff bringing employment discrimination claims under these

statutes alleging disparate treatment by way of a failure to promote is required to make a *prima

facie* showing that "(1) she is a member of a protected class; (2) she applied and was qualified

for a job for which the employer was seeking applicants; (3) she was rejected for the position;

and (4) the position remained open and the employer continued to seek applicants having the

plaintiff's qualifications."  Estate of Hamilton v. City of New York., 627 F.3d 50, 54-55 (2d Cir.

2010) (*prima facie* case applies to Title VII, NYSHRL, and NYCHRL); see Feingold, 366 F.3d

at 159 (equal protection claims under section 1983 parallel Title VII claims).  The fourth element

is also established when "the employer fills the position with a person outside the protected class

who was similarly or less qualified than the plaintiff."  Yu v. New York City Hous. Dev. Corp.,

494 F. App'x 122, 125 n.4 (2d Cir. 2012) (internal quotation marks omitted).  The NYCHRL is

intended to be construed more liberally than federal and state counterparts.  See N.Y. City

Admin. Code § 8-130(a) ("The provisions of this title shall be construed liberally. . . regardless

of whether federal or New York state civil and human rights laws, including those laws with

provisions worded comparably to provisions of this title, have been so construed."); see also Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009).

Ordinarily, the second element of the *prima facie* case requires a "specific application" to a specific job opening.  Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004).  However, this "specific application requirement" is excused where "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer."  Id.

### a.   Plaintiff's *Prima Facie* Cases.

Plaintiffs have all alleged sufficient facts to satisfy the *prima facie* requirements that they did not receive the challenged promotions, that they were qualified for the promotions and more qualified than the people who received the promotions, and that they either applied for the challenged promotions or the vacancies were not posted and they were unaware of the vacancies before they were filled.  The remaining inquiry regards whether, for each claim, the plaintiff is a member of a protected class and whether the position was filled with a candidate not from that protected class.

Doran, as a white person, is considered part of a protected class for the purposes of determining whether he was discriminated against on the basis of race in favor of non-whites. See Broich v. Inc. Vill. of Southampton, 462 F. App'x. 39, 43 (2d Cir. 2012).  He is also a member of a protected class as a man, Judge v. New York City Police Dept., No. 05 cv 240 (JSR), 2008 WL 852010, at *2 (S.D.N.Y. Mar. 27, 2008), over 40 years of age, Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 316 n.1, 317 (2d Cir. 1999), and of non-Italian ancestry. Doran thus states a claim for race discrimination with respect to the September 2012 MI-3 Position, which was filled by Green, an African-American woman, and the September 2014 MI-

24

3 Position, which was filled by Cheriyan, an Indian-American man. Doran states a claim for national origin discrimination with respect to the January 2013 MI-3 Position, the April 2014 MI-3 Position, and the April 2014 MI-4 Position, which were filled by individuals of Italian ancestry. Doran states a claim for sex discrimination with respect to the September 2012 MI-3 Position and the April 2014 MI-3 Position, which were filled by women. Doran states a claim for age discrimination with respect to the June 2013 MI-3 Position and the April 2014 MI-3 Position, which were filled by younger candidates.[2]

Plaintiff Baez is a member of protected classes as a Hispanic woman over 40 years of age. Baez states a claim for race and national origin discrimination with respect to the September 2012 MI-3 Position, the January 2013 MI-3 Position, the April 2014 MI-3 Position, and the September 2014 MI-3 Position, all of which were filled by individuals not within the Hispanic protected class. Baez states a claim for sex discrimination with respect to the January 2013 MI-3 Position and the September 2014 MI-3 Position, both of which were filled by men. Baez fails to state a claim for age discrimination because, while she alleges that she is over 40 years old and thus a member of a protected class, she fails to allege that any of the individuals who received the promotions she challenges were younger than she.

Plaintiff Linn is a member of protected classes as a Caucasian man of Jewish ancestry[3] over the age of 40. Linn thus states a claim for race discrimination with respect to the September 2012 MI-3 Position, which was filled by Green, an African-American woman, and

---

[2] Plaintiffs may state a claim for age discrimination by alleging that they are over 40 and were discriminated against in favor of a younger person, regardless of whether that person is also over 40. See Metro. Opera Ass'n, 192 F.3d at 317.

