UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ROBERT DORAN, MARIA BAEZ,
ALEXANDER SHAPOROV, and
BERNARD LINN,

                              Plaintiffs,                          15-cv-7217 (PKC)

              -against-
                                                                  OPINION AND
                                                                  ORDER

NEW YORK STATE DEPARTMENT OF
HEALTH OFFICE OF THE MEDICAID
INSPECTOR GENERAL, DENNIS ROSEN,
JAMES C. COX, DAN COYNE, ANNA
COSCHIGNANO, SHERRI TOMPKINS,
ROBERT BYRNES, RUSSELL S. RIZZO,
MATHEW CHIESA, CHRISTOPHER BEDELL,
and JOHN and JANE DOES 1-5
(said names being fictitious, the persons intended
being those who aided and abetted the unlawful
conduct of the named Defendants),

                              Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

              Plaintiffs Robert Doran, Maria Baez, Alexander Shaporov, and Bernard Linn

bring this action for employment discrimination under the Age Discrimination in Employment

Act of 1967 ("ADEA"), 42 U.S.C. § 1983, New York State Human Rights Law ("NYSHRL"),

and the New York City Human Rights Law ("NYCHRL").  Plaintiffs allege that eight individual

defendants discriminated against them based on race, sex, national origin, age, and Jewish

ancestry, retaliated against them for complaining about the discrimination, and created a hostile

work environment.[1]  Defendants, namely, Dennis Rosen, Anna Coschignano, Robert Byrnes,

---

[1] On March 2, 2017, this Court issued a Memorandum and Order (Doc. 92) dismissing all claims against the New
York State Department of Health Office of the Medicaid Inspector General and Christopher Bedell, along with

Daniel Coyne, James Cox, Sherri Tompkins, Mathew Chiesa, and Russell Rizzo have moved for summary judgment on all claims except Doran's ADEA claim against Rosen in his official capacity for injunctive relief.[2]

Plaintiffs have expressly withdrawn all of their discrimination claims related to the appointments of Eunice Green (September 2012 MI-3 Position), Lisa Gerardi (April 2014 MI-3 Position), Eugene Greco (PMFA Position), and Mark Kelly (DMIG Position).[3] (Pl. Br. at 4 n.1). Those claims are accordingly dismissed. Defendants' motion for summary judgment will be granted in part and denied in part.

BACKGROUND FACTS

The facts discussed below are undisputed except where otherwise noted.[4] The Court has drawn all reasonable inferences in favor of the plaintiffs, as the nonmovants. See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

*OMIG and It's Organizational Hierarchy*

The Office of the Medicaid Inspector General ("OMIG") is an independent entity created within the New York State Department of Health ("DOH") to promote and protect the integrity of the New York State Medicaid program. (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2). There

---

numerous other claims. In this Opinion, the Court will only discuss the claims and parties that survived the motion to dismiss.

[2] Defendants do not challenge this claim in their moving brief. They discuss it only in their reply brief, (Def. Reply at 18-19), and plaintiffs have not had an opportunity to respond. The Court will not consider defendants' arguments with respect to this claim and will not discuss it in the remainder of this Opinion. See Playboy Enterprises, Inc. v. Dumas, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997), aff'd, 159 F.3d 1347 (2d Cir. 1998) ("Arguments made for the first time in a reply brief need not be considered by a court.").

[3] The Court employs the same terminology that it used in its Memorandum and Order disposing of defendants' motion to dismiss to refer to the challenged promotions.

[4] Any citation to the parties' Rule 56.1 Statements incorporates by reference the documents and testimony cited therein.

are multiple divisions within OMIG including the Division of Medicaid Investigations ("DMI"), which is responsible for investigating allegations of fraud and abuse in Medicaid, the Division of Medicaid Audit ("DMA"), which is a separate division that handles Medicaid audits, and the Division of Administration, which includes the Department of Human Resources ("HR"). (Def. 56.1 ¶ 3; Pl. 56.1 Resp. ¶ 3).

The Deputy Medicaid Inspector General for Investigations ("DMIG") is the highest position within DMI. (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4). The DMIG oversees directly or indirectly approximately 100 staff members located in OMIG's offices throughout the State. (Id.). There are two Assistant Medicaid Inspector General ("AMIG") positions within DMI that are under the DMIG. (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5). One AMIG position is located in the New York City office. (Id.). Below the DMIG and AMIG positions, are Medicaid Investigator ("MI") positions, which range from Levels 1 to 5. (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6). MI-1s and MI-2s conduct investigations, MI-3s act as mid-level managers who directly supervise the lower-level employees, and MI-4s and MI-5s are high-level managers who generally supervise MI-3s. (Def. 56.1 ¶¶ 6, 143-44; Pl. 56.1 Resp. ¶¶ 6, 143-44). The DMI also has Management Specialist ("MS") positions and MS responsibilities include, among other things, reviewing Medicaid participant applications. (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7).

MIs are generally members of the Public Employees Federation ("PEF"), and the collective bargaining agreement with PEF sets forth a process for responding to contract grievances. (Def. 56.1 ¶ 39; Pl. 56.1 Resp. ¶ 39).

Rosen is the Medicaid Inspector General ("MIG") at OMIG. (Def. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 24). He is named in this lawsuit only in his official capacity for injunctive relief in a claim brought by Doran under the Age Discrimination in Employment Act ("ADEA"). (Id.).

Cox was appointed Acting MIG in July 2011 and received a permanent appointment in March 2012. (Def. 56.1 ¶ 25; Pl. 56.1 Resp. ¶ 25). Cox left OMIG on December 31, 2014. (Id.).

Coschignano was the DMIG for Investigations from March 2012 to December 2014. (Def. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26). Coschignano was born in 1956 and is of Italian and German ancestry. (Def. 56.1 ¶¶ 26, 27; Pl. 56.1 Resp. ¶¶ 26, 27).

Coyne was hired at OMIG as a Senior Attorney in 2009. (Def. 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 28). He was appointed to Assistant Medicaid Inspector General ("AMIG") in 2014. (Id.). As AMIG, he had the highest position in DMI in OMIG's New York City office under Coschignano. (Id.). Coyne was appointed as acting DMIG when Coschignano left OMIG in December 2014, and he held this position until August 2015. (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29). In April 2017, Coyne was again appointed as acting DMIG, and he officially became DMIG in November 2017. (Id.).

Byrnes was hired as an MI-4 in the DMI NYC office. (Def. 56.1 ¶ 30; Pl. 56.1 Resp. ¶ 30). As an MI-4, his duties and responsibilities included overseeing the operations of a number of investigative units in the NYC office. (Id.). Byrnes was promoted to MI-5 in March 2015. (Def. 56.1 ¶ 31; Pl. 56.1 Resp. ¶ 31). Byrnes retired from OMIG in November 2018. (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32). Byrnes was born in 1947. (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 33).

Rizzo's official start date at OMIG was May 5, 2014. (Def. 56.1 ¶ 34; Pl. 56.1 Resp. ¶ 34). He was hired as an MI-4 in the DMI NYC office. (Id.). As an MI-4, his main duties and responsibilities included supervising MI-3s. (Id.). Rizzo was born in 1953 and is of Italian ancestry. (Def. 56.1 ¶¶ 35, 44; Pl. 56.1 Resp. ¶¶ 35, 44).

Tompkins has worked at OMIG or its predecessor agencies for 35 years. (Def. 56.1 ¶ 36; Pl. 56.1 Resp. ¶ 36). She currently works in OMIG's Division of Administration in HR and has never been supervised by anyone in DMI. (Def. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37). She has worked in HR since 2008 where she is responsible for recruitment and staffing. (Def. 56.1 ¶ 36; Pl. 56.1 Resp. ¶ 36).

Chiesa began working at OMIG in January of 2010 and he left OMIG in the summer of 2016. (Def. 56.1 ¶ 38; Pl. 56.1 Resp. ¶ 38). During his time at OMIG, he was the Director of Employee Relations. (Id.). As such, he was responsible for anything that fell within the labor relations realm, which included employee discipline, assisting supervisors with counseling of employees if there were problems, and hearing and responding to contract grievances. (Id.). As Director of Employee Relations, Chiesa also acted as an intermediary among management, staff, and union representatives. (Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 40). He has never been supervised by anyone in DMI. (Id.). Chiesa is of Italian and Irish descent. (Pl. 56.1 Resp. ¶ 38).

*The Plaintiffs*

Plaintiffs Robert Doran, Maria Baez, Alexander Shaporov, and Bernard Linn are all current employees of OMIG. (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1).

Robert Doran was born in 1956 and identifies as a white male whose ethnic background is Irish. (Def. 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12). He is not of Italian ancestry. (Pl. 56.1

¶ 382; Def. 56.1 Resp. ¶ 382).  OMIG appointed Doran to an MI-1 position in February 2009 and promoted him to an MI-2 position in 2010, both in the Fraud Investigations Unit at the DMI NYC office.  (Def. 56.1 ¶¶ 13-14; Pl. 56.1 Resp. ¶¶ 13-14; Pl. 56.1 ¶ 388; Def. 56.1 Resp. ¶ 388).

Maria Baez is a Hispanic woman.  (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15).  She was born in 1973 in Puerto Rico.  (Id.).  OMIG hired Baez to an MI-2 position in August 2008.  (Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16).

Alexander Shaporov was born in 1983 and identifies as a white male of Russian national origin and ancestry.  (Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17).  He speaks with a Russian accent and English is his second language.  (Pl. 56.1 ¶ 409; Def. 56.1 Resp. ¶ 409).  OMIG hired Shaporov for an MI-1 position in February 2009.  (Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18).  On January 20, 2014, OMIG promoted Shaporov to an MI-2 position.  (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19).

Bernard Linn was born in 1952 and identifies as a white male of Jewish heritage and ancestry.  (Def. 56.1 ¶ 21; Pl. 56.1 Resp. ¶ 21).  In 1978, Linn began working as a Management Specialist Level 1 ("MS-1").  (Def. 56.1 ¶ 22; Pl. 56.1 Resp. ¶ 22).  He was promoted to MS-2 in 2006.  (Id.).

*OMIG Hiring and Recruitment*

Positions at OMIG are usually classified as either non-competitive or competitive. MI positions are in the "non-competitive" category.  (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8).  As such, candidates for these positions are not required to take a civil service examination to qualify. (Id.).  However, they must meet certain "minimum qualifications," which vary depending on the position.  (Id.).  OMIG develops the minimum qualifications for the MI positions in consultation

with the New York State Department of Civil Service ("DCS").  (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10).

OMIG has an Agency Policy & Procedural Manual that sets forth a process for recruitment and selection of candidates for employment.  (Pl. 56.1 ¶¶ 436-37; Tompkins Decl. ¶ 26).  The APPM outlines two methods by which a non-competitive position can be filled: by posting the position and conducting interviews, or through "alternate recruitment."  (Pl. 56.1 ¶ 441; Tompkins Decl. ¶¶ 26-33).  With respect to "alternate recruitment," it provides that

> "In limited instances, it may be reasonable to pursue appointment without implementation of a full recruitment plan (alternate recruitment).  Alternate recruitment requests are appropriate only when there are few qualified and eligible internal candidates, or when a uniquely qualified candidate has been identified through other legitimate means.  Approval of requests for alternate recruitment must result in selection of a qualified candidate who would have reasonably been identified had a recruitment plan been implemented, and should not substantially affect the general ability of qualified candidates to express interest in and be considered for positions within the agency."

(Pl. 56.1 ¶ 441).

A statewide hiring freeze came into effect in 2008.  (Tompkins Decl. ¶ 27).  Since 2008, Tompkins explains that, in practice, filling positions usually involves requesting a budget waiver from the New York State Division of Budget and posting a job announcement.  (Id.).  Thereafter, Tompkins would review applications and determine which candidates meet the minimum qualifications, DMI managers would set up an interview panel and select candidates to be interviewed, and the panel would recommend a candidate to the DMI manager, who then nominates a person for appointment.  (Id.).  OMIG then requests approval from the Governor's Appointments Office, background checks occur, and OMIG extends an offer.  (Id.).