[3] While the Second Circuit has not ruled on whether Jewish ancestry is a class protected by Title VII, such that discrimination based on Jewish ancestry could be challenged under section 1983, such discrimination has been found to count as race discrimination under other civil rights statutes. See United States v. Nelson, 277 F.3d 164, 177 (2d Cir. 2002) (42 U.S.C §§ 1981, 1982); T.E. v. Pine Bush Cent. Sch. Dist., 58 F. Supp. 3d 332, 354-55 (S.D.N.Y. 2014) (Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.).

the September 2014 MI-3 Position, which was filled by Cheriyan, an Indian-American man.

Linn states a claim for discrimination based on his Jewish ancestry with respect to the January

2013 MI-3 Position, the June 2013 MI-3 Position, the April 2014 MI-3 Position, the April 2014

MI-4 Position, the September 2014 MI-3 Position, the Principal Medical Facilities Auditor

position, and the DMIG position, all of which were filled by individuals not of Jewish heritage or

ancestry.  Linn states a claim for sex discrimination with respect to the April 2014 MI-3 Position

which was filled by a woman.  Linn states a claim for age discrimination with respect to the

January 2013 MI-3 Position, the June 2013 MI-3 Position, the April 2014 MI-3 Position, the

Principal Medical Facilities Auditor position, and the DMIG position, which were all filled by

younger candidates.

    Shaporov is a member of protected classes as a white man of Russian ancestry

who was born in Russia.  Shaporov states a claim for race discrimination with respect to the

September 2012 MI-3 Position, which was filled by Green, an African-American woman, and

the September 2014 MI-3 Position, which was filled by Cheriyan, an Indian-American man.

Shaporov does not state a claim for national origin discrimination based on being born in Russia

because he does not allege that the individuals who filled the challenged positions were not born

in Russia.  However, he does state a claim for national origin discrimination based on his

Russian ancestry with respect to the January 2013 MI-3 Position, the April 2014 MI-3 Position,

and the April 2014 MI-4 Position, which were filled by individuals of Italian ancestry.  Shaporov

states a claim for sex discrimination with respect to the September 2012 MI-3 Position and the

April 2014 MI-3 Position, which were filled by women.

    The Court finds that where any plaintiff has failed to state a claim under section

1983 or the NYSHRL they have also failed to state a claim under the NYCHRL.  Even though

the NYCHRL "must be reviewed independently from and 'more liberally' than their federal and state counterparts," <u>Loeffler</u>, 582 F.3d 268, 278, plaintiffs must still at least plead facts sufficient to give rise to an inference of discriminatory intent, <u>Dowrich-Weeks v. Cooper Square Realty, Inc.</u>, 535 F. App'x 9, 12 n.3 (2d Cir. 2013); <u>Bennett v. Health Mgt. Sys., Inc.</u>, 936 N.Y.S.2d 112, 117 (App. Div. 2011), which they have failed to do with respect to the challenged promotions for which they have not alleged that the position was filled by someone outside their protected class.

ii.    <u>Other Discriminatory Actions.</u>

Shaporov alleges that he was discriminated against by Rizzo and Coyne on the basis of his Russian national origin and ancestry through, among other things, verbal harassment, preventing him from using a state car, and withholding approval of overtime such that he was required to complete official business on his own time.

To state a claim for employment discrimination under section 1983 under such circumstances, "a plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." <u>Vega</u>, 801 F.3d at 83 (internal quotation marks omitted). "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." <u>Id.</u> at 85. Such a change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Id.</u> "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." <u>Id.</u>

27

Shaporov is of Russian ancestry and national origin, and thus a member of a protected class.  Shaporov alleges that he was qualified for his position.  By refusing to approve overtime for Shaporv such that he was required to perform official duties on his own time Rizzo subjected Shaporov to an adverse employment action.  See Robinson v. Goulet, 525 F. App'x 28, 30 (2d Cir. 2013).  The fact that Rizzo made discriminatory remarks about Shaporov's Russian national origin, i.e., that Russians cannot be trusted, and derisive remarks about his accent gives rise to an inference of discriminatory animus.

Shaporov thus states a claim against Rizzo and Coyne for discrimination based on national origin and ancestry under section 1983.