Coschignano was appointed as DMIG in March 2012 during the hiring freeze. (Def. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26). In the DMI NYC office, the AMIG and MI-5 positions are the highest-ranking positions under the DMIG and oversee most or all of the staff in that office. (Def. 56.1 ¶ 45; Pl. 56.1 Resp. ¶ 45). Shortly before Coschignano became DMIG, a senior MI-5 in the NYC office retired and an AMIG left the office. (Def. 56.1 ¶ 46; Pl. 56.1 Resp. ¶ 46). One of the two MI-3s in that office also left within months of Coschignano's arrival. (Def. 56.1 ¶ 47; Pl. 56.1 Resp. ¶ 47). As a result of these departures, Coschignano was directly supervising investigative staff in the DMI NYC office when she began. (Def. 56.1 ¶ 48; Pl. 56.1 Resp. ¶ 48). Coschignano declares that because she was responsible for staff members throughout the State, she wanted to make promotions and appointments as quickly as possible in DMI NYC. (Cosch. Decl. ¶¶ 9, 14-16). Shortly after Coschignano became DMIG, OMIG requested and received approval to fill some of its vacancies. (Def. 56.1 ¶ 53; Pl. 56.1 Resp. ¶ 53).

*The Alleged Discriminatory and Retaliatory Conduct*

A number of plaintiffs' claims revolve around appointments made by OMIG during Coschignano's tenure as DMIG. These promotions include Anthony Canade's appointment to the January 2013 MI-3 position, Christopher Bedell's promotion to the June 2013 MI-3 position, Russell Rizzo's appointment to the April 2014 MI-4 position, and Thomas Cheriyan's promotion to the September 2014 MI-3 position. Plaintiffs also make discrimination, retaliation, and hostile work environment claims related to various other alleged discriminatory and retaliatory conduct. The Court will discuss the facts relating to these claims below in the course of analyzing those claims. However, some of plaintiffs' evidence serves as relevant background information and is discussed here.

During Coschignano's tenure as DMIG from March 5, 2012 to December 13, 2014, 27 appointments were made in DMI across the State of New York. (Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 42). Of the 27, five were filled by people in or around their 30s (one of whom was Shaporov), seven by people in or around their 40s, four by people in or around their 50s, and eleven by people in or around their 60s or older. (Def. 56.1 ¶ 43; Pl. 56.1 Resp. ¶ 43). Twelve appointments were for MI-3 or higher positions. (Def. 56.1 ¶ 44; Pl. 56.1 Resp. ¶ 44). Of those twelve, five were filled by people in or around their 60s, including Rizzo and Cheriyan. (Id.). Plaintiffs present evidence that three out of these 27 appointees were of Italian ancestry, namely Anthony Canade, Russell Rizzo, and Lisa Gerardi. (Id.; Cosch. Dep. at 257). Canade was appointed to an MI-3 position, Gerardi to an MI-3 position, and Rizzo to an MI-4 position. (Def. 56.1 ¶¶ 93, 95, 145, 179-82, 193; Pl. 56.1 Resp. ¶¶ 93, 95, 145, 179-82, 193).

None of these three candidates worked at OMIG at the time that they were appointed to their respective positions. (Def. 56.1 ¶¶ 74-75, 147, 193; Pl. 56.1 Resp. ¶¶ 74-75, 147, 193). Canade was hired through "alternate recruitment," while Rizzo and Gerardi were appointed via the ordinary recruitment process. (Def. 56.1 ¶¶ 74-95, 143-94; Pl. 56.1 Resp. ¶¶ 74-95, 143-94). Rizzo and Gerardi were the only external candidates considered for their respective positions and Coschignano sat on both of their panels. (Id.). Coschignano advocated for Canade and Gerardi to receive salaries $10,000 above the hiring rate. (Pl. 56.1. ¶¶ 76, 193). Unlike Canade and Rizzo, Gerardi was appointed to an MI-3 position in the DMI Albany office rather than the NYC office. (Def. 56.1 ¶¶ 183, 185-86; Pl. 56.1 Resp. ¶¶ 183, 185-86). OMIG posted an internal job announcement for Gerardi's position in 2013 and none of the plaintiffs applied. (Id.).

Coschignano knew Gerardi and Rizzo prior to her employment at OMIG. Coschignano knew Gerardi because they worked together at the Department of Health and Human Services for a few years before Gerardi applied to OMIG. (Cosch. Dep. at 36-37). Rizzo testified that he and Coschignano met in March 2012 at a wedding and that during this encounter, Rizzo told Coschignano that he was retiring soon and she told him to "Give me your business card. When you retire send me your resume." (Pl. 56.1 Resp. ¶ 145). Shaporov testified that Coschignano told him she knew Rizzo for years prior to working at OMIG from her previous job where she worked on cases with Rizzo. (Shap. Dep. at 259-60). Rizzo's promotion is discussed in more detail below.

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "When the burden of proof at trial would fall on the

nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

In an employment discrimination case where "the merits turn on a dispute as to the employer's intent," courts exercise caution in granting summary judgment to a defendant. Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). In such cases, "[n]o one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." Walsh v. N.Y. City Housing Auth., 828 F.3d 70, 76 (2d Cir. 2016). "Even in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment" and summary judgment is appropriate when there is no genuine issue of material fact. Holcomb, 521 F.3d at 137 (citation omitted); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006); see Burke v. Gutierrez, No. 04 CIV. 7593(PKC), 2006 WL 89936, at *4 (S.D.N.Y. Jan. 12, 2006), aff'd sub nom. Burke v. Evans, 248 F. App'x 206 (2d Cir. 2007) ("[W]here an employer provides convincing evidence explaining its conduct and the

plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact."). Courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

DISCUSSION

Plaintiffs assert numerous claims for discrimination, retaliation, and hostile work environment pursuant to section 1983, NYSHRL, and NYCHRL. The Court will first address plaintiffs' failure to promote claims alleging discrimination, then plaintiffs' retaliation claims, and, finally, Shaporov's disparate treatment and hostile work environment claims.

I. Plaintiffs' Failure to Promote Claims

Plaintiffs failure to promote claims arise under section 1983, NYSHRL, and NYCHRL and are asserted against defendants Coschignano, Byrnes, Coyne, Cox, Tompkins, Chiesa, and Rizzo in their individual capacities. These claims assert discrimination based on race, national origin, Jewish ancestry,[5] age, and sex. The race discrimination claims arise under section 1983, NYSHRL, and NYCHRL. The age and sex discrimination claims arise under NYSHRL and NYCHRL. The national origin discrimination claims arise under section 1983.

The claims that arise under section 1983 and NYSHRL are governed by the familiar burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S.

---

[5] Though the Second Circuit has not decided whether Jewish ancestry is a protected class under Title VII such that discrimination based on Jewish ancestry can be challenged under section 1983, Jewish ancestry has been treated as a form of race discrimination under other civil rights statutes. See United States v. Nelson, 277 F.3d 164, 177 (2d Cir. 2002) (discussing 42 U.S.C. §§ 1981 and 1982). Defendants do not argue that Jewish ancestry discrimination claims are not cognizable under section 1983, NYSHRL, or NYCHRL. The Court will thus treat the Jewish ancestry discrimination claims as race discrimination claims.

792 (1973) for Title VII claims.  <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 311–12 (2d Cir. 2015) (holding that disparate treatment claims under section 1983 are "subject to the burden-shifting evidentiary framework set forth in <u>McDonnell</u>"); <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 80 (2d Cir. 2010) (holding that discrimination claims under the NYSHRL are subject to same framework).

This framework consists of three steps.  First, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination."  <u>Holcomb</u>, 521 F.3d at 138.  To establish a prima facie case of discriminatory failure to promote, a plaintiff must demonstrate that "(1) [he or she] is a member of a protected class; (2) [he or she] applied and was qualified for a job for which the employer was seeking applicants; (3) [he or she] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."  <u>Yu v. New York City Hous. Dev. Corp.</u>, 494 F. App'x 122, 124–25 (2d Cir. 2012) (citing <u>Estate of Hamilton v. City of New York</u>, 627 F.3d 50, 55 (2d Cir. 2010)).  "[T]he fourth element is also established if the employer fills the position with 'a person outside the protected class who was similarly or less qualified than' the plaintiff."  <u>Id.</u> at 124–25 n.4.  In age discrimination cases, this fourth element is "modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person."  <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 79 (2d Cir. 2005).

If plaintiff succeeds at the first step, "the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'"  <u>Yu</u>, 494 F. App'x at 125.  "The defendant's burden in this regard is only one of production, not of persuasion. . . . the defendant need not persuade the Court that the proffered purpose was in fact its reason for having taken the challenged employment action."  <u>Memnon v. Clifford Chance US,</u>

LLP, 667 F. Supp. 2d 334, 341 (S.D.N.Y. 2009) (citing Fisher v. Vassar College, 114 F.3d 1332, 1335–36 (2d Cir. 1997)).

"If the defendant articulates such a reason, the presumption of discrimination [raised by the prima facie case] drops out, . . . and the plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Woodman, 411 F.3d at 76. At this step, plaintiff must show that "the defendant was actually motivated, at least in part, by discrimination."[6] Hardekopf v. Sid Wainer & Son, No. 02-cv-3251 (LAP), 2004 WL 2199502, at *6 (S.D.N.Y. Sept. 29, 2004). "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Borzon v. Green, No. 18-2211, 2019 WL 2754960, at *2 (2d Cir. July 2, 2019) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Holcomb, 521 F.3d at 138.

Discrimination claims under the NYCHRL must be analyzed "separately and independently from any federal and state law claims" and courts must "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013). "[E]ven if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader

---

[6] The Court notes that under the ADEA, an age discrimination claim requires proof that "the age discrimination was the 'but for cause' of the adverse employment action," as opposed to proof "that age discrimination 'motivated at least in part' the adverse employment action." Piccone v. Town of Webster, 511 F. App'x 63, 64 n.1 (2d Cir. 2013). The "but-for" standard does not govern plaintiffs' age discrimination claims, which arise under the NYSHRL and NYCHRL only. Id.

New York City standards." Id. "To prevail on liability [under the NYCHRL], the plaintiff need only show differential treatment,—that [he or] she is treated less well—because of a discriminatory intent." Id. at 110 (internal quotation marks omitted). "When applying this standard, however, district courts must be mindful that the NYCHRL is not a 'general civility code.'" Id. Plaintiff still bears the burden of showing that he or she "has been treated less well at least in part *because of* [his or] her [protected characteristic]." Id. (internal quotation marks omitted). As always, defendant is entitled to summary judgment "if the record establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions." Id. at 110 n.8 (citation omitted).

### A. Plaintiffs' Failure to Promote Claims Against Chiesa, Rizzo, Coyne, Byrnes, Cox, and Tompkins Are Dismissed

As will be discussed in detail below, the only failure to promote claims that survive are Linn and Doran's age discrimination claims related to Christopher Bedell's promotion to the June 2013 MI-3 position. These claims arise under the NYSHRL and the NYCHRL. Before discussing the merits of the failure to promote claims, the Court notes that these claims do not survive against certain defendants because they were not personally involved and did not actually participate in the alleged discriminatory conduct.

An individual may only be held liable under section 1983 "if that individual is personally involved in the alleged deprivation." Littlejohn, 795 F.3d at 314 (internal quotation marks omitted). That defendant, additionally, "must act with discriminatory purpose." Raspardo v. Carlone, 770 F.3d 97, 125 (2d Cir. 2014). As such, when discrimination claims are asserted against multiple defendants, a court must "examine each individual defendant's actions to determine whether he [or she] treated the plaintiffs disparately on the basis of [a protected characteristic]." Id. Personal involvement exists where "(1) the defendant participated directly

in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." Littlejohn, 795 F.3d at 314. "If individual liability is shown under [Section] 1983, it is also established under the SHRL and CHRL." Hagan v. City of New York, 39 F. Supp. 3d 481, 514 (S.D.N.Y. 2014) (citing Feingold v. New York, 366 F.3d 138, 157–58 (2d Cir. 2004)).

Under the NYSHRL, a supervisor or co-worker is liable if that person "actually participates in the conduct giving rise to [the] discrimination." Feingold, 366 F.3d at 157–58 (citing Tomka, 66 F.3d at 1317). Defendants actually participate if they "aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." Id. (citing N.Y. Exec. Law § 296(6)). "Aiding and abetting liability requires that the aider and abettor 'share the intent or purpose of the principal actor[] [because] there can be no partnership in an act where there is no community of purpose.'" Brice v. Sec. Operations Sys., Inc., No. 00 CIV. 2438 (GEL), 2001 WL 185136, at *4 (S.D.N.Y. Feb. 26, 2001) (citation omitted). Co-workers need not have "authority to either hire or fire the plaintiff" in order to "actually participate[]." Feingold, 366 F.3d at 157–58 (citing Tomka, 66 F.3d at 1317). These same standards apply to NYCHRL claims "because the language of the two laws is 'virtually identical'" on this point. Id. at 158–59 (collecting cases).