C.   Retaliation Claims.

Plaintiffs bring retaliation claims under section 1983, the NYSHRL, and the NYCHRL against Coschignano, Coyne, Cox, Chiesa, Rizzo, Tompkins, and Byrnes.  Retaliation claims under the NYSHRL are construed pursuant to the same standards at its federal counterparts, including Title VII and 1983.  See Weinstock v. Columbia University, 224 F.3d 33, 42 n.1 (2d Cir. 2000); Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 n.3 (2004) (relying on federal Title VII precedent to construe the NYSHRL); Vega, 801 F.3d at 91 ("elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII").  The NYCHRL is to be construed more liberally than the federal standards and the NYSHRL, which serve as the floors below which NYCHRL enforcement must not fall.  See Williams v. New York City Housing Auth., 61 A.D.3d 62, 66-67 (1st Dept. 2009)).

"To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the

protected activity and that adverse action." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks omitted); see also Patane, 508 F.3d at 115-17 (analyzing retaliation claim under the NYCHRL and NYSHRL using the same criteria as Title VII). The analysis of retaliation claims under the NYCHRL is broader than the analysis under section 1983 and the NYSHRL, because under the NYCHRL "retaliation 'in any manner' is prohibited, and '[t]he retaliation . . . need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment.'" Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010) (quoting N.Y. City Admin. Code § 8-107(7)); see also Williams, 61 A.D.3d at 69-72.

Denial of a promotion is a materially adverse action. See Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002). "[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." Summa v. Hofstra Univ., 708 F.3d 115, 127-28 (2d Cir. 2013). Plaintiffs allege that defendants knew about their complaints. (SAC ¶ 346.)

        i.     Doran

Doran alleges that he engaged in numerous protected activities, including complaining to OMIG, the NYSIG, his union, and the New York State Division of Human Rights about alleged discrimination he suffered at OMIG. Doran alleges that he was retaliated against in response to these protected activities by being denied promotion to the June 2013 MI-3 Position (SAC ¶ 187), the April 2014 MI-3 Position (SAC ¶ 192), the April 2014 MI-4 Position (SAC ¶ 199), and the January 2016 MI-3 Position (SAC ¶ 217). Doran alleges that Rizzo "tacitly admitted" that he was selected for the April 2014 MI-4 position by Coschignano to "target" OMIG employees who had complained about the failure to promote them for

discriminatory reasons.  (SAC ¶ 200.)  This is sufficient to draw the inference that the selection

of Rizzo rather than Doran for the April 2014 MI-4 Position was causally connected to Doran's

prior complaints.  Rizzo was hired on April 24, 2014, shortly after Doran's April 10 complaint,

and the January 2016 MI-3 Position was filled shortly after Doran filed this lawsuit in September

2015.  Doran claims that he was further retaliated against in September 2015 by having his

primary supervisory functions transferred to other individuals.  (SAC ¶ 218.)  The facts alleged

in the SAC give fair notice of a facially plausible retaliation claim sufficient to meet the pleading

standard, and the motion to dismiss Doran's retaliation claims is denied.

ii.  <u>Baez</u>

Plaintiff Baez has engaged in various protected activities including complaining

to OMIG, the NYSIG, her union, and the New York State Division of Human Rights about

alleged discrimination she suffered at OMIG.  Baez alleges that she was retaliated against in

response to these protected activities by being denied promotion to the January 2013, April 2014,

and January 2016 MI-3 Positions.  (SAC ¶ 246.)  The failure to promote Baez to the January

2016 MI-3 Position, at least, was sufficiently close in time to when Baez engaged in the

protected activity of filing this lawsuit to indirectly establish a causal connection.  Baez also

complained to OMIG, the NYSIG, and the New York State Civil Service Commission about

being denied the September 2012 MI-3 Position. (SAC ¶ 225.)  Though the SAC does not

specify when she complained, it is reasonable to infer that it was in late 2013 or early 2014, and

thus causally connected to her being denied the April 2014 MI-3 Position.  The facts alleged in

the SAC give fair notice of a facially plausible retaliation claim sufficient to meet the pleading

standard, and the motion to dismiss Baez's retaliation claims is denied.

30

Baez also alleges she was retaliated against in ways other than being denied promotions.  Baez alleges that she was transferred to work under Rizzo, who verbally harassed her, that Rizzo unlawfully accessed Baez's personnel folder and limited her access to investigative cases she had uploaded as part of her case load, accused her of time theft, and tracked her movements around the office.  Baez was asked to comply with random spot-checks of her completed work.  In May, 2015, Coyne threatened Baez with disciplinary action over her telecommuting in retaliation for her complaints of discrimination.  (SAC ¶ 258.)  However, excessive scrutiny and close monitoring without more do not constitute adverse employment actions.  See Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) ("Courts in this district have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions."); Castro v. New York City Bd. of Educ. Pers., 96 cv 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (finding that while "reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions").  While this alleged non-promotion related retaliation does not rise to the level of an adverse action necessary to state a claim under section 1983 or the NYSHRL, the lower standard of the NYCHRL prohibits any retaliation.  Further, the denial of the above mentioned promotions is sufficient to state a plausible claim of retaliation under all three statutes.