The failure to promote claims are asserted against Coschignano, Cox, Tompkins, Chiesa, Rizzo, Coyne, and Byrnes in their individual capacities. These claims are dismissed with respect to defendants Cox, Tompkins, Chiesa, Rizzo, Coyne, and Byrnes.

Plaintiffs have abandoned the failure to promote claims against Chiesa and Rizzo because defendants have asserted that there is no evidence that either Chiesa or Rizzo were involved in any way in denying plaintiffs any of the challenged promotions (Def. Br. at 31-34) and plaintiffs have not, in their response, pointed to any evidence of the personal involvement of these defendants or addressed defendants' arguments. Felix v. City of New York, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018) ("[A court] may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); see also Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."). Similarly, the failure to promote claims against Byrnes and Coyne are dismissed because plaintiffs only argue that Byrnes and Coyne were involved in the promotion of Thomas Cheriyan (Pl. Br. at 55) and, as will be later shown, no failure to promote claims related to the promotion of Cheriyan survive.

The failure to promote claims are also dismissed with respect to Tompkins, who plaintiffs argue aided and abetted the discriminatory acts of other defendants. See Feingold, 366 F.3d at 157–58 (discussing how the NYSHRL and NYCHRL provide for individual liability when defendants "aid, abet, incite, compel or coerce" another person to engage in conduct giving rise to discrimination). Although Tompkins participated in the challenged appointments, for example, by determining that candidates met the minimum qualifications for the positions (Def.

56.1 ¶¶ 243-44; Pl. 56.1 Resp. ¶¶ 243-44), plaintiffs have not presented any evidence that

Tompkins "share[d] the intent or purpose" of other defendants, i.e. that Tompkins harbored any

discriminatory intent against plaintiffs. See Brice, 2001 WL 185136, at *4 ("Aiding and abetting

liability requires that the aider and abettor share the intent or purpose of the principal actor."

(internal quotation marks omitted)).

      The failure to promote claims against Cox are also dismissed. Plaintiffs argue

that Cox was "personally involved" because he signed off on Coschignano's appointments,

received and reviewed discrimination complaints from plaintiffs about the appointments, and

took no remedial action after receiving those complaints. (Def. 56.1 ¶ 258; Pl. 56.1 Resp. ¶ 258;

Cox Dep. at 61-66). They argue that Cox's conduct amounts to "deliberate indifference." See

Littlejohn, 795 F.3d at 314 ("Personal involvement can be established by showing that . . . after

being informed of the violation through a report or appeal, [a defendant] failed to remedy the

wrong . . . [or] exhibited deliberate indifference . . . by failing to act on information indicating

that unconstitutional acts were occurring.").

      "Deliberate indifference" exists when "the defendant's response to known

discrimination is clearly unreasonable in light of the known circumstances." Back v. Hastings

On Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004). "In an appropriate case,

there is no reason why courts, on a motion . . . for summary judgment . . . , could not identify a

response as not 'clearly unreasonable' as a matter of law." Id. (holding that defendant did not act

with deliberate indifference where defendant conducted an "inquiry" into plaintiff's

discrimination complaint and "[t]here [was] no indication that . . . his investigation [was]

undertaken with a jaundiced eye").

Plaintiffs have not presented evidence from which a reasonable jury could conclude that Cox acted with deliberate indifference. The parties do not dispute that after receiving the discrimination complaints, Cox conducted an "analysis" of those complaints by reviewing the demographics of selected candidates and concluded that no discrimination occurred. (Pl. 56.1 Resp. ¶ 259; Pl. 56.1 ¶ 459; Def. 56.1 Resp. ¶ 459). Plaintiffs point out that in Cox's testimony, Cox admits that he did not generate a report based on his analysis, does not recall comparing the qualifications of selected candidates against unselected candidates in the course of the analysis, and could not conclude that the most qualified candidates were selected for promotion. (Pl. 56.1 Resp. ¶ 259; Pl. 56.1 ¶ 459; Def. 56.1 Resp. ¶ 459). However, this testimony does not reveal that Cox's "investigation [was] undertaken with a jaundiced eye." Back, 365 F.3d at 127. On the summary judgment record, no reasonable jury could conclude that Cox's "response to known discrimination [was] clearly unreasonable in light of the known circumstances." Id. The failure to promote claims against Cox are dismissed.

The failure to promote claims that survive only survive against Coschignano. As described in more detail below, these claims survive against Coschignano because the evidence shows that Coschignano was personally involved in Bedell's promotion by setting up his interview panel, drafting his interview questions, and ultimately nominating him for the position and plaintiffs have come forward with some evidence, which if believed, shows that Coschignano harbored an age-based discriminatory preference in favor of "young blood." See infra Part I.C.

B. Anthony Canade and the January 2013 MI-3 Position

Anthony Canade was hired to fill the January 2013 MI-3 position. Based on this appointment, plaintiffs assert a number of failure to promote claims. Doran, Baez, and Shaporov

assert national origin discrimination claims, Baez additionally asserts race and sex discrimination claims, and Linn asserts age discrimination claims and discrimination claims based on his Jewish ancestry. The claims arise under section 1983, NYSHRL, and NYCHRL.

Canade identifies as being of mixed Albanian and Italian descent and he speaks with an Italian-American accent. (Canade Decl. ¶ 4; Henry Decl. ¶ 10). He was 43 years old when he was hired at OMIG. (Def. Ex. 50). At that time, Linn was 61 years old. (Pl. 56.1 ¶ 496). Canade's application materials for the MI-3 position disclose that he attended college from 1987 to 1991 and lists work experience beginning in 1995. (Pl. 56.1 Resp. ¶ 85).

Canade did not work at OMIG when he was hired for this position. (Def. 56.1 ¶¶ 74-75; Pl. 56.1 Resp. ¶¶ 74-75). He was hired through "alternate recruitment" without an interview and the opening for the position he filled was never posted. (Def. 56.1 ¶¶ 74-95; Pl. 56.1 Resp. ¶¶ 74-95). As such, no OMIG employees, including plaintiffs, were considered for the position filled by Canade. (Def. 56.1 ¶ 95; Pl. 56.1 Resp. ¶ 95). Coschignano and Cox testified that Canade was referred to OMIG by the Governor's office. (Def. 56.1 ¶ 74; Pl. 56.1 Resp. ¶ 74). Linn testified that Canade was a "political appointment." (Id.). Tompkins marked his resume as received by OMIG on July 12, 2012 and wrote "Governor's referral" at the top. (Def. Exs. 29, 31, 33; Tompkins Decl. ¶ 57).

Coschignano declared that when Canade was referred, she was impressed by his resume and asked HR whether he could be considered for a "supervisory position." (Def. 56.1 ¶ 76; Pl. 56.1 Resp. ¶ 76). Tompkins informed her that Canade did not qualify for an MI-4 position. (Def. 56.1 ¶¶ 76-77; Pl. 56.1 Resp. ¶¶ 76-77). Based on the resume he submitted, she also could not approve him for an MI-3 position and informed Coschignano that for him to meet the MI-3 minimum qualifications, Canade had to clarify that he had "two years of direct

supervisory or team leader experience in investigations." (Id.). Coschignano called Canade to pass along this message and ask for clarification. (Def. 56.1 ¶ 78; Pl. 56.1 Resp. ¶ 78). Coschignano had never met Canade before this call, which was the first time she spoke to him. (Def. 56.1 ¶¶ 83-84; Pl. 56.1 Resp. ¶¶ 83-84).

After the call Canade produced a revised resume, which included a new line stating that at a previous job, he "lead investigative team members, agency staff, vendors, and organizations to resolve complaints and investigations." (Def. 56.1 ¶¶ 79-80; Pl. 56.1 Resp. ¶¶ 79-80). Based on the revised resume, Tompkins determined that Canade satisfied the minimum qualifications for the MI-3 position. (Def. 56.1 ¶ 81; Pl. 56.1 Resp. ¶ 81). The parties dispute whether Canade actually met the minimum qualifications. (Def. 56.1 ¶¶ 81-82; Pl. 56.1 Resp. ¶¶ 81-82).

Coschignano contacted Canade's three references, who were Canade's former co-workers and who spoke highly of his performance. (Def. 56.1 ¶¶ 88, 92; Pl. 56.1 Resp. ¶¶ 88, 92). Coschignano extended an employment offer to Canade on January 9, 2013. (Def. 56.1 ¶ 93; Pl. 56.1 Resp. ¶ 93). Coschignano declares that when she extended this offer, she did not know Canade's race, ethnicity, national origin, age, or religion and believed that his last name sounds French. (Def. 56.1 ¶¶ 85-86; Pl. 56.1 Resp. ¶¶ 85-86).

With that background, the Court will discuss Doran, Baez, Linn, and Shaporov's claims of relating to the hiring of Canade.

        i.   Baez's Sex Discrimination Claims and Linn's Jewish Ancestry
           Discrimination Claims Are Dismissed as Abandoned

Baez's sex discrimination claims based on the Canade appointment are asserted only under the NYSHRL and the NYCHRL, while Linn's Jewish ancestry discrimination claims based on this appointment are asserted under section 1983, NYSHRL, and NYCHRL.

Defendants argue that these claims should be dismissed because plaintiffs have presented no evidence that any of the named defendants participated in the promotion of Canade motivated in any part on any kind of discriminatory animus. (Def. Br. at 30-34). In response, plaintiffs have not pointed to evidence demonstrating that any defendant acted on Canade's hiring with discriminatory intent towards Baez based on gender or Linn based on Jewish ancestry. (See Pl. Br. at 53-55). Because plaintiffs have not offered evidence that any defendant harbored discriminatory animus against Baez or Linn on the basis of Baez's gender or Linn's Jewish ancestry in response to defendants' arguments, the Court deems that plaintiffs have abandoned Baez's sex discrimination claims and Linn's Jewish ancestry discrimination claims based on the Canade appointment. See Felix, 344 F. Supp. 3d at 654; Jackson, 766 F.3d at 196. These claims are accordingly dismissed.

      ii. Doran, Shaporov, and Baez's National Origin and Race
          Discrimination Claims Are Dismissed

Doran, Baez, and Shaporov assert that discrimination against them based on national origin was the reason they were passed over for promotion in favor of Canade. Additionally, Baez asserts race discrimination claims. Doran, Baez, and Shaporov's national origin claims under section 1983 and Baez's race discrimination claims under section 1983 and NYSHRL are dismissed.

For the purpose of this motion, the Court assumes without deciding that Doran, Shaporov, and Baez have made out a prima facie claim of discrimination. In response, defendants have proffered a legitimate nondiscriminatory reason for promoting Canade. Specifically, defendants assert that the DMI NYC office had a management shortage, Coschignano wanted to appoint managers quickly to reduce her supervisory burden, and Canade was fortuitously referred by the Governor's office and appointed without considering any

internal candidates.  (Cosch. Decl. ¶¶ 11-16, 27-41).  In support of this purported reason,

defendants have presented evidence and testimony documenting the management shortage at the

DMI NYC office, testimony that Canade was referred to the office by the Governor's office,

Canade's resume, and notes documenting the positive evaluations that Canade's references gave

him.  Plaintiffs dispute whether DMI actually had an urgent management shortage, whether

Canade was actually referred by the Governor's office, and whether Canade actually met the

minimum qualifications, but at this step, defendants' burden is one of "production, not

persuasion."  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142 (2000).

  In response to defendants' stated reason, plaintiffs do not present evidence from

which a reasonable jury could conclude that the reason proffered was a pretext for discrimination

based on national origin or race.  Even if the Court generously assumed that defendants'

purported reason was a pretext, plaintiffs have not presented evidence that would enable a

reasonable fact-finder to conclude that it was a pretext for discrimination.  See Borzon, 2019 WL

2754960, at *2 ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is

shown *both* that the reason was false, *and* that discrimination was the real reason."); see also

Ghent v. Moore, 324 F. App'x 55, 57 (2d Cir. 2009) ("[E]ven if we were [to] assume, arguendo,

that explanations provided by Defendants could be found by a jury to be pretextual, we do not

find sufficient evidence of discrimination to allow the case to survive summary judgment.").