       iii.    Linn

Linn has engaged in various protected activities, including filing grievances with his union alleging that he was discriminated against at OMIG.  Linn alleges that he was retaliated against in response to these protected activities by being denied promotion to the Principal Medical Facilities Auditor position.  (SAC ¶ 282).  He further argues that the failure to promote

him to the January 2013 MI-3 Position, the April 2014 MI-3 Position, the April 2014 MI-4

Position, and the DMIG position constitute retaliation for his filing grievances alleging

discrimination.  (SAC ¶ 293).  Linn was denied promotion to Principal Medical Facilities

Auditor in February 2014 several weeks after filing a grievance alleging discrimination.  He was

denied the April 2014 MI-3 and MI-4 Positions approximately a month after he filed another

grievance alleging discrimination.  The fact that Linn was denied these promotions shortly after

engaging in protected activities is sufficient to establish a causal connection between the two at

the pleadings stage.

    The other events that Linn alleges were retaliation, such as being transferred to

work under Bedell, (SAC ¶ 295), which was humiliating because Bedell was younger and less

experienced, (SAC ¶ 296), and receiving unsatisfactory evaluations, (SAC ¶ 298), while not

rising to the level of an adverse employment action under section 1983 or the NYSHRL, may

meet the lower standard of the NYCHRL.  The facts alleged in the SAC give fair notice of a

facially plausible retaliation claim sufficient to meet the pleading standard, and the motion to

dismiss Linn's retaliation claims is denied.

                    iv.     <u>Shaporov</u>

    Plaintiff Shaporov has engaged in various protected activities, including

complaining to OMIG, the NYSIG, his union, and the New York Civil Service Commission

about alleged discrimination he suffered at OMIG.  Shaporov alleges that he was retaliated

against in response to these protected activities by being "forced to remain on probation from

January 2014 to about January 2015," (SAC ¶ 320), which prevented him from being eligible for

promotion, (SAC ¶ 321).  He alleges that he was retaliated against by being denied promotion to

the September 2012 MI-2 Position, the September 2012 MI-3 Position, the January 2013 MI-3

Position, the June 2013 MI-3 Position, the April 2014 MI-3 Position, the April 2014 MI-4 Position, the September 2014 MI-3 Position, and the January 2016 MI-3 Position.  (SAC ¶¶ 337-38.)  Shaporov made complaints alleging discrimination approximately two months before he was denied promotion to the June 2013 MI-3 Position, approximately two months before he was denied promotion to the April 2014 MI-3 and MI-4 Positions, and filed this lawsuit several months before he was denied promotion to the January 2016 MI-3 Position.  The fact that Shaporov was denied these promotions shortly after engaging in protected activities is sufficient to establish a causal connection between the two at the pleadings stage.  Further, Rizzo's racially tinged harassment of Shaporov, directed by Coschignano, beginning in May 2014, (SAC ¶ 340), was severe enough to qualify as an adverse action, and followed Shaporov's complaints of discrimination closely enough to be plausibly causally connected to those protected activities. The facts alleged in the SAC give fair notice of a facially plausible retaliation claim sufficient to meet the pleading standard, and the motion to dismiss Shaporov's retaliation claims is denied.

        D.   <u>Hostile Work Environment.</u>

        Baez and Shaporov bring claims under section 1983, the NYSHRL, and the NYCHRL against Rizzo and Coschignano under a hostile work environment theory of employment discrimination.

        A defendant may be liable under Title VII for creating a hostile work environment if "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ."  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted), <u>abrogated on other grounds by</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998).  The same standards apply to claims brought under section 1983.

Patterson v. Cty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).  Claims under the NYSHRL are construed pursuant to the same standards as its federal counterparts, including Title VII.  See Weinstock, 224 F.3d at 42 n.1.  "[C]laims under the [NYCHRL] must be reviewed independently from and 'more liberally' than their federal and state counterparts."  Loeffler, 582 F.3d at 278.