  In sum, plaintiffs' evidence suggesting that either race or national origin

discrimination was the "real reason" for hiring Canade consists entirely of the following:

Coschignano's part-Italian ancestry, testimony that Canade speaks with an Italian accent,

evidence that during Coschignano's tenure, three out of 27 hires were of Italian ancestry (namely

Canade, Gerardi, and Rizzo), evidence that each of these three people were external hires,

evidence that Coschignano advocated for Canade and Gerardi to receive salaries $10,000 above the hiring rate, and statistical evidence that plaintiffs suggest demonstrates that the number of persons of Italian ancestry that Coschignano hired was disproportionate to the local population. Considering all of this evidence in its totality, a reasonable jury could not conclude that defendants were motivated in any part by discriminatory intent in failing to promote Baez, Doran, or Shaporov. Such a finding would be based on "mere speculation and conjecture." See Bickerstaff, 196 F.3d at 448.

   Plaintiffs' purported statistical evidence is not substantiated by the record. Plaintiffs make the bare assertion that 40% of the 27 appointees were of Italian descent, based on plaintiffs' analysis of the surnames of those appointees, and argue that 40% is disproportionate to New York State's Italian population of 15%. (Pl. 56.1 ¶ 43 (citing United States Census 2000, available at https://www.niaf.org/culture/statistics/states-with-the-highest-population-of-italian-americans/)). However, plaintiffs do not describe how they determined which surnames were Italian, and based on the Court's review of the relevant exhibits, this figure appears inaccurate. (See Def. Exs. 50, 51). Plaintiffs only present evidence that three out of the 27, i.e. 11%, were of Italian descent (Canade, Gerardi, and Rizzo). In any case, disproportionate representation has limited significance where the sample size is so small at a mere 27. See Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 121–22 (2d Cir. 1997) ("A statistical showing of discrimination rests on the inherent improbability that the institution's decisions would conform to the observed pattern unless intentional discrimination was present. The smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it.").

Moreover, the fact that Coschignano hired three persons of Italian ancestry externally, hired one of Italian ancestry (Canade) through "alternate recruitment," and purportedly lobbied for two persons of Italian ancestry (Gerardi and Canade) to receive a $10,000 salary hike, has limited significance where Coschignano knew two out of the three candidates (Gerardi and Rizzo) prior to her time at OMIG. As such, a reasonable jury could not conclude that Coschignano's hiring decisions were motivated in part by race or national origin discrimination rather than favoritism based on friendship. See Reichert v. Perdue, No. 18-2452-CV, 2019 WL 4410255, at *2 (2d Cir. Sept. 16, 2019) ("[P]retext may mask an unsavory, but not illegal, motivation such as 'back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility.'" (citing Fisher v. Vassar Coll., 114 F.3d 1332, 1337-38 (2d Cir. 1997))); cf. DeCintio v. Westchester Cty. Med. Ctr., 807 F.2d 304, 308 (2d Cir. 1986) ("Appellees were not prejudiced because of their status as males; rather, they were discriminated against because Ryan preferred his paramour.").

The national origin and race discrimination claims under section 1983 and NYSHRL are dismissed. Though the NYCHRL is broader, Baez's race discrimination claim under NYCHRL is also dismissed because, for the reasons discussed above, the evidence would not allow a reasonable jury to could conclude by a preponderance of the evidence that Baez was "treated less well at least in part *because of*" her race. See Mihalik, 715 F.3d at 110.

### iii. Linn's Age Discrimination Claim Is Dismissed

Linn's age discrimination claims based on Canade's appointment and arising under NYSHRL and NYCHRL are dismissed. In analyzing the NYSHRL claim, the Court assumes without deciding that Linn has made out a prima facie claim of age discrimination. In response and as discussed above, defendants have satisfied their burden of offering a legitimate

nondiscriminatory reason for promoting Canade, namely that the DMI NYC office had a management shortage, that Coschignano wanted to quickly appoint managers to alleviate her supervisory burden, and that Canade was fortuitously referred from the Governor's office and thereafter appointed without considering other candidates. (Cosch. Decl. ¶¶ 11-16, 27-41).

In response, plaintiffs do not present evidence from which a reasonable jury could conclude that the stated reason was a pretext for age discrimination. As evidence of discriminatory animus, plaintiffs present testimony that Byrnes informed Linn that Coschignano wanted to hire "young blood"[7] and that Coschignano spent more time at work with the younger employees. (Pl. 56.1 Resp. ¶¶ 44, 93, 423-33; Pl. Ex. 30; Doran Dep. at 76-79; Linn Dep. at 98). They also present evidence that Linn was in his 60s when Canade, a 43-year-old, was hired, and that Linn had more supervisory experience and OMIG experience than Canade. (Id.).

On the issue of pretext, plaintiffs assert that both the hiring need and the Governor's referral were pretexts for age discrimination. Plaintiffs argue that the hiring urgency was a pretext because Coschignano started at OMIG in March 2012 but did not begin filling vacancies until four months later when she received Canade's resume in July 2012. (Pl. 56.1 Resp. ¶ 50). They additionally point to evidence that at the time Coschignano was appointed, Doran had been performing MI-3 functions in the NYC office for over a year (since October 2010) and yet Doran was never promoted to alleviate the hiring need. (Id.).

_____

[7] Defendants argue that Byrnes's statement is hearsay. At the time Byrnes made this statement to Linn, Byrnes was an MI-5 at DMI NYC, who reported directly to Coschignano, and Linn testified that Byrnes has "some input on who's going to be promoted, since these people are going to be working under him" and that he is the "No. 2 or No. 3 person in the chain of command" at the DMI NYC office. (Linn Dep. at 81-83). Similarly, Coschignano testified that she solicited Byrnes's input on hiring decisions and made joint hiring decisions with Byrnes. (See, e.g., Cosch. Dep. at 451). Therefore, this statement is not hearsay because it qualifies as a statement "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" under Fed. R. Evid. 801(d)(2)(D). See United States v. Rioux, 97 F.3d 648, 661 (2d Cir. 1996) ("The statements of agents with supervisory power regarding 'the attitudes, intentions or policies of . . . higher-ups' do concern matters within the agent's authority.").

Coschignano testified that the reason she chose to hire Canade, an external candidate, over promoting someone from within, such as Doran, is that, during the hiring freeze, Cox had "exempted positions," which could be used on external candidates but not internal candidates. (Pl. 56.1. Resp. ¶ 76; Cosch. Dep. at 261). Plaintiffs argue that this explanation further suggests pretext because Cox testified that he did not have a way of "waiv[ing] through a promotion" during the hiring freeze, while Tompkins and Cox testified that they believed it would be easier to promote an internal candidate during a hiring freeze than to hire an external candidate. (Pl. 56.1 Resp. ¶ 76; Tompkins Dep. at 49-51).

Plaintiffs' evidence does not rebut the urgency of defendants' hiring need because plaintiffs do not dispute that around the time that Coschignano was hired, an AMIG, an MI-5, and an MI-3 position opened up in the DMI NYC office such that Coschignano was directly supervising many staff members in that office. Additionally, plaintiffs' assertion that Coschignano made no attempt to hire before Canade's resume arrived is undercut by documentary evidence that in April 2012, just one month after Coschignano was appointed, Tompkins signed a budget waiver request form for an MI-3 position. (Def. Ex. 29). That request form lists "Anna Coschignano" as the "Requestor." (Id.).

The fact that Coschignano's belief that Cox had "exempted" positions applicable to external candidates was incorrect does not create pretext. When Canade submitted his application, Coschignano had only worked at OMIG for a short period of time and defendants have presented evidence that someone from HR explained to Coschignano in an email about Canade's candidacy that "The only other options we have is [sic] to place [Canade] in an exempt position. We have few of these positions and these are left to [Cox's] discretion." (Pl. Ex. 33;

Cosch. Decl. ¶ 49). Plaintiffs do not present evidence that Coschignano's purported belief was a lie rather than a mistake.

Crucially, plaintiffs' also present no evidence to rebut defendants' evidence that Canade was hired as a Governor's referral. In support of their assertion that Canade was promoted based on a Governor's referral, defendants have offered the testimony of both Cox and Coschignano that Canade was referred from the Governor's office and testimony by Linn himself that Canade was a "political appointment." Additionally, Cox testified that Governor's referrals could be vetoed but that he only recalled vetoing such a referral once or twice. (Cox Dep. at 171-75). Plaintiffs do not present evidence of any other instances where referrals were vetoed.

Plaintiffs point to Tompkins's testimony that Governor's referral candidates were usually emailed to HR and that she was not told that Canade was a Governor's referral. (Tompkins Dep. at 82-83). But Tompkins's denial is contradicted documentary evidence such as an email from Tompkins in which she addressed Canade as a "Governor's Referral" while discussing his minimum qualifications, and an internal copy of Canade's resume with the words "Governor's Referral" written at the top, which Tompkins admits she wrote. (Tompkins Decl. ¶ 57; Def. Ex. 29; Pl. Ex. 18).

Through discovery, plaintiffs have had a fair opportunity to discover the sequence of events through which Canade's candidacy became known to OMIG. In light of that opportunity, it is notable that plaintiffs do not themselves present any evidence of how Canade's resume arrived at OMIG other than by a Governor's referral or any testimony by Canade or anyone from the Governor's office denying defendants' version of events. Plaintiff's argue that "[f]rom this ambiguity, a jury could reject the 'Governor's referral' story." (Pl. Br. at 13).

However, because "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," plaintiffs bear the consequence of the lack of evidence on this point.  Holcomb, 521 F.3d at 138.

Plaintiffs' failure to rebut the evidence that Canade was referred from the Governor's office or to present evidence that such referrals are vetoed with any frequency at OMIG is futile to their discrimination claims because Coschignano did not consider anyone but Canade for the MI-3 position and no plaintiff submitted an application to the position.  Unlike Christopher Bedell's promotion to MI-3, which is discussed later in Supra Part I.C. in relation Linn and Doran's corresponding age discrimination claims, Canade's appointment was made without posting a job vacancy or seeking applications and without comparing Canade to other potential candidates.  Plaintiffs have failed to come forward with probative evidence, not merely speculation, that would enable a reasonable jury to conclude that the proffered reasons for hiring Canade were a pretext.  See Borzon, 2019 WL 2754960, at *2 ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.").

Linn's age discrimination claim under the NYSHRL based on the Canade promotion is dismissed.  Though the NYCHRL is broader, Linn's age discrimination claim under the NYCHRL is also dismissed because, for the reasons discussed above, plaintiffs' evidence does not enable a reasonable jury to conclude that Canade's promotion was motivated in part "because of" the fact that Canade was younger than Linn.  See Mihalik, 715 F.3d at 110.

C.  Christopher Bedell and the June 2013 MI-3 Position

Christopher Bedell was promoted to the June 2013 MI-3 position.  Based on this promotion, the remaining failure to promote claims consist of the following: Doran and Linn's

age discrimination claims and Linn's Jewish ancestry discrimination claims. These claims arise under section 1983, NYSHRL, and NYCHRL.

Bedell identifies as a white male of mixed ancestry. (Def. 56.1. Resp. ¶ 442). He was promoted to the June 2013 MI-3 position when he was 34 years old. (Pl. 56.1 ¶ 496; Def. 56.1 Resp. ¶ 496). At that time, Doran was 57 and Linn was 61. (Id.). OMIG posted a job announcement for this position in June 2013. (Pl. 56.1 ¶ 494; Def. 56.1 Resp. ¶ 494). The posting sought candidates for an MI-3 position supervising investigations. (Pl. 56.1 ¶¶ 494-95; Def. 56.1 Resp. ¶¶ 494-95; Mulhall Decl. ¶ 36). Bedell, Doran, Linn, Baez, Cheriyan, Anthony Murphy, Susan Ostrowski, and Maliaka Williams applied. (Def. 56.1 ¶ 98; Pl. 56.1 Resp. ¶ 98). All candidates were OMIG employees in the DMI NYC office at the time. (Def. 56.1 ¶ 99; Pl. 56.1 Resp. ¶ 99). Ultimately, Tompkins determined that Doran, Linn, and Bedell met the minimum qualifications for the MI-3 position including the requirement of two years as a supervisor, team leader, or lead worker. (Def. 56.1 ¶ 101; Pl. 56.1 Resp. ¶ 101). However, with respect to Bedell, Tompkins initially found him unqualified based on his resume until Bedell submitted additional information. (Pl. 56.1 Resp. ¶ 101).