To state a claim for hostile work environment in violation of Title VII, a plaintiff must plead facts which tend to show that the complained of conduct: "(1) 'is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex,'" Patane, 508 F.3d at 113 (alterations in original) (quoting Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001)), or because of another characteristic protected by Title VII, Gregory, 243 F.3d at 692 (indicating that any characteristic protected by Title VII is sufficient to satisfy the third element).  Factors that courts consider in evaluating a hostile work environment claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23.

Shaporov pleads facts that are sufficient to meet this standard, as Shaporov alleges harassment inflicted by his superiors that was frequent, severe, and humiliating.  (See, e.g., SAC ¶ 343 ("Rizzo's repeated verbal harassment of Shaporov. . . included discriminatory remarks about Shaporov's Russian national origin."); SAC ¶ 352 ("Rizzo made derisive remarks about Shaporov 'speaking English,' in reference to his Russian accent and had been making such remarks before."); SAC ¶ 351 (Rizzo accused Shaporov of lying about an assignment in front of Shaporov's supervisors in order to harm his reputation.); SAC ¶ 345 (Rizzo started rumors that

Shaporov was lying about his work hours.); SAC ¶ 356 (Rizzo refused to approve overtime for Shaporov, which required Shaporov to perform official duties on his own time.); SAC ¶¶ 368-69 (Coyne altered one of Shaporov's performance evaluations that had been filled out by his direct supervisor.); SAC at ¶ 345 (Rizzo denied Shaporov the use of a state car to conduct field work.)

Baez has failed to state a claim for hostile work environment.  The facts pled in the complaint are plausibly attributable to a motivation to retaliate against Baez for her past complaints of discrimination, rather than by animus based on Baez's membership in a protected class.  (See Pl.'s Mem. in Opp., 29; SAC ¶ 247 ("Baez was transferred to work under newly hired MI-4 Rizzo in retaliation for filing grievances for promotion denials."); SAC ¶¶ 253, 255 (random spot-checks of Baez's work were instituted as retaliation against Baez for filing grievances); SAC ¶ 257 (verbal harassment and punitive spot-checking "were also in retaliation against Baez for filing grievances"); SAC ¶ 258 ("Coyne threatened Baez with disciplinary action, including a counseling memo, over her telecommuting in retaliation for her discrimination complaints. . . .").)  Further, a supervisor's close scrutiny and unreasonable criticism, without more, fails to rise to the level of "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ."  Harris, 510 U.S. at 21 (internal quotation marks and citation omitted).  Neither do the actions Baez complains of rise to the level of a hostile work environment under the more lenient standards of the NYCHRL.  See Dowrich-Weeks, 535 F. App'x at 13 & n.4 (dismissal of hostile work environment claims under the NYCHRL proper when those claims are based on actions that were not alleged to have been rooted in any protected characteristic and were not frequent or severe enough to constitute a hostile work environment).

CONCLUSION

Experience has shown that a complaint may be sufficient to withstand a motion to dismiss, but, after discovery, the facts may look quite differently on a motion for summary judgment or at trial.

The following claims for legal relief against the individual defendants in their individual capacities survive defendants' motion to dismiss: all plaintiffs' claims for discrimination by disparate treatment based on race and national origin under section 1983 against Coschignano, Coyne, Cox, Chiesa, Rizzo, Tompkins, and Byrnes; all plaintiffs' claims for discrimination by disparate treatment based on race and sex under the NYCHRL against Coschignano, Coyne, Cox, Chiesa, Tompkins, and Byrnes; Doran's and Linn's claims for discrimination by disparate treatment based on age under the NYCHRL against Coschignano, Coyne, Cox, Chiesa, Tompkins, and Byrnes; Doran's and Linn's claims for discrimination by disparate treatment based on age under the NYSHRL against Coschignano, Coyne, Cox, Chiesa, Rizzo, Tompkins, and Byrnes; all plaintiffs' claims for discrimination by disparate treatment based on race and sex under the NYSHRL against Coschignano, Coyne, Cox, Chiesa, Rizzo, Tompkins, and Byrnes; all plaintiffs' claims for retaliation under section 1983, the NYSHRL, and the NYCHRL against Coschignano, Coyne, Cox, Chiesa, Rizzo, Tompkins, and Byrnes; and Shaporov's claims for hostile work environment under section 1983, the NYSHRL, and the NYCHRL against Coschignano and Rizzo.  Plaintiffs' claims for equitable relief survive against Rosen, Coyne, Chiesa, Rizzo, Tompkins, and Byrnes.  All other claims are dismissed.

The defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk is directed to terminate the motion (Dkt. No. 73).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      March 2, 2017