The candidates were interviewed in August by a panel of three people, Christopher Mulhall, Matthew Babcock, and William Gilbert, who all worked for OMIG and were stationed in Albany. (Def. 56.1 ¶ 102; Pl. 56.1 Resp. ¶ 102; Pl. 56.1 ¶¶ 497-98; Def. 56.1 Resp. ¶¶ 497-98). Mulhall and Gilbert were employed by DMI, while Babcock was not. (Cosch. Decl. ¶ 53). At the time, Mulhall was an AMIG and reported directly to Coschignano. (Pl. 56.1 Resp. ¶ 103). Gilbert was an MI-4 and reported directly to Mulhall. (Pl. 56.1 Resp. ¶ 108).

Coschignano personally contacted Mulhall to sit on the panel and to find other panelists. (Cosch. Decl. ¶ 53). She declares that she thought panelists from outside of the NYC

office could "offer a fresh perspective." (Id.). Though Coschignano denies reviewing candidate resumes and knowing which candidates were interviewed, the documentary evidence reveals that Coschignano personally emailed the interview panelists the candidate resumes and directed them to hold interviews sometime in August 2013. (Pl. 56.1 Resp. ¶ 102).

The panelists asked the interviewees the same set of questions, scored their answers, and took notes. These interview questions were drafted by Coschignano and Mulhall. (Id.). According to the panelists' declarations and notes, all of the them thought that Bedell interviewed well and gave detailed examples of his experience in response to questions. (Def. 56.1 ¶¶ 113-15, 121, 127; Pl. 56.1 Resp. ¶¶ 113-15, 121, 127). Mulhall thought Bedell was "Impressive and Articulate." (Def. 56.1 ¶¶ 114-15; Pl. 56.1 Resp. ¶¶ 114-15). Gilbert noted that Bedell had a good work ethic and that he had contacts with the New York Attorney General's office. (Def. 56.1 ¶ 121; Pl. 56.1 Resp. ¶ 121). Bedell received scores of 114, 98, and 89 from Mulhall, Gilbert, and Babcock, respectively, for an average score of 100. (Def. 56.1 ¶¶ 120, 125, 131; Pl. 56.1 Resp. ¶¶ 120, 125, 131).

Neither Mulhall nor Gilbert thought that Doran interviewed well. (Def. 56.1 ¶¶ 116-17, 122; Pl. 56.1 Resp. ¶¶ 116-17, 122). Both thought that his answers were short and that he did not provide enough examples of his work. (Id.). Mulhall thought that Doran "[d]id not articulate well." (Def. 56.1 ¶ 117; Pl. 56.1 Resp. ¶ 117). Doran received scores of 61, 61, and 71 from Mulhall, Gilbert, and Babcock, respectively, for an average score of 64. (Def. 56.1 ¶¶ 120, 125, 131; Pl. 56.1 Resp. ¶¶ 120, 125, 131). All three interviewers thought that Linn interviewed well. (Def. 56.1 ¶¶ 118, 123, 130; Pl. 56.1 Resp. ¶¶ 118, 123, 130). However, Mulhall and Gilbert were concerned that more of Linn's experience was in audits rather than investigations, while the open MI-3 position required supervising investigations, not audits. (Def. 56.1 ¶¶ 118,

123-24; Pl. 56.1 Resp. ¶¶ 118, 123-24). Linn received scores of 95, 75, and 92 from Mulhall, Gilbert, and Babcock, respectively, for an average score of 87. (Def. 56.1 ¶¶ 120, 125, 131; Pl. 56.1 Resp. ¶¶ 120, 125, 131).

The panelists declare that they discussed the interviews, agreed that Bedell was the best candidate for the MI-3 position, and informed Coschignano of their recommendation. (Def. 56.1 ¶¶ 132-33; Pl. 56.1 Resp. ¶¶ 132-33). Coschignano declares she agreed with the panel's recommendation. (Def. 56.1 ¶ 135; Pl. 56.1 Resp. ¶ 135). Coschignano signed a nomination form on October 4, 2013. (Def. 56.1 ¶¶ 136-37; Pl. 56.1 Resp. ¶¶ 136-37).

i. Linn's Jewish Ancestry Discrimination Claims Are
Dismissed as Abandoned

Linn's Jewish ancestry discrimination claims under section 1983, NYSHRL, and NYCHRL are dismissed. Defendants assert that there is no evidence from which a jury could conclude that they engaged in discrimination based on Linn's Jewish ancestry and point to evidence that the panelists never made disparaging remarks about Linn's Jewish ancestry or treated him unfairly because of his faith. (Def. Br. at 18-19). In response, plaintiffs have failed to point to any evidence which, if believed, would permit a reasonable jury to conclude that Linn's Jewish ancestry or faith played a role in the decision not to promote him. Indeed, plaintiffs do not address defendants' arguments with respect to the Jewish ancestry discrimination claims in their response brief and thus the Court deems that they have abandoned those claims. See Felix, 344 F. Supp. 3d at 654; Jackson, 766 F.3d at 196.

ii. Linn and Doran's Age Discrimination Claims Survive

Linn and Doran's age discrimination claims under NYSHRL and NYCHRL survive. Plaintiffs' burden of establishing a prima facie case of discrimination is "minimal" and both Linn and Doran meet that burden here. Littlejohn, 795 F.3d at 312–13. First, they have

presented evidence that Linn was 61 and Doran was 57 at the time of Bedell's promotion such that they were both over the age of 40 and thus members of a protected class.  See Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101–02 (2d Cir. 2001) superseded on other grounds by Fed. R. Civ. P. 37(e).  Second, they both "applied and [were] qualified" for the June 2013 MI-3 position since it is not disputed that they both submitted applications and met the minimum qualifications.  Third, it is not disputed that both Doran and Linn were rejected.

Lastly, the fourth element requires that the employer fill the position with "a significantly younger person" who is "similarly or less qualified than the plaintiff."  On this point, there is no dispute that Bedell was 34 when promoted while Linn was 61 and Doran was 57.  Plaintiffs have also presented evidence that Bedell was "similarly or less qualified" than both Doran and Linn.  This evidence includes Linn's extensive work experience—specifically, that Linn has over 35 years of experience working for OMIG, which includes experience both in audits and investigations, undercover experience, and supervisory experience.  (Pl. 56.1 Resp. ¶¶ 93, 423-33).  It also includes Doran's 30 years of experience working for federal and state agencies, including OMIG, and his years of supervisory experience, including supervisory experience filling in for a departing MI-3 at the DMI NYC office starting in October 2010.  (Pl. 56.1 ¶¶ 383-95; Def. 56.1 Resp. ¶¶ 383-95).  While Linn and Doran both had years of supervisory experience at OMIG, Bedell did not have either team leader or supervisory experience at OMIG.  (Pl. 56.1 ¶¶ 422-33, 383-95, 524; Def. 56.1 Resp. ¶¶ 422-33, 383-95, 524).  Indeed, Bedell had only about two to three years of experience as a team leader at a previous job, which was not reflected on his resume until he failed to meet the minimum qualifications and resubmitted his application.  (Pl. Ex. 40).

Defendants assert a legitimate nondiscriminatory reason for the promotion of Bedell, namely that a panel of three interviewers agreed that Bedell's was the best interview out of those who met the minimum qualifications. (Cosch. Decl. ¶¶ 59-62). To corroborate this purported reason, defendants have submitted evidence of the interviewers' evaluation forms, which on average, gave Bedell a score of 100, Linn a score of 87, and Doran and score of 64. Their evidence also includes the declarations that the interviewers submitted in this case and the contemporaneous notes they took during the interviews summarizing their impressions of the candidates.

In response, plaintiffs argue that Coschignano intended for Bedell to be promoted from the outset and that the interview process was a formality, serving merely as a cover for Coschignano to choose Bedell over Doran and Linn because of age-related animus. As evidence of pretext, plaintiffs present evidence that Coschignano began interviewing candidates only after she received a union complaint from PEF and complaints from DMI employees about her failure to conduct interviews. (Pl. 56.1 ¶ 94; Cosch. Decl. ¶¶ 23-24; Pl. Exs. 19, 39, 131). They also point out that Coschignano personally chose Mulhall as a panelist, who then chose Gilbert, and that both Mulhall and Gilbert were Coschignano's subordinates. Relatedly, they point to Mulhall's testimony, which reveals that Coschignano and Mulhall discussed candidates before and after interviews and, specifically, that they had discussions about the promotion potential of certain NYC staff members, including Bedell. (Pl. 56.1 ¶ 448-51).

Additionally, plaintiffs present evidence that the interviewers used two different evaluation forms during the interview process—one for Linn and Doran and one for Bedell. (Pl. 56.1 ¶¶ 507-08; Def. 56.1 Resp. ¶¶ 507-08). The form for Doran and Linn instructed the interviewers to circle a score and listed the numbers "0 1 2 3 4" on all questions that demanded a

score (resulting in the interviewers giving Linn and Doran scores ranging from 0 to 4), whereas the form for Bedell only listed the numbers "0 4" for certain questions (resulting in Bedell receiving 4s from all interviewers on all of those questions). (Id.). Specifically, Questions 2 and 3, worth a total of 36 points, were different on the two forms. (Id.). While the use of two forms may have been an innocent mistake, it undermines defendants' claim that Bedell performed best during those interviews. The inconsistency also suggests that the forms were not created carefully, which calls into question whether defendants considered the interview scores generated by those forms to be an important consideration in choosing among the candidates.

Lastly, plaintiffs also present evidence suggesting that Coschignano pre-selected another candidate, Gregory Waring, for an MI-3 position a few months after Bedell was appointed. Specifically, they present a memo written by Tompkins, dated September 12, 2013, which states that Waring was "Selected for MI 3 (Item 33302)" even though the MI-3 job vacancy associated with "Item 33302" was not posted until late September 2013, applications were not due until October 2013, interviews were not conducted until November 2013, and Waring was not nominated until January 2014. (Pl. 56.1 ¶¶ 528-30; Def. 56.1 Resp. ¶¶ 528-30).

Based upon the totality of the evidence, a reasonable jury could conclude that Coschignano pre-selected Bedell for the MI-3 position and the interview process was a formality.

Moreover, plaintiffs also present evidence that the purported reason was a pretext for discrimination based on age. They point to the evidence discussed above that Byrnes informed Linn that Coschignano wanted to hire "young blood" and that Coschignano spent more time at work with the younger employees. (Pl. 56.1. Resp. ¶¶ 44, 93, 423-33; Pl. Ex. 30; Doran Dep. at 76-79; Linn Dep. at 98). They also point to evidence that Bedell was 27 years younger than Linn and 23 years younger than Doran when hired. Lastly, they point to the disparity

between Bedell's experience and that of Doran and Linn—particularly the disparity in supervisory experience. The testimony regarding Coschignano's preference for "young blood" is particularly suggestive of discriminatory intent because it is not merely a "stray remark" regarding age—rather, it is an expression of a preference for younger employees by a decision-maker regarding hiring preferences to a subordinate (Byrnes) who had input into hiring decisions. (See Cosch. Dep. at 451 ("I evaluated the candidates speaking with Dan Coyne and Bob Byrnes, and it was agreed [who] should fill that position."); see Mullinix v. Mount Sinai Sch. of Med., No. 12-CV-8659 PKC, 2014 WL 3687217, at *15 (S.D.N.Y. July 24, 2014), on reconsideration in part, No. 12-CV-8659 PKC, 2015 WL 328050 (S.D.N.Y. Jan. 23, 2015) ("Although 'the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination' . . . '[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."); see, e.g., Nobler v. Beth Israel Med. Ctr., 702 F. Supp. 1023, 1029 (S.D.N.Y. 1988) (sufficient evidence of discriminatory intent in light of statements by hiring committee members that they were looking for "new blood," a "fresh face," and "a new outlook").

Defendants argue that Coschignano could not have been motivated by discriminatory animus because during Coschignano's tenure, 5 out of 12 supervisory positions were filled by people around their 60s or older and that Coschignano herself was 57 at the time. The fact that 5 out of 12 supervisory positions were filled by people around their 60s should be weighed by the jury in determining the presence of discriminatory animus. However, it does not render the record deficient of a triable issue of fact, especially since the evidence indicates that three of those five hires were promoted after internal discrimination complaints were filed. (Pl. 56.1 Resp. ¶¶ 44, 195; Pl. Exs. 50-51). With respect to the similarity in age, the Second Circuit

has observed that "[t]he proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." Danzer v. Norden Sys., Inc., 151 F.3d 50, 55 (2d Cir. 1998). Thus, though Coschignano's age is a relevant factor in the calculus, it is also a factor that should be weighed by the jury in light of all of the other evidence.

Based on this evidence, a reasonable jury could conclude that defendants' purported reason for promoting Bedell was a pretext for age discrimination. Thus, Linn and Doran's age discrimination failure to promote claims under the NYSHRL and the broader NYCHRL survive.

D.  Russell Rizzo and the April 2014 MI-4 Position

Russell Rizzo was appointed to the April 2014 MI-4 position. Doran and Shaporov claim that they did not receive the position because of national origin discrimination. Linn claims he did not receive the position because of Jewish ancestry discrimination. Doran, Shaporov, and Linn's claims arise under section 1983, NYSHRL, and NYCHRL.

Rizzo identifies as a white male of Italian descent. (Pl. 56.1 Resp. ¶ 44). As discussed, there is evidence that Rizzo and Coschignano met at a wedding at which Coschignano asked Rizzo to send her his resume and that they knew each other from previously working together. (Pl. 56.1 Resp. ¶ 145; Shap. Dep. at 259-60). In May 2012, Rizzo sent his resume to Coschignano and the resume stated that he spoke fluent Italian. (Pl. Ex. 46). In August 2013, Coschignano told Cox that she spoke with "Russ," that he was interested in working at OMIG, and that she planned to schedule an interview if Cox agreed. (Pl. Ex. 46). At some point in September 2013, Rizzo informally met with Cox and Coschignano to discuss the MI-4 position before submitting a formal application. (Rizzo Dep. at 136-40).

OMIG internally posted a job announcement for this position on October 9, 2013. (Def. 56.1 ¶ 146; Pl. 56.1 Resp. ¶ 146). Seven candidates applied for the position including Doran, Linn, and Rizzo. (Def. 56.1 ¶ 147; Pl. 56.1 Resp. ¶ 147). Rizzo was the only external candidate who applied or was interviewed. (Tompkins Decl. ¶ 105). Shaporov did not apply. (Def. 56.1 ¶ 148; Pl. 56.1 Resp. ¶ 148). Rizzo, Linn, and Doran each met the minimum qualifications and were all interviewed for the position by a panel consisting of Coschignano, Mulhall, and Harry Glick. (Def. 56.1 ¶ 150; Pl. 56.1 Resp. ¶ 150). At the time, Glick did not work in DMI and did not report to Coschignano. (Def. 56.1 ¶ 153; Pl. 56.1 Resp. ¶ 153).

The panelists asked the interviewees the same set of questions, scored their answers, and took notes. According to the panelists' declarations submitted in this case and their notes from the interviews, they thought Rizzo interviewed well, was knowledgeable about investigations, and demonstrated that he had a lot of second-level supervisory experience. (Def. 56.1 ¶¶ 155, 164, 170; Pl. 56.1 Resp. ¶¶ 155, 164, 170). Glick noted that Rizzo said he had "25 years of prior experience" and supervised a group of "50 detectives" and "7 support staff." (Def. 56.1 ¶ 156; Pl. 56.1 Resp. ¶ 156). Rizzo received scores of 76, 74, and 80 from Glick, Mulhall, and Coschignano, respectively, for an average of 77. (Def. 56.1 ¶¶ 152, 163, 169; Pl. 56.1 Resp. ¶¶ 152, 163, 169).

The interviewers thought that Doran did not provide a responsive answer to the first question of the interview (which asked him why he would like the position), did not interview well, and gave very brief responses without elaborating. (Def. 56.1 ¶¶ 157-58, 165-67; Pl. 56.1 Resp. ¶¶ 157-58, 165-67). Glick noted that Doran said the largest group he ever supervised was "10-14." (Id.). Doran received scores of 51, 48, and 53 from Glick, Mulhall, and

Coschignano, respectively, for an average of 51. (Def. 56.1 ¶¶ 152, 163, 169; Pl. 56.1 Resp. ¶¶ 152, 163, 169).

Glick and Mulhall noted that Linn did not have experience leading internal investigations or improving internal controls and that the largest group Linn ever supervised was 8 people. (Def. 56.1 ¶¶ 160, 168; Pl. 56.1 Resp. ¶¶ 160, 168). Glick noted that Linn said he "never managed" undercover operations. (Id.). Coschignano similarly noted that Linn expressed a lack of experience in these areas. (Def. 56.1 ¶ 172; Pl. 56.1 Resp. ¶ 172). Linn received scores of 50, 47, and 50 from Glick, Mulhall, and Coschignano, respectively, for an average of 49. (Def. 56.1 ¶¶ 152, 163, 169; Pl. 56.1 Resp. ¶¶ 152, 163, 169).

Coschignano called Rizzo's three references and they gave positive evaluations. (Def. 56.1 ¶¶ 175-78; Pl. 56.1 Resp. ¶¶ 175-78). She signed a nomination form for him on January 28, 2014. (Def. 56.1 ¶¶ 179-80; Pl. 56.1 Resp. ¶¶ 179-80). He started as MI-4 at the DMI NYC office on May 5, 2014. (Def. 56.1 ¶ 182; Pl. 56.1 Resp. ¶ 182).

i. Linn's Jewish Ancestry Discrimination Claims Are Dismissed as Abandoned

Linn's Jewish ancestry discrimination claims under section 1983, NYSHRL, and NYCHRL are dismissed. Defendants argue that no inference of Jewish ancestry discrimination can be drawn based plaintiffs' evidence. They point out that one of the interview panel members, Glick, was Jewish and that Linn testified no panel member ever said anything derogatory about his Jewish ancestry to him. (Def. Br. at 22). In response to defendants' assertion, plaintiffs have failed to point to evidence which, if believed, would enable a reasonable jury to find in Linn's favor. Indeed, plaintiffs do not address defendants' arguments with respect to the Jewish ancestry discrimination claims in their response brief and thus the

Court deems that they have abandoned those claims.[8]  See Felix, 344 F. Supp. 3d at 654;

Jackson, 766 F.3d at 196.

> ii. Doran and Shaporov's National Origin Discrimination
>     Claims Are Dismissed

Doran and Shaporov assert national origin discrimination claims under section

1983.  These claims are dismissed.  Assuming Doran and Shaporov have made out a prima facie

claim of discrimination, defendants have proffered a legitimate nondiscriminatory reason for

promoting Rizzo, namely that a panel of three interviewers agreed that Rizzo's was the best

interview out of those who met the minimum qualifications.  (Cosch. Decl. ¶¶ 80-87).  In support

of this purported reason, defendants have presented evidence documenting Rizzo's

qualifications, such as his resume and the panelists' evaluations, which gave Rizzo an average

score of 77, Doran a score of 51, and Linn a score of 49.  They have also presented the

interviewers' declarations and contemporaneous notes summarizing their impressions of the

candidates.  This evidence satisfies defendants' burden of production.

In response to defendants' purported reason, plaintiffs do not present evidence

that the reason proffered was a pretext for discrimination based on national origin.  Plaintiffs

argue that based on the evidence, "a jury could find that Coschignano intentionally selected a

kinfolk to 'clean house,' supporting an inference of ancestral discrimination.  That is, she could

only trust a fellow Italian and old pal to scrutinize the undesirables in DMI."  (Pl. Br. at 37).

Based on this record, any such conclusion would be premised entirely on speculation.  As this

Court discussed in dismissing Doran, Shaporov, and Baez's race and national origin

---

[8] In summarizing the disputes of fact about Rizzo's promotion, for example, plaintiffs state "Defendants' claimed reasons for hiring Rizzo are suspect and raise multiple genuine disputes of fact requiring denial of summary judgment for Plaintiffs' age and national origin claims under section 1983 and the NYSHRL."  (Pl. Br. at 41).  To the extent that plaintiffs intended for their arguments regarding their race or national origin discrimination claims to apply to Linn's Jewish ancestry claims, the Jewish ancestry claims are dismissed for the same reasons that the race and national origin claims are dismissed.

discrimination claims related to the Canade promotion, plaintiffs' evidence does not allow a reasonable jury to conclude that defendants' purported reason for promoting Rizzo was based on his Italian ancestry rather than Coschignano's prior relationship with him. The reasons discussed above with respect to Doran, Shaporov, and Baez's race and national origin discrimination claims related to the Canade promotion apply with equal force to Doran and Shaporov's national origin discrimination claims related to the Rizzo promotion. Doran and Shaporov's national origin discrimination claims are accordingly dismissed.

### E. Thomas Cheriyan and the September 2014 MI-3 Position

Thomas Cheriyan was promoted to the September 2014 MI-3 position. Based on this promotion, the remaining failure to promote claims consist of the following: Doran, Baez, Linn, and Shaporov's race discrimination claims, Baez's national origin discrimination claims, Baez's sex discrimination claims, and Linn's Jewish ancestry discrimination claims. These claims arise under section 1983, NYSHRL, and NYCHRL.

These claims are dismissed. Defendants argue that plaintiffs have not presented evidence on each of these claims that would permit a reasonable jury to find in plaintiffs' favor. (Def. Br. at 23-26). Specifically, they present evidence that Cheriyan was promoted because of his qualifications and supervisory experience and argue that plaintiffs do not present evidence that his promotion was motivated by discrimination. (Id.). In response to defendants' motion, plaintiffs have not pointed to evidence, which, if believed, would entitle a reasonable jury to find in favor of Doran, Baez, Linn, or Shaporov on their discrimination claims based on the Cheriyan promotion. Indeed, plaintiffs do not address defendants' arguments with respect to these claims in their response brief and the Court accordingly deems that plaintiffs have abandoned these claims. See Felix, 344 F. Supp. 3d at 654; Jackson, 766 F.3d at 196.

## II. Plaintiffs' Retaliation Claims

All plaintiffs bring retaliation claims under section 1983, NYSHRL, and NYCHRL against Coschignano, Coyne, Cox, Chiesa, Rizzo, Tompkins, and Byrnes in their individual capacities. Each plaintiff argues that Coschignano, Byrnes, and Coyne retaliated against them by promoting Thomas Cheriyan to an MI-3 position in September 2014.[9] (Pl. Br. at 45-47).

Each plaintiff also alleges additional individualized retaliatory conduct by certain defendants. Doran argues that Byrnes and Coschignano retaliated against him by removing his supervisory duties in April 2014. (Pl. Br. at 44-45). Baez argues that Rizzo and Coyne retaliated against her. (Pl. Br. 49-51). The retaliatory conduct she alleges includes being heavily monitored, having her personal file accessed without permission, being accused of fraud and time theft, having her telecommuting investigated, having her work attendance tracked, being leered at, being threatened with a counseling memo, and having her Qui Tam cases taken away. (Id.). Linn argues that defendants Coyne, Byrnes, Coschignano, Chiesa, and Rizzo retaliated against him. (Pl. Br. at 47-49). The retaliatory conduct he alleges includes being transferred to

---

[9] Doran, Baez, and Linn each assert retaliation claims based in part on the promotion of Thomas Cheriyan to the MI-3 position. (Pl. Br. at 45-47). Defendants argue that plaintiffs' complaint does not allege that this promotion was retaliatory, and thus that they did not have sufficient notice of this basis for plaintiffs' retaliation claims. (Def. Br. at 19). Though plaintiffs could have "been clearer in articulating this theory of retaliation," the Court concludes that the defendants were "on notice that [plaintiffs] intended to pursue such an argument." Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 89–90 (2d Cir. 2010); see also Simpson v. Town of Warwick Police Dep't, 159 F. Supp. 3d 419, 441 (S.D.N.Y. 2016), appeal dismissed (June 15, 2016) ("[C]laims that are 'related to or are mere variations of previously pleaded claims . . . may be raised on a motion for summary judgment where the defendant was clearly on notice from the complaint and was not unfairly prejudiced."). Specifically, in plaintiffs' Second Amended Complaint, under the heading "Discrimination Complaints and Defendants' Responses," plaintiffs describe the discrimination complaints made by plaintiffs and the actions that defendants took in response, including Coschignano making "quick minority promotions" such as the promotion of Cheriyan to MI-3. (SAC ¶¶ 132-50). In addition, in enumerating the claims, Cheriyan's promotion is described as "a band-aid response to previous discrimination complaints by Plaintiffs and other OMIG employees," (SAC ¶ 213), and as "retaliation" for "complaints of discrimination" in numerous locations, (See, e.g., SAC ¶¶ 243, 337). Plaintiffs also described Cheriyan's promotion to MI-3 as "retaliation" in their depositions. (See, e.g., Doran Dep. at 241-43; Baez Dep. at 172-76).

work under Bedell, receiving an unsatisfactory evaluation, being charged with 1.5 hours of unauthorized leave without pay, and being subjected to a four-hour case review with multiple supervisors. (Id.).

Section 1983 and NYSHRL retaliation claims are analyzed using the same standards. Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (noting that Title VII and NYSHRL retaliation claims are analyzed under the same standards); Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 91 (2d Cir. 2015) "[T]he elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII."). The NYCHRL is construed more liberally than section 1983 or NYSHRL, which serve as the floors below which the NYCHRL must not fall. Williams v. New York City Hous. Auth., 61 A.D.3d 62, 66-67 (2009).

Retaliation claims under section 1983 and NYSHRL are evaluated under a three-step burden-shifting framework similar to the one discussed above in relation to the failure to promote discrimination claims. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). "To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that '(1) [he or] she engaged in protected activity; (2) the employer was aware of that activity; (3) the [plaintiff] suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" Kelly, 716 F.3d at 14–15. To satisfy this initial burden, a plaintiff must present evidence "sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute, 420 F.3d at 173. At the prima facie stage, "[a] retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." Vega., 801 F.3d at 90–91.

"An employee's complaint may qualify as protected activity . . . so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Kelly, 716 F.3d at 14–15. "[A]n adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega, 801 F.3d at 90. "[A]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 25 (2d Cir. 2014); Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) ("[E]ven minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable.").

"If a plaintiff sustains the initial burden, a presumption of retaliation arises" and the burden shifts to the defendant "to articulate a legitimate, non-retaliatory reason for the adverse employment action." Jute, 420 F.3d at 173. If the employer satisfies that burden, "the presumption of retaliation dissipates." Id. The plaintiff must then show that "retaliation was a 'but-for' cause of the employer's adverse action." Vega, 801 F.3d at 90–91. The plaintiff need not establish "that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Id. At this third step, "[t]he temporal proximity" between the adverse action and the protected activity "without more . . . is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext." El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010)

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that [he or] she took an action opposing her employer's discrimination, . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik, 715 F.3d at 112. "[T]he retaliation inquiry under the CHRL is 'broader'

than its federal counterpart." Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010).  Under the NYCHRL, "retaliation in any manner is prohibited, and [t]he retaliation . . . need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment." Id. (internal quotation marks omitted).  "The proper inquiry under the CHRL [does not] tak[e] account of whether the employer's conduct was sufficiently deterrent so as to be material[ ]." Id. (internal quotation marks omitted).  Under the NYCHRL, a plaintiff must prove that "the conduct is caused at least in part by . . . retaliatory motives," and the defendant's conduct must rise to "more than 'petty slights or trivial inconveniences.'" LeBlanc v. United Parcel Serv., No. 11 CIV. 6983 KPF, 2014 WL 1407706, at *19 (S.D.N.Y. Apr. 11, 2014).

A. Plaintiffs' Discrimination Complaints

Doran and Baez first submitted complaints at OMIG alleging discrimination on February 11, 2014.  (Pl. Ex. 49).  Doran's complaint alleged age discrimination because he "was passed over for promotion to the [MI-3] position despite being highly more qualified than the younger person that received the promotions."  (Pl. Ex. 49).  Baez's complaint alleged that she was "passed over in promotions and discriminated against" because she is "hispanic and female." (Pl. Ex. 49).  Linn filed a discrimination grievance on February 19, 2014 alleging age discrimination because he "was passed over for promotion to the [MI-3] position despite being highly more qualified than two younger persons that received the promotions."  (Pl. Ex. 76). Byrnes testified that he was aware of the complaints.  (Byrnes Dep. at 164-66).  Coschignano both received complaints via email and was alerted to complaints by PEF via email.  (Pl. Exs. 49, 123).

The PEF email stated "Recent promotions in OMIG have unleashed a torrent of bent up resentment among employees, especially [MIs], who allege the existence of a culture of racism and ageism that has been festering a long time. You may be aware that at least five grievances have been filed and more are expected soon. Morale at the office has never been lower." (Pl. 56.1 Resp. ¶ 195).

Baez testified that a group of six or seven employees, including Baez and Shaporov, brought their grievances to Coschignano in her office. (Pl. 56.1 Resp. ¶ 195). She testified that Coschignano "went crazy" and started shouting, telling the group "don't give those to me," and instructing them to give the grievances to Coyne instead. (Id.). After filing his grievance, Doran told Byrnes that he was being discriminated against and Byrnes said that "he doesn't care at all" and "you have no civil rights." (Pl. 56.1 Resp ¶ 205). Shaporov testified he was present for this interaction. (Id.).

On May 1, 2014, PEF held a rally outside the NYC office to protest discriminatory practices and seek Cox's resignation. (Pl. 56.1 Resp. ¶ 195). Right before the rally, Coschignano warned Shaporov not to attend the rally and said "Alex don't—don't go outside the building to demonstrate because it's going to cost you your job" and "you will see what's going to happen with those people, you'll see if you're going to go." (Id.).

### B. Shaporov's Retaliation Claims Are Dismissed as Abandoned

Shaporov's retaliation claims under section 1983, NYSHRL, and NYCHRL are dismissed. Defendants assert that Shaporov does not have evidence of retaliation by any defendant, which, if believed, would allow a reasonable jury to find in his favor. (Def. Br. at 36-50). Defendants point out, among other things, that the alleged retaliatory conduct occurred before any defendant was aware of Shaporov's discrimination complaints. (Id.). Because in

response to defendants' assertions, plaintiffs have not pointed to evidence that would enable a reasonable fact finder to conclude that Shaporov was retaliated against, defendants are entitled to summary judgment.  Indeed, plaintiffs do not address defendants' arguments with respect to Shaporov's retaliation claims in their response brief, and the Court deems that they have abandoned those claims.  See Felix, 344 F. Supp. 3d at 654; Jackson, 766 F.3d at 196.

### C.  The Retaliation Claims Against Rizzo Are Dismissed

Defendants argue that all retaliation claims should be dismissed against Coyne, Byrnes, and Rizzo because they were not aware of Doran, Baez, or Linn's discrimination complaints.  As described below, plaintiffs have pointed to evidence that would allow a reasonable jury to infer that Byrnes and Coyne had knowledge of the complaints at the time that the alleged retaliatory conduct occurred.  However, plaintiffs have pointed to no evidence that Rizzo was aware of their discrimination complaints.  The retaliation claims against Rizzo are dismissed because plaintiffs accordingly cannot make out a prima facie case of retaliation against him under section 1983 or NYSHRL and cannot establish a causal nexus between the complaints and his alleged retaliatory conduct under NYCHRL.  See Kelly, 716 F.3d at 14–15 ("To make out a *prima facie* case of retaliation [under section 1983 and NYSHRL], a plaintiff must demonstrate that . . . the employer was aware of [plaintiff's protected] activity."); LeBlanc, 2014 WL 1407706, at *19 (noting that under the NYCHRL, a plaintiff must "prove the conduct is caused at least in part by . . . retaliatory motives").

### D.  The Retaliation Claims Against Byrnes, Coyne, and Coschignano Survive

Doran, Baez, and Linn assert retaliation claims under section 1983, NYSHRL, and NYCHRL against Byrnes, Coyne, and Coschignano.  These claims survive insofar as they are related to the promotion of Thomas Cheriyan to MI-3.  The Court notes that Doran, Baez, and Linn each present evidence of a host of other individualized retaliatory conduct to support

these retaliation claims and that such evidence is relevant to an assessment of the merits of their retaliation claims. See Rivera, 743 F.3d at 25 ("[A]lleged acts of retaliation must be evaluated both separately and in the aggregate."). However, the Court need not address that conduct in order to conclude that their retaliation claims survive against Byrnes, Coyne, and Coschignano. The Court will discuss the individualized conduct as needed in its later analysis of plaintiffs' claims against the other defendants.

Cheriyan was promoted to the subject MI-3 position temporarily on September 25, 2014 and permanently in late 2015. (Def. 56.1 ¶ 206; Pl. 56.1 Resp. ¶ 206). During the summer of 2014, Coschignano learned that an MI-3 in the DMI NYC office was taking leave from OMIG to perform military service in Iraq. (Def. 56.1 ¶ 195; Pl. 56.1 Resp. ¶ 195). She, Byrnes, and Coyne discussed who to promote to the vacant position and jointly decided on Cheriyan. (Cosch. Decl. ¶ 105; Coyne Decl. ¶ 15; Byrnes Decl. ¶ 23; Cosch. Dep. at 451; Byrnes Dep. at 164-65). Cheriyan was not interviewed for the position and HR classified his appointment as "alternate recruitment." (Pl. 56.1 Resp. ¶ 206).

Doran, Baez, and Linn have made out a prima facie case of retaliation against Coschignano, Byrnes, and Coyne based on the Cheriyan promotion. The first element of the prima facie case, that plaintiffs "engaged in protected activity," is satisfied because there is no dispute that Doran and Baez filed discrimination complaints on February 11, 2014 and that Linn filed a discrimination complaint on February 19, 2014. On the second element, which requires proof that defendants were "aware of that activity," there is evidence that Coschignano either received or was alerted to complaints via email (Pl. Exs. 49, 123) and Byrnes testified that he was aware of the complaints (Byrnes Dep. at 164-66). Though Coyne denies knowledge of the complaints, there is testimony that Coschignano instructed those employees who came to her

office with grievances to give the grievances to Coyne instead. (Pl. 56.1 Resp ¶ 195). Additionally, Coschignano, Byrnes, and Coyne's testimony and declarations reveal that they all consulted with each other about the MI-3 position and jointly decided to promote Cheriyan. (Cosch. Decl. ¶ 105; Coyne Decl. ¶ 15; Byrnes Decl. ¶ 23; Cosch. Dep. at 451; Byrnes Dep. at 164-65). From that evidence, a reasonable jury could infer that Coyne also had knowledge of plaintiffs' complaints. See Mandell v. Cty. of Suffolk, 316 F.3d 368, 384 (2d Cir. 2003) ("[A] trier of fact does not have to believe [the defendant's] denials of knowledge, since in making his 1997 promotion decision [the defendant] consulted police chiefs who were aware of [the protected activity].").

The third element, that plaintiffs suffered "materially adverse action," is satisfied for each plaintiff because plaintiffs were passed over for promotion in favor of Cheriyan. See id. ("Adverse employment actions include both refusals to promote and demotions."). Lastly, the fourth element, requiring a "causal connection" between the adverse action and the protected activity, is satisfied by the fact that plaintiffs made discrimination complaints in mid-February 2014 and Cheriyan was promoted to MI-3 six months later in September. Such evidence of "temporal proximity" suffices to establish causation at the prima facie stage especially in light of documentary evidence that this MI-3 position was the first one that became available after plaintiffs made their complaints. (Pl. 56.1 ¶¶ 179-80; 528-30; Def. 56.1 Resp. ¶¶ 179-80; 528-30; Pl. Ex. 50); see Mandell, 316 F.3d at 384 ("In a failure to promote case, . . . the opportunities for retaliation do not necessarily immediately present themselves."); cf. Kopchik v. Town of E. Fishkill, New York, 759 F. App'x 31, 35–36 (2d Cir. 2018) ("A nine-month gap may not be too long to support [an inference of causation], particularly given that Kopchik alleges the Town's

mechanism for retaliating was a Town Board resolution . . . [and] [i]t is plausible that [the resolution] would take longer to plan and formally adopt.").

Defendants' purported legitimate non-retaliatory reason for promoting Cheriyan is that Cheriyan had "been attending weekly managers' meeting[s]," and "was already supervising staff and was aware of management's vision for DMI." (Cosch. Decl. ¶¶ 96-97, 106; Pl. Ex. 83). Assuming defendants satisfy their burden of presenting evidence of a legitimate non-retaliatory reason, plaintiffs present sufficient evidence from which a reasonable jury could infer that these reasons were a pretext and that retaliation was a "but-for" reason for promoting Cheriyan. For one, they point to the evidence previously discussed that both Linn and Doran also had supervisory experience at OMIG. Additionally, they present evidence of Cheriyan's poor performance in the months leading up to his promotion and at his previous interviews. In his evaluation for 2013, for instance, Coschignano stated "[o]ver the course of the last several months of Mr. Cheriyan's evaluation period, DMIG Coschignano has personally observed that Mr. Cheriyan has been late on several significant assignments for which he had responsibility to insure [sic] that his staff completed the assignments in a timely manner." (Pl. 56.1 Resp. ¶ 196).

After Cheriyan's interview in August 2013 for the MI-3 position that went to Bedell, he received the lowest score with an average of 58 (compared to Linn's 87, Baez's 84, and Doran's 64). (Pl. 56.1 Resp. ¶ 196). He again scored the lowest out of all candidates when he interviewed for the MI-4 position that went to Rizzo in December 2013, with an average of 41 points (compared to Doran's 51 and Linn's 49). (Id.). In Coschignano's notes from that interview, Coschignano summarized that "Tom was very inarticulate. At times it was very difficult to understand his responses. Many responses were not appropriate to address the question. He dwelled on his importance in DMI. His expertise related to investigations is from

the 80's and 90's. . . . His responses did not articulate his supervisory mentoring abilities." (Id.). As additional evidence of pretext, plaintiffs present evidence that Cheriyan himself was surprised he was promoted (Pl. Ex. 71), that Cheriyan was promoted through "alternate recruitment" without interviewing any other candidates (Pl. 56.1 Resp. ¶ 206), and that when Doran supervised Cheriyan in 2012, he requested that Cheriyan be removed from his investigation team due to Cheriyan's poor performance (Doran Decl. ¶¶ 7-10).

As evidence of retaliatory animus, plaintiffs first point to the evidence of "temporal proximity" discussed in relation to plaintiffs' prima face case. They additionally present evidence that Coschignano "went crazy" and shouted at a group of employees when they brought grievances to her office and that when Doran complained to Byrnes, Byrnes told Doran "he doesn't care at all" and "you have no civil rights." (Pl. 56.1 Resp ¶ 205). They also present evidence that during the PEF rally in protest of discrimination at DMI, Coschignano warned Shaporov not to attend the rally "because it's going to cost you your job" and "you will see what's going to happen with those people, you'll see if you are going to go." (Pl. 56.1 Resp. ¶ 195). This evidence of pretext, temporal proximity, and defendants' statements, considered in its totality, is a sufficient basis upon which a reasonable jury could conclude that retaliation was a but-for reason for selecting Cheriyan rather than plaintiffs for the MI-3 promotion. Cf. Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013) ("[Plaintiff's] evidence of [defendant's] inconsistent explanations for [plaintiff's] termination and the very close temporal proximity between her protected conduct and her termination are sufficient to create a triable issue of fact with regard to whether the [plaintiff's] complaint was a but-for cause of her termination.").

### E. The Retaliation Claims Against Cox, Chiesa, and Tompkins Are Dismissed

Per this Court's discussion above, all retaliation claims against Rizzo are dismissed, while Doran, Baez, and Linn's retaliation claims against Byrnes, Coyne, and Coschignano survive. What remains are Doran, Baez, and Linn's retaliation claims against Chiesa, Cox, and Tompkins. These claims are also dismissed.

In response to defendants' arguments in support of summary judgment dismissing the retaliation claims against Cox, Chiesa, and Tompkins, plaintiffs have not pointed to evidence which, if believed, would entitle a reasonable jury to find in their favor. Indeed, Doran, Baez, and Linn have made no argument that Tompkins or Cox retaliated against them. (Pl. Br. at 43-51). Doran, Baez, and Linn's retaliation claims against Tompkins and Cox are therefore dismissed as abandoned. See Felix, 344 F. Supp. 3d at 654; Jackson, 766 F.3d at 196. Similarly, plaintiffs have pointed to no evidence and made no argument that Chiesa retaliated against Doran or Baez. Doran and Baez's claims against Chiesa are also dismissed as abandoned.

The only retaliation claims that remain to be discussed, therefore, are Linn's claims against Chiesa under section 1983, NYSHRL, and NYCHRL. These claims are dismissed because plaintiffs do not present evidence of Chiesa's involvement in the alleged retaliatory conduct. The only form of retaliation that plaintiffs argue Chiesa was involved in was an unsatisfactory evaluation that Linn received from Bedell. (Pl. Br. at 48). At some point after Bedell was promoted to MI-3, Bedell began acting as Linn's direct supervisor. (Def. 56.1 ¶ 291; Pl. 56.1 Resp. ¶ 291). On July 29, 2014, Bedell gave Linn a performance evaluation with an "unsatisfactory" rating. (Id.). His evaluation stated that Linn "routinely failed to meet established deadlines for multiple projects/cases" and described the missed deadlines. (Def. 56.1 ¶ 294; Pl. 56.1 Resp. ¶ 294). The evaluation also stated that "Linn was found to leave work early

at 4:00 PM [on 7/11/2014] . . . Linn was advised to charge the missing 1½ hours as Unauthorized Leave Without Pay." (Def. 56.1 ¶ 295; Pl. 56.1 Resp. ¶ 295).

Even assuming Bedell did retaliate against Linn by giving him this evaluation, plaintiffs have not presented evidence from which a reasonable jury could conclude that Chiesa was involved in Bedell's retaliatory conduct in any way. Chiesa denies involvement and the only evidence plaintiffs present in response is that Bedell forwarded the evaluation to Chiesa via email. (See Pl. 56.1 Resp. ¶ 291). There is no evidence that Chiesa did anything with the evaluation or provided any feedback. This evidence is not sufficient to establish that Chiesa was "personally involved" or "actually participate[d]" in the retaliatory act of giving an unsatisfactory review, as required by section 1983, NYSHRL, and NYCHRL for liability to attach. See Feingold, 366 F.3d at 157–59 (citing Tomka, 66 F.3d at 1317). Thus, Linn's retaliation claims against Chiesa are dismissed.

## III. Shaporov's Disparate Treatment Discrimination Claims Are Dismissed as Abandoned

Shaporov alleges a claim of discrimination based on disparate treatment under section 1983, NYSHRL, and NYCHRL against Coyne and the same claim against Rizzo under section 1983 and NYSHRL only. These claims are dismissed. Defendants have argued that Shaporov has not presented sufficient evidence of disparate treatment by Rizzo or Coyne (Def. Br. at 50-55) and in response, plaintiffs have not pointed to evidence that would allow a reasonable jury to find in their favor. Indeed, plaintiffs do not respond to those arguments in their response brief. The Court therefore deems these claims abandoned. See Felix, 344 F. Supp. 3d at 654; Jackson, 766 F.3d at 196.

## IV. Shaporov's Hostile Work Environment Claims

Shaporov asserts claims against Rizzo and Coschignano for creating a hostile

work environment under section 1983, NYSHRL, and NYCHRL. Shaporov has abandoned his hostile work environment claims under section 1983 and the NYSHRL because he has not responded to defendants' arguments on those claims in his response brief. (Def. Br. at 50-55); see Felix, 344 F. Supp. 3d at 654; Jackson, 766 F.3d at 196. For the same reason, he has abandoned his claim against Coschignano. What remains is Shaporov's one claim of hostile work environment under the NYCHRL against Rizzo.

"To prevail on liability [under the NYCHRL], the plaintiff need only show differential treatment,—that [he or] she is treated less well—because of a discriminatory intent." Mihalik, 715 F.3d at 110 (internal quotation marks omitted). NYCHRL hostile work environment claims are construed more "liberally" than section 1983 and NYSHRL claims. Id. at 109. For instance, unlike section 1983 or NYSHRL, the NYCHRL does not require a plaintiff to establish that a defendant engaged in "severe and pervasive conduct" to prevail on a hostile work environment claim. Id. at 108. A defendants' alleged mistreatment of a plaintiff can be actionable under the NYCHRL even if it is "neither severe nor pervasive." Id. at 113-15. Indeed, "even 'a single comment' may be actionable in appropriate circumstances." Id. A court may grant summary judgment in "truly insubstantial cases" where "a reasonable jury could not interpret the alleged comments as anything 'more than petty slights or trivial inconveniences.'" Id. (summary judgment inappropriate where "a jury could reasonably find that [defendant's] behavior constituted more than 'petty slights or trivial inconveniences,' and that it was sexually-charged conduct that subjected [plaintiff] to a different set of employment conditions than her male colleagues").

Shaporov's hostile work environment claim against Rizzo under the NYCHRL survives. Shaporov makes out a hostile work environment claim under the NYCHRL because he

has presented evidence from which a reasonable jury could conclude that Rizzo treated him "less well" because of his Russian national origin.

Rizzo was assigned as one of Shaporov's supervisors in May 2014 and supervised Shaporov until September 2015. (Def. 56.1 ¶ 356; Pl. 56.1 Resp. ¶ 356). During Shaporov's time at OMIG, he worked on a multi-agency task force with Health and Human Services— Office of the Inspector General, which involved overtime work. (Def. 56.1 ¶¶ 364-65; Pl. 56.1 Resp. ¶¶ 364-65). OMIG has a pool of state cars for NYC employees and Shaporov often used a state car to complete his overtime work. (Def. 56.1 ¶¶ 366-67; Pl. 56.1 Resp. ¶¶ 366-67). As evidence of mistreatment, Shaporov presents testimony that Rizzo denied Shaporov the use of a state car on multiple occasions and that Shaporov was unable to participate in task force assignments on about 5-10 occasions because he could not secure a ride. (Def. 56.1 ¶¶ 367, 374; Pl. 56.1 Resp. ¶¶ 367, 374; Pl. 56.1 ¶¶ 550-53). Rizzo also accused Shaporov of fabricating additional overtime and did not approve his overtime on numerous occasions, which led to Shaporov working without pay on those occasions because "the case was important." (Id.). On multiple occasions and in the presence of other supervisors, Rizzo accused Shaporov of lying about various things, including his use of the state car and vacation time. (Pl. 56.1 ¶ 554). Rizzo also accused Shaporov of pretending to be a law enforcement officer when participating in investigations in front of Coyne. (Pl. 56.1 ¶ 555).

As evidence that this mistreatment was the result of discriminatory animus, Shaporov testified that Rizzo told him "Russians cannot be trusted," criticized his English-speaking skills by saying things like "Come on, spit it out, spit it out. What, you can't talk English?," and critiqued his conduct by saying things like "maybe it's done in the Soviet Union, but it's not done in the United States." (Def. 56.1 ¶ 379; Pl. 56.1 Resp. ¶ 379; Pl. 56.1 ¶¶ 546-

49).  Linn testified that he observed that Shaporov was "very upset" after Rizzo made disparaging comments about Russians in a meeting, which corroborates Shaporov's testimony. (Id.).

Though the NYCHRL is not a "general civility code," even a single comment can give rise to liability if it suggests discrimination.  See Mihalik, 715 F.3d at 110, 113–15.  Here, a reasonable jury could infer based on Rizzo's treatment of Shaporov and Rizzo's multiple comments about Russians and Shaporov's accent that Shaporov suffered "more than petty slights or trivial inconveniences."  See id.  Shaporov's hostile work environment claim against Rizzo under the NYCHRL accordingly survives.

CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment (Doc. 160) is GRANTED in part and DENIED in part.  The following claims survive: Doran and Linn's age discrimination claims under the NYSHRL and NYCHRL against Coschignano related to Bedell's promotion to the June 2013 MI-3 position; Doran, Baez, and Linn's retaliation claims under section 1983, NYSHRL, and NYCHRL against Coschignano, Byrnes, and Coyne; Shaporov's hostile work environment claim under the NYCHRL against Rizzo; and Doran's (unchallenged) ADEA claim for injunctive relief against Rosen.  All other claims have been dismissed either at the motion to dismiss stage or in this Opinion.  The Clerk is directed to terminate defendants' motion.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 27, 2